**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MALIK BOWERS** | : | **CIVIL ACTION** |
|     **Petitioner** | : | |
| **v.** | : | **NO. 2:13-cv-05550-BMS** |
| | : | |
| **MICHAEL WENEROWICZ, et al.** | : | **(Habeas § 2254)** |

**MEMORANDUM OF LAW IN SUPPORT OF PETITION**
**UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS**

**Table of Contents**

I.     INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.    PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.   TESTIMONY AND PRIOR STATEMENTS OF THE PRINCIPAL WITNESSES
      AGAINST PETITIONER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.    Witnesses Relating to the Kidnapping and Killing of Andrew Haynes ("the
         Dread"). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

         1.    Police and Forensic Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

         2.    Testimony of Clayton Duncan ("Jamaica") at Petitioner's Trial. . . . . . . 11

         3.    Testimony of Clayton Duncan ("Jamaica") at the Trial of Allister
            Durrante ("Trinidad"). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

         4.    Testimony and Statements of Aloysius ("Stanley") Hall. . . . . . . . . . . . . 14

         5.    Testimony and Statements of Selvan Sylvester Haynes. . . . . . . . . . . . . 16

         6.    Felicia Brokenbrough – "Excited Utterance" Hearsay Testimony and
            Stipulation at Trial; Testimony at Allister Durrante's Trial. . . . . . . . . . 17

         7.    Testimony and Statements of Rasheema Washington Relating to
            Kidnapping and Assaults upon Haynes. . . . . . . . . . . . . . . . . . . . . . . . . 17

**Table of Contents (Continued)**

III. TESTIMONY AND PRIOR STATEMENTS OF THE PRINCIPAL WITNESSES
AGAINST PETITIONER (CONTINUED)

    B.    Testimony Relating to Alleged Gun Possession Prior to and After  Haynes's
Killing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

IV. ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    A.    Standards for Decision Under 28 U.S.C. § 2254. . . . . . . . . . . . . . . . . . . . . . . . 21

    B.    Argument With Respect to Specific Grounds for Relief Alleged. . . . . . . . . . . . 23

            Ground One:        Petitioner was deprived of due process of law under
the Fifth and Fourteenth Amendments  by the trial
court's charge (and similar statements by the
prosecution), pursuant to which it was reasonably
likely that the jury believed that proof of a specific
intent to kill on Petitioner's part was not necessary to
convict Petitioner of first degree murder as
accomplice or co-conspirator. . . . . . . . . . . . . . . . . . . . . . . 23

            Ground Two:        Trial and direct appeal counsel rendered ineffective
assistance under the Fifth,  Sixth and Fourteenth
Amendments by failing to (a) correctly and adequately
raise and argue Petitioner's claim that the court's jury
charge effectively relieved the prosecution of its
burden of proving specific intent in the case of
accomplice and co-conspirator liability for first degree
murder, and (b) object to the prosecutor's arguments
which were based upon the same fundamental
constitutional error. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

            Ground Three:      Trial counsel rendered ineffective assistance by failing
to have the former testimony of unavailable witness
Felicia Brokenbrough read to the jury to impeach the
Commonwealth's time-line and Rasheema
Washington's  story, and by failing to impeach
witnesses Hall, Duncan, Washington and Selvan
Haynes  by reference to their former testimony and
statements.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**Table of Contents (Continued)**

IV.   ARGUMENT (CONTINUED)

     B.    Argument With Respect to Specific Grounds for Relief Alleged (Continued)

          Ground Four:      Petitioner was deprived of due process of law by virtue of his conviction of first degree murder upon evidence which was legally insufficient to provide proof beyond a reasonable doubt that he specifically intended to kill the decedent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

          Ground Five:      Direct appeal counsel was ineffective for inadequately arguing the due process/insufficiency issue as a matter of Pennsylvania law and constitutional due process, and for failing to properly seek review of the Superior Court's failure to decide the matter as to *Petitioner*, as opposed to his co-defendant Rasheed Simpson. . . . . . . . . 54

          Ground Six:      Trial and direct appeal counsel rendered ineffective assistance by failing to object to the prosecution's use of its peremptory strikes, make a full record in support of that objection, or otherwise pursue Petitioner's claim of racially motivated jury selection under Batson v. Kentucky, and the Fifth, Sixth and Fourteenth Amendments. . . . . . . . . . . . . . . . . . . . . . . . . . . 56

          Ground Seven:      Petitioner was deprived of due process of law by virtue of the admission of prejudicial and irrelevant evidence concerning his unrelated purchase and alleged later possession of a certain firearm. . . . . . . . . . . 72

          Ground Eight:      Both trial and direct appeal counsel were ineffective for failing to make and/or properly support arguments against admission of testimony purporting to connect Petitioner to a certain nine millimeter weapon. . . . . . . . . 75

          Ground Nine:      The cumulative prejudice from the foregoing constitutional violations was sufficient to require that Petitioner be granted a new trial. . . . . . . . . . . . . . . . . . . . . 77

V.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

## I.      INTRODUCTION

This matter is before the Court on Petitioner's timely first habeas petition under 28 U.S.C. § 2254, which was filed on September 23, 2013.  By order dated October 3, 2013, Petitioner was granted 60 days – that is, until December 2, 2013 – to file a brief in support of the Petition.  Upon Petitioner's motion for an additional extension of time, the Court, by order dated November 22, 2013, granted an additional 60 days – that is, until January 21, 2014.  This brief is being submitted in accordance with said order.

Substantively, this case raises important issues concerning due process and the ineffective assistance of counsel particularly affecting (a) the requirement that specific intent be proven beyond a reasonable doubt to support a first degree murder conviction, (b) the need for counsel to have unmasked a wholesale, coordinated alteration in the Commonwealth's time-line from one trial to the next, along with other significant changes in testimony, (c) alleged racially biased jury selection and (d) the use of highly prejudicial irrelevant evidence.  For all of the reasons set forth below, Petitioner respectfully requests that the Court grant  habeas relief.

## II.     PROCEDURAL HISTORY

Petitioner Malik Bowers is presently incarcerated in the State Correctional Institution at Graterford, Pennsylvania, having been convicted at CP-51-CR-1103162-1996 of first degree murder, robbery, kidnapping, criminal conspiracy and possession of an instrument of crime – all arising out of the December 8, 1993 slaying of Andrew Haynes ("The Dread") after a failed kidnapping-for-ransom attempt.  Petitioner was tried along with Rasheed Simpson by a death-qualified jury, the Honorable David N. Savitt presiding, December 2-22, 1997, and was represented at trial by Louis T. Savino, Jr.,  Esquire.  Bernard Siegel, Esquire, represented Rasheed Simpson and Assistant

4

District Attorney William Fisher, Esquire, represented the Commonwealth.

The jury's verdict as to guilt was rendered December 17, 1997.  On  December 22, 1997, after a penalty phase hearing, the same jury returned a verdict of life imprisonment for Petitioner, and death for Mr. Simpson.  N.T.  12/17/97, pp. 5-12; 12/22/84, pp. 7-9.  Immediately thereafter, Judge Savitt imposed sentence as follows: life imprisonment for murder (Count 1), 10-20 years for robbery (Count 2), 10-20 years for kidnapping (Count 3), 2½ -5 years for possession of an instrument of crime (Count 7) and 5-10 years for conspiracy (Count 10).  The sentences on Counts 2, 3, 7 and 10 were imposed consecutively to each other, but concurrently with the life sentence on Count 1.

On January 6, 1998, Mr. Savino filed a notice of appeal to the Superior Court for Petitioner (164 PHL 1998). During the pendency of the appeal, Mr. Savino petitioned to be relieved as counsel, and Edward C. Meehan, Jr., Esquire, was appointed in his stead.  Thereupon followed several appellate rounds in which counsel failed to file the brief for appellant, causing dismissal of the appeal, following which rights were restored in a PCRA proceeding, only to have the appeal dismissed again for failure to file a brief.  On the third such PCRA, the court appointed different counsel, Barbara Ann McDermott, Esquire and again restored Petitioner's direct appeal rights.

After filing a timely *nunc pro tunc* appeal on August 5, 2003 (2468 EDA 2003), Ms. McDermott did, thankfully, file a brief and Petitioner's direct appeal was finally heard on the merits. See Brief for Appellant  filed March 15, 2004 (R. 228a-258a)[1]. On September 9, 2004, the Superior Court affirmed judgment of sentence. See Superior Court Memorandum, Commonwealth v. Bowers,

---

[1]      Petitioner filed a comprehensive Reproduced Record in the Superior Court on appeal from denial of his PCRA petition, and for the convenience of the Court, will supply citations to the Reproduced Record pagination as well as to the original document.

2468 EDA 2003 (Habeas Petition[2], Attachment A), 863 A.2d 1219 (2004) (table).[3]  A timely petition for allowance of appeal to the Pennsylvania Supreme Court (498 EAL 2004) was denied on June 1, 2005.  Petitioner did not file a petition for certiorari with the United States Supreme Court. Accordingly, his direct appeal became final for purposes of the PCRA statute of limitations on August 29, 2005.  See 42 Pa.C.S.A. §9545(b)(3).

Petitioner then filed, with counsel, on August 11, 2006, within the one-year statute of limitations provided under 42 Pa.C.S.A. 9545(b)(1), a timely first Petition for Post Conviction Collateral Relief (hereinafter, PCRA Petition).[4]  On August 20, 2008, the Court of Common Pleas

---

[2]  Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody, filed September 23, 2013 herein.

[3]  Ms. McDermott raised the following questions in the Brief for Appellant in the Superior Court, and also in the subsequent Petition for Allowance of Appeal in the Supreme Court:

"Whether it was reversible error for the trial court to permit evidence of appellant's possession and purchasing of firearms?"

"Whether it was reversible error for the trial court to refuse a motion for a mistrial following the prosecutor's reference in closing argument to the killing being an execution?"

"Whether it was reversible error for the trial court to refuse to instruct the jury that a person cannot be held culpable for first degree murder as an accomplice or conspirator unless that person had the specific intent to kill?"

"Whether the evidence was sufficient to sustain the guilty verdicts?"

"Whether the verdicts were against the weight of the evidence?"

R. 236a, 265a.

[4]  Although this is technically the fourth PCRA Petitioner has filed concerning this particular conviction, the first three were merely for the purpose of restoring his direct appeal rights, and accordingly, this petition was considered to be Petitioner's first for purposes of timeliness and burden of proof.  See Commonwealth v. Lewis, 718 A.2d 1262, 1263-1264 (Pa.Super. 1998) – cited

_____

with approval in <u>Commonwealth v. Priovolos</u>, 746 A.2d 621, 624 (Pa.Super. 2000) and <u>Commonwealth v. Vega</u>, 754 A.2d 714, 716, n.3 (Pa.Super. 2000).

Petitioner raised the following issues in his PCRA petition:

1. Whether the Commonwealth misrepresented and suppressed material evidence concerning the decedent Andrew Haynes and witnesses Aloysius Hall and Tracena Copper, and committed other related prosecutorial misconduct during the questioning of Tracena Copper, in violation of due process under Fourteenth Amendment to the Constitution of the United States and under Article I, Section 9 of the Pennsylvania Constitution.

2. Whether trial and direct appeal counsel rendered ineffective assistance by failing to investigate, discover and use any available facts concerning Andrew Haynes' criminal history, Aloysius Hall's criminal history, and Tracena Copper's cooperation with governmental authorities prosecuting Petitioner, by failing to request a continuance after learning of Copper's involvement in the federal proceeding, and by failing to raise where appropriate at trial, post-trial, or on appeal the prosecutorial misconduct claims asserted in the previous issue.

3. Whether trial counsel rendered ineffective assistance by failing to have former testimony of unavailable witness Felicia Brokenbrough read to the jury as important impeachment of the Commonwealth's time-line and Rasheema Washington's story, and by failing to impeach witnesses Hall, Duncan, Washington and Selvan Haynes, by reference to their former testimony and statements.

4. Whether trial and direct appeal counsel rendered ineffective assistance by failing to object to the prosecution's use of its peremptory strikes, make a full record in support of that objection, and otherwise pursue Petitioner's claim of racially motivated jury selection under <u>Batson v. Kentucky</u>, and the Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States and under Article I, Sections 1, 6, 9, and 26 of the Pennsylvania Constitution.

5. Whether trial and direct appeal counsel were ineffective for failing to (a) correctly and adequately raise and argue Petitioner's claim that the court's jury charge effectively relieved the prosecution of its burden of proving specific intent in the case of accomplice and co-conspirator liability for first degree murder, and (b) object to the prosecutor's arguments which were based upon the same fundamental constitutional error.

6. Whether trial and direct appeal counsel were ineffective for failing to make and/or properly support arguments against admission of testimony connecting Petitioner to a certain nine millimeter weapon.

7. Whether there was insufficient evidence to support a finding of guilt of first degree murder beyond a reasonable doubt, and whether direct appeal counsel was ineffective for

denied relief without a hearing.  Petitioner took a timely appeal to the Superior Court of

Pennsylvania, which affirmed on December 31, 2009.  See Superior Court Memorandum, No. 2703

EDA 2008, 12/31/09 (Habeas Petition, Attachment C).[5]  On January 22, 2010, Petitioner filed a

---

inadequately arguing the issue, for failing to preserve the issue as a matter of federal due process, and for failing to properly seek review of the Superior Court's failure to decide the matter as to *petitioner*, as opposed to his co-defendant Rasheed Simpson**.**

      8.   Whether the cumulative prejudice from the foregoing constitutional violations was sufficient to require that Petitioner be granted a new trial.

     [5]   Petitioner raised the following issues in his PCRA appeal:

     I.   Did the court below erred by failing to hold an evidentiary hearing, given that this timely, first PCRA petition raises multiple issues of material fact?

     II.   Did the PCRA court err by denying without a hearing Petitioner's claim of trial counsel ineffectiveness for failing to utilize the former testimony of unavailable witness Felicia Brokenbrough and other Commonwealth witnesses?

     III.   Did the court below err by refusing to hold an evidentiary hearing on Petitioner's claim of trial counsel ineffectiveness for failing to object and make a full record concerning the prosecution's racially discriminatory use of its peremptory strikes?

     IV.   Did the court below err in failing to grant an evidentiary hearing upon Petitioner's claim of trial and direct appeal counsel ineffectiveness for failing to (a) correctly litigate Petitioner's meritorious objection to the jury charge relating to co-conspirator  liability for first degree murder, and (b) object to the prosecutor's related arguments to the jury?

     V.   Did the court below err in failing to grant an evidentiary hearing on Petitioner's claim of direct appeal counsel ineffectiveness for failing to competently litigate the sufficiency of the evidence?

     VI.   Did the court below err in failing to grant an evidentiary hearing on Petitioner's claim of trial and direct appeal counsel ineffectiveness, for failing to properly litigate Petitioner's meritorious arguments against admission of testimony purporting to connect him to a certain firearm?

     VII.   When evaluating the prejudice resulting from the various constitutional claims set forth above, is it necessary to consider their cumulative effects?

petition for allowance of appeal with the Pennsylvania Supreme Court, which was denied on

September 12, 2013, at 37 EAL 2010.[6]  This timely first habeas petition was thereafter filed on

---

[6]     Petitioner raised the following questions for review in his *allocatur* petition:

I.   Whether allowance of appeal should be granted to correct the disregard below for Petitioner's entitlement to an evidentiary hearing upon all issues of material fact, pursuant to Pa.R.Crim.P. 907(1) and 908(A)(2)?

II.   Whether allowance of appeal should be granted to correct the Superior Court's holding that Petitioner's trial counsel was not ineffective, despite his failure to use the prior testimony and statements of various witnesses to impeach the Commonwealth's time line – a holding which is based upon a fundamental misapprehension of the evidence and the issue as raised by Petitioner?

III.   Whether allowance of appeal should be granted to reconsider this Honorable Court's holdings in Commonwealth v. Spence, 534 Pa. 233, 627 A.2d 1176 (1993) and Commonwealth v. Uderra, 580 Pa. 492, 862 A.2d 74 (2004) in light of the subsequent holding in Commonwealth v. Collins, 585 Pa. 45, 888 A.2d 564 (2005) and the United States Supreme Court's decision in Johnson v. California, 545 U.S. 162, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005)?

IV.   Whether allowance of appeal is necessary to correct the improper denial of an evidentiary hearing, since Petitioner has submitted the necessary information to make a *prima facie* case under Batson and Spence, and has made a sufficient evidentiary proffer under Uderra as well?

V.   Whether Petitioner's prior counsel were ineffective for failing to (a) correctly litigate Petitioner's meritorious objection to the jury charge relating to co-conspirator  liability for first degree murder, and (b) object to the prosecutor's related arguments to the jury – and whether allowance of appeal is necessary to correct the Superior Court's erroneous conclusion that this issue has been previously litigated and lacks merit?

VI.   Whether Petitioner's direct appeal counsel was ineffective for failing to competently litigate the sufficiency of the evidence, and whether allowance of appeal is necessary to correct the Superior Court's erroneous?

VII.   Whether allowance of appeal is necessary to correct the Superior Court's erroneous holding that it was proper to admit evidence connecting petitioner to a certain firearm and that counsel were not ineffective in their handling of the issue?

VIII.   Whether allowance of appeal is necessary to correct the superior court's erroneous refusal to consider the cumulative prejudice from all the foregoing constitutional errors?

September 23, 2013.

## III.   TESTIMONY  AND  PRIOR  STATEMENTS   OF THE PRINCIPAL WITNESSES AGAINST PETITIONER

### A.   Witnesses Relating to the Kidnapping and Killing of Andrew Haynes ("the Dread")[7]

#### 1.   Police and Forensic Testimony.

On the clear, cold night of December 8-9, 1993, at approximately midnight, police – responding to the second of two calls within an hour about the killing – found the deceased Andrew Haynes in a dark, deserted lot in the 1800 block of Somerset Street, near the intersection of Somerset and Sedgley Streets, in a commercial/industrial area in North Philadelphia.  N.T. 12/9/97, pp. 61-68, 85-88, 90-102; 12/10/97, pp. 29-33, 37-39.[8]  Haynes – otherwise known as "Kenny," "the Dread" and "Gregory Gainey," had been shot in the head and  was bound hand and foot with industrial duct tape. N.T. 12/9/97, pp. 107; 12/10/97, pp. 31, 36, 41.

---

[7]  Persons involved in this case will be referred to by their proper names where available.  For the convenience of the Court when reading original parts of the record, however, the following is a key to the nicknames used in the transcript:

Andrew Haynes: Kenny, The Dread, Gregory Gainey – see N.T. 12/10/97, p. 44; 12/11/97, p. 82 (R. 1642a, 1758a)

Clayton Duncan: Jamaica, The Jamaican – see N.T. 12/10/97, pp. 45-46; 12/11/97, pp. 18-19 (R. 1643a-1644a, 1694a-1695a)/

Aloysius Hall:  Stanley – see N.T. 12/11/97, p. 74 (R. 1751a).

Allister Durrante: Trinidad – see Commonwealth v. Durrante, N.T. 10/3/95 (PCRA Petition, Exhibit O), p. 4 (R. 634a).

[8]  The first caller, at 11:10 p.m. on December 8, 1993, reported an execution-style killing at 17th & Sedgley Streets, the doers driving a late model brown or beige Dodge Vanity station wagon with wood on the side.  The second call was at 12:02 a.m. on December 9, 1993.  See Telephone and Radio Transmittal (PCRA Petition, Exhibit N), pp. 1-3 (R. 624a-626a).

Aside from Mr. Haynes' body and clothing and blood – no guns or other ballistics evidence, no tire tracks or drag marks or other physical evidence was recovered from the scene.  N.T. 12/9/97, pp. 92-98,104-105; 12/10/97, pp. 41.   It could not be determined whether Mr. Haynes was shot and killed where he was found, or shot elsewhere and his body dumped.  N.T. 12/9/97, pp. 105-106; 12/10/97, pp. 37, 42.  The Assistant Medical Examiner who testified was unable to state the time of death.  N.T. 12/11/97, p. 153 (R. 1829a).  There was no evidence of close range firing.  Id., pp. 163-164 (R. 1839a-1840a. Aside from a scrape mark on the lower left leg – which could have resulted from a fall or a kick – there were no other abrasions on the body.  Id., pp. 159, 162 (R. 1835a, 1838a).  According to the Medical Examiner, this might or might not have been consistent with having been beaten, depending upon how severe the blows and given the winter clothes Haynes was wearing.  Id., p. 165 (R. 1842a).  Toxicology analysis showed that Haynes had used cocaine shortly before his death.  Id., p. 164 (R. 1840a).

Although Haynes had been shot four times in the back of the head and the neck, no bullets were found in the body or at the scene, nor was any gun recovered.  N.T.  12/9/97, pp. 69-70; 12/11/97, p. 158 (R. 1834a).  The two small bullet fragments removed from Haynes' head could not be connected by the  Commonwealth's ballistics expert to the nine millimeter firearm which was introduced in evidence against Defendant, nor even identified as nine millimeter ammunition. N.T. 12/12/97, pp. 169-183 (R. 2015a-2029a).

### 2. Testimony of Clayton Duncan ("Jamaica") at Petitioner's Trial

Clayton Duncan ("Jamaica" or "the Jamaican") lived on the first floor, and Haynes on the third, of an apartment building at 18th and Tioga Streets.  Duncan testified on direct examination that at about  9:00 p.m. on the evening Haynes was killed, he answered the doorbell to find Allister

Durrante ("Trinidad") asking for Haynes.  After going upstairs to inform Haynes, who was in his apartment with Aloysius ("Stanley") Hall, Duncan followed Haynes back down the stairs, where he observed him talking at the door with Durrante.  He did not overhear any part of the conversation, however, and did not know if anyone went back upstairs or came in or out of the building – because he immediately entered his own apartment, shut the door, spent five minutes listening to music, took a shower, and then watched television for a quarter of an hour.  N.T. 12/10/97, pp. 44-51, 56-57 (R. 1642a-1649a, 1654a-1655a).  At this point, Hall telephoned from Haynes' apartment to say that someone had rung the third floor apartment doorbell.  When Duncan looked outside, however, no one was there.  The same thing happened a couple of minutes later.  Finally, after Hall rang him up a third time, Duncan opened the door to find Felicia Brokenbrough, scared and shaking, standing outside.  After taking a minute to calm herself down at Duncan's suggestion, Brokenbrough described how an  unspecified number of men had come, fired a gunshot into the air, chased Haynes down in an alley, thrown him into a station wagon, and taken off in it. After relating these events to Duncan, Brokenbrough left.  Duncan then told Hall, and Hall in turn called Haynes' brother Selvan, asking him to come quickly because "something had happened."  N.T. 12/10/97, pp. 51-54, 60, 72-73 (R. 1649a-1652a, 1658a, 1670a-1671a).

On cross-examination, Duncan said that he remained upstairs with Hall for a few minutes while Haynes went down to talk to Durrante, and while upstairs, heard a gunshot.  Looking out the window, however, neither he nor Hall could see anything but some headlights at a distance.  It was not until after he and Hall had attempted to see where the gunshot came from, that he went downstairs where he observed Haynes talking to Durrante, who was not alone, but accompanied by someone Duncan did not know.  N.T. 12/10/97, pp. 57-59, 69 (R. 1655a-1657a, 1667a).  Duncan

12

also insisted on cross examination that the shot he heard while upstairs with Hall, before Haynes had

completed his conversation with Durrante, was the very same shot Brokenbrough claimed to have

seen fired  while Haynes was being abducted.  N.T. 12/10/97, p. 59 (R. 1657a).

### 3.   Testimony of Clayton Duncan ("Jamaica") at the Trial of Allister Durrante ("Trinidad")

At the trial of Allister Durrante for killing Haynes – which took place in October, 1995, two

years prior to Petitioner's trial – Duncan's testimony was that he had spent the evening in the third

floor apartment with Haynes and Hall, from 7:00 p.m. until a little before 10:00 p.m., when he went

downstairs to his own place to shower.  It was, therefore, after 10:00 p.m. when he heard the bell ring

and looked through the peep hole to see Durrante standing outside, along with a man in a blue

raincoat and pea cap.  He did not open the door, but went straight upstairs to tell Haynes who was

there.  Returning downstairs to his own apartment, he immediately shut the door and heard nothing

whatsoever of Haynes' conversation with Durrante –  although he did profess to know that that

conversation had lasted for only about three minutes.  Commonwealth v. Durrante, N.T. 10/3/95

(PCRA Petition, Exhibit O), pp. 6-9, 26-28 (R. 636a-639a, 656a-658a).  About 10 minutes after he

had re-entered his apartment, Felicia Brokenbrough started to ring the doorbell.  Id., pp. 9-10, 31-32

(R. 639a-640a, 661a-662a).

On cross examination at the Durrante trial, Duncan was questioned about the disparity

between his claim to have heard nothing that transpired between Durrante and Haynes, and his claim

to know just how long that conversation took.  He responded that he had entered his apartment and

closed the door just as Haynes was first looking through the peephole.  When he heard the front door

actually open, however, he opened his own apartment door part way and listened to the three-minute

conversation between Haynes and Durrante, at the end of which Haynes shut the front door.  After watching Haynes climb back up the stairs, he closed the door to his own apartment again.  At this point, he again took a shower, and heard nothing further.  Id., pp. 30-33 (R. 660a-663a).

### 4.    Testimony and Statements of Aloysius ("Stanley") Hall

Aloysius ("Stanley") Hall testified that he was visiting with Haynes in his apartment when the doorbell rang at about 8:45 p.m., prompting Duncan to come upstairs to announce Mr. Durrante, and Haynes to go down and answer the door.  After returning upstairs again, Haynes stayed for 10-15 minutes, then went out again to the store to purchase some cooking oil.  N.T. 12/11/97, pp. 16-17, 44, 75, 81 (R.  1692a-1693a, 1720a, 1751a, 1757a).[9]  While he was watching TV after Haynes had left, Hall heard a gunshot and looked out the window, but failed to see anything of interest.[10]  A few minutes after that, the doorbell rang, and he asked Duncan to answer, but Duncan responded that no one was there.  Very soon after, the bell rang again.  Duncan then reported having the conversation with Brokenbrough about seeing Haynes kidnapped and thrown in the back of a car.  At this, Hall attempted to page Mr. Haynes, and almost immediately thereafter the phone rang with a person named Rasheed asking for "Stan" and identifying himself as the person who has previously robbed Hall on 11th Street.  Id., pp. 18-21, 46, 52-55 (R. 1694a-1697, 1722a, 1728a-1731a).

(Hall explained to the jury that about six weeks prior to Haynes' death, he was about to go

---

[9]  At Durrante's Trial, Hall testified that he did not actually see or hear Haynes leave the apartment, but missed him later after he heard the gunshot, and looked unsuccessfully around the apartment for him.  Commonwealth v. Durrante, N.T. 10/3/95 (PCRA Petition, Exhibit R), pp. 59, 76 (R. 713a, 730a).

[10] On cross examination, Hall stated that Duncan was present with him in Haynes' apartment at the time he heard the gunshot, but had gone back downstairs before Brokenbrough began to ring the doorbell.  N.T. 12/11/97, pp., 44-45 (R. 1720a-1721a).

into his house when a man he had never seen before called him by name, identified himself as Rasheed, stated he lived on Warnock Street, and shortly thereafter pulled out a gun.  He was then joined by two other people in masks who held him while Rasheed asked "Where's the Dread?" After Hall said he didn't know, the three went through his pockets and were in the process of walking him into his house, when he broke free and ran. At trial, he identified this Rasheed as Petitioner's codefendant Simpson. N.T. 12/11/97, pp. 22-23, 33, 47-51 (R. 1698a-1699a, 1709a, 1723a-1727a.).

In any event, Hall went on to testify that the caller, Rasheed, said "he had asked [Hall] for the Dread but now he got him.  And he needs $20,000 in 15 minutes or the Dread is dead."  After Hall protested that 15 minutes was too short a time to contact Haynes' family and raise the money, the caller merely repeated his demand and his threat and hung up the phone.  This phone call occurred, according to Hall, at about 9:45 p.m.  Id., pp. 21, 40 (R. 1697a, 1716a).

At this point, Hall called Haynes' brother Selvan at his mother's house and told him to come over right away.  No sooner had he arrived and been put in the picture by Duncan and Hall, than the phone rang again, and Selvan proceeded to have a conversation during which he protested that he didn't have money, and repeated the phrase "$20,000 in 15 minutes."  This second phone call occurred, according to Hall, about 15 minutes after the first call to Hall alone – which would have been approximately 10:00 p.m.  Id., pp. 21-22, 33-36, 40 (R. 1697a-1698a, 1709a-1712a, 1716a).

After looking unsuccessfully for money in Haynes' apartment, Hall, Duncan and Selvan Haynes went back to  Haynes' mother's house, where they received a series of additional calls

concerning the ransom demand, from about 10:15 p.m. all the way up to about 11:00 p.m.[11]  At some point during the evening, Hall left and went home. The next morning, he heard on the news that Haynes' body had been found.  Id., pp. 36, 41-42 (R. 1712a, 1717a-1718a).

### 5.    Testimony and Statements of Selvan Sylvester Haynes

The decedent's brother, Selvan Haynes, testified to receiving the phone call from Hall at about 8:00 p.m.[12]  Upon arriving at the apartment, he was told by Hall that he had first heard a gunshot, and then gotten a call from somebody saying that they "had" Haynes.  As he and Hall were talking, the telephone rang, and the man on the other end demanded $20,000, or else they would kill his brother.  Hall was arguing with the caller, who responded "listen, this is no joke.  We want 20 grand or we going to kill him and we give you 15 minutes to come up with the money."  He then hung up the phone.  At a loss as to what to do, Selvan went back to his mother's house, after first using call forwarding to reroute any calls to his brother's phone, to the phone at his mother's.  Just as they were arriving at his mother's house, the phone rang once again.  The kidnapper repeated his threats,  refused Selvan's offer to give him the proceeds of selling his two cars, plus the $3,000 savings he had in a credit union –  and refused to give him more time, until the morning, to come up with the cash.  All told, Selvan testified, there 4-5 phone conversations that evening with the kidnapper, the last of which was after midnight, and during one of which he was able to speak to his

---

[11]  At the preliminary hearing, Hall testified that there were three calls total.  Commonwealth v. Durrante, 10/3/95 (PCRA Petition, Exhibit R), p. 46 (R. 702a).

[12]  In his statement to police, he said it was after 11:00 p.m.  At Durrante's trial, he estimated about 10:00 p.m.   Statement of Selvan Haynes, 12/9/93 (PCRA Exhibit S), p. 2 (R. 746a); Commonwealth v. Durrante, N.T. 10/3/95 (PCRA Petition, Exhibit T), p. 91 (R. 751a).

brother.[13]  He found out about his brother's death on the morning news.  N.T. 12/11/97, pp.71-79

(R. 1747a-1755a); Statement of Selvan Haynes, 12/9/93 (PCRA Petition, Exhibit S) (R. 746a-748a).

### 6. Felicia Brokenbrough – "Excited Utterance" Hearsay Testimony and Stipulation at Trial; Testimony at Allister Durrante's Trial

As previously stated, Duncan testified that Felicia Brokenbrough came to the door, frightened

and shaking, to tell him how Haynes had been abducted.  N.T. 12/10/97, pp. 52-53, 60, 73 (R. 1650a-

1651a, 1658a, 1671a).  This testimony was admitted as an excited utterance.  A stipulation was also

read to the jury, to the effect (a)  that Brokenbrough had been sought by both sides and not found,

and (b) that she had tentatively identified the person who fired the shot in the air, from a photo array

shown to her by police, and that the person she identified was neither Petitioner nor Simpson. N.T.

12/15/97, pp. 38-40 (R.  2045a-2047a).

At Allister Durrante's trial, Brokenbrough had testified that she met up with Haynes, who

was just on his way to the store to purchase oil and "weed," at about 10:00 or 10:30 p.m.   She

walked with him to the store, and on their way back, they were accosted by a man who fired a shot,

chased Haynes down in an alley, and threw him into a station wagon with painted windows, which

then drove off.  Commonwealth v. Durrante, N.T. 10/4/95 (PCRA Petition, Exhibit U), pp. 17-19

(R.  783a-785a).

### 7. Testimony and Statements of Rasheema Washington Relating to Kidnapping and Assaults upon Haynes

Rasheema Washington testified that on an unknown date in an unknown month, about a half

hour after getting home from work, she received a call from her friend, the Petitioner, telling her he

---

[13]  In his statement to police, and his testimony at Durrante's trial, he mentioned only two
phone calls. Statement of Selvan Haynes, 12/9/93 (PCRA Exhibit S), p. 2 (R. 746a); Commonwealth
v. Durrante, N.T. 10/3/95 (PCRA Petition, Exhibit T), pp. 94-106 (R. 754a-766a).

was on his way over.  This was not unusual because he "always" came over.  N.T. 12/12/97, pp. 6-10, 38-39, 42 (R. 1852a-1856a, 1884a-1885a, 1888a).   Although she was unable to give the time of this call, she did state that she would often leave work as late as 7:00 or 8:00 p.m.  Id., pp. 10-21, 42 (R. 1856a-1867a, 1888a).[14]

In anticipation of Petitioner's coming, Washington had unlocked her apartment door, relying on him to use his key to the downstairs door, or to have her or someone else buzz him in.  Id., pp. 11-12, 41-42 (R. 1857a-1858a,  1887a-1888a).[15]   Less than an hour later, she was in the bedroom and heard the door to her apartment open.  Walking into the living room a few minutes later[16],  she found Petitioner, Rasheed Simpson, Allister Durrante ("Trinidad"), a dark skinned man with dreadlocks whom she did not  know, and a fifth man who was bound hand and foot, hands behind his back, lying on the floor, with a skully-type hat over his head covering his eyes down to the nose.  Id., pp. 13-16, 43-50 (R. 1859a-1862a, 1889a-1896a).

According to Washington, Petitioner, Simpson, Durrante and the unidentified extra man were all hitting and kicking the tied-up man, over and over, for a whole half hour, while repeatedly demanding to know where was the money.   It was the unidentified man, however, who was

---

[14]   In her statement to police and preliminary hearing testimony, she indicated that the call was received between 9:00 and 10:00 p.m., and that Petitioner and his companions left her apartment somewhat before midnight. Statement of Rasheema Washington, 6/17/96, pp. 2-4 (R. 805a, 807a); Preliminary Hearing N.T. 11/7/96 (PCRA Petition, Exhibit X), p. 5 (R. 820a).

[15]   In her statement and preliminary hearing testimony, she stated that she had previously taken away Petitioner's key.  Statement of Rasheema Washington, 6/17/96, p. 4 (R. 807a); Preliminary Hearing N.T. 11/7/96 (PCRA Petition, Exhibit X), pp. 6, 16 (R. 821a, 831a).

[16]   At the preliminary hearing, she testified that she was just coming out of her bedroom in time to see the men all walk in with their prisoner through the door. Preliminary Hearing N.T. 11/7/96 (PCRA Petition, Exhibit X), pp. 8, 19 (R. 823a, 834a).

18

responsible for most of the abuse and questioning.  At some point during the same half hour, Simpson and Durrante used the phone in her bedroom, though she could not hear what it was they were saying.  Id., pp. 99-101 (R. 1945a-1947a).  She never saw the tied-up man taken to the phone. Id., pp. 17, 50, 69, 97, 99-101  (R. 1863a, 1896a, 1915a, 1943a, 1945-1947).

Eventually, according to Washington, Petitioner noticed her discomfort with these proceedings in her living room, and told the others  they had to leave – which they did, carrying with them the bound-up man.  Id., p. 18 (R. 1864a).

Washington did not go to the police at the time, and testified that she gave her statement in 1996 only after officers came to her school, took her to the roundhouse, and told her she was going to be charged with Haynes' murder if she failed to give a statement to their satisfaction.  N.T. 12/12/97, pp.28-29, 89-91 (R. 1874a-1875a, 1935a-1937a).  Without this motivation, she would not have given testimony against Simpson and Petitioner.  Id., pp. 95-96, 115 (R. 1941a-1942a, 1961a). In fact, she stated further, she remained  friends with Petitioner  through  February of 1996 at least. Id., p. 103 (R. 1949a).[17]

### B.    Testimony Relating to Alleged Gun Possession Prior to and After Haynes' Killing

Tracena Copper testified that on September 28, 1993, she went into a gun shop with money provided to her by Petitioner and purchased for him a nine millimeter firearm.  N.T. 12/12/97, pp. 126-132 (R. 1972a-1978a).  In the course of so testifying she persisted in answering questions, even

---

[17]    Detective Steven Vivarina testified that in May of 1994, police were looking for someone by the name of "Sheema" in the area of 15th and Allegheny, but that he did not come by the full name "Rasheema Washington" until March 25, 1995, and did not acquire an address for her until February of 1996. She was not actually brought in for questioning until June of 1996. N.T. 12/15/97, pp. 8-15.  Accordingly, she did not testify against Allister Durrante in his 1995 trial. N.T. 12/12/97, pp. 93-94 (R. 1939a-1940a).

on direct examination *by the Court*, in such a way as to imply that she had dealt in guns for Petitioner

on multiple occasions as a regular course of business.  See, e.g., the following:

> THE COURT: Did you buy the gun? THE WITNESS: No.  What happened is I
> would go in to the gun shop with Malik and he would give me the money inside the
> car and he had told me which guns to pick out.

> MR. SAVINO: I object and I ask to see the Court at sidebar.  THE COURT: Your
> objection is overruled.  I want to know specifically with respect to this gun, okay?
> THE WITNESS:  Yes.

> THE COURT: This gun.  Now, members of the jury, that's what we're interested in,
> and any other evidence is not relevant and is to be stricken.  With respect to this gun,
> what's in front of you, do you understand that, ma'am?  THE WITNESS: Yes.

> THE COURT: Now, did you buy that gun?   THE WITNESS: Yes.

> THE COURT: Okay.  What were the circumstances, when did you buy it?  THE
> WITNESS:  9/28/93.

> THE COURT: Okay.  What were the circumstances concerning the purchase of that
> gun?  THE WITNESS: To sell the guns.

> THE COURT: You bought it?  MR. SAVINO: Objection once again.  THE COURT:
> Are you talking about this gun?  MR. SAVINO: I move for a mistrial twice.

> THE COURT: Why did you keep saying guns, we're talking about one gun, aren't
> we?  THE WITNESS: Yes.

> THE COURT: That's all there is, isn't that so?  THE WITNESS: Yes.

Id., pp. 127-128 (R. 1973a-1974a).[18]

Cheltenham Township Police Officer James Slavin testified that on December 16, 1993,

Petitioner along with four other companions approached a car which had been under surveillance

after a gun was spotted partially protruding from under the driver's seat.  Petitioner and the other

---

[18]     Petitioner's motion for a mistrial as denied, and counsel declined a cautionary
instruction, fearing to overemphasize the matter.  N.T. 12/12/97, pp. 146-148 (R. 1992a-1994a).

passengers sat down in the car, but the driver, Medea Clark, was prevented from entering and handcuffed.   The others were ordered to raise their hands, but Petitioner allegedly reached underneath the front passenger seat where he was sitting instead.   N.T. 12/11/97, pp. 99-107, 120-127 (R. 1775a-1783a, 1796a-1803a).   Petitioner was then directed to exit the car, and upon doing so was found  to be unarmed.   Id., pp. 126-128 (R. 1802a-1804a).   Thereafter, police removed the gun from the car, which turned out to be the nine millimeter firearm which Ms. Copper claimed to have purchased  for Petitioner.   Id., pp. 107-108, 139-140 (R. 1783a-1784a, 1815a-1816a). Petitioner was arrested for possession of the gun, but this charge was dropped at the time of Petitioner's guilty plea to disorderly conduct (for his behavior when being arrested by Officer Slavin).   Id., pp. 137-138 (R. 1813a-1814a).

Rasheema Washington testified that she was part of the group who went to the movies at the Cheltenham Mall on the day Petitioner was arrested.   According to Washington, the gun was placed under the driver's seat of the car before they went into the theater, by Rasheed Simpson.   N.T. 12/12/97, pp. 24-26, 80-82, 87-88 (R. 1870a-1872a, 1926a-1928a, 1933a-1934a).

Upon the foregoing testimony, Petitioner was convicted of first degree murder and the other crimes previously mentioned.

IV.    **ARGUMENT**

A.    **Standards for Decision Under 28 U.S.C. § 2254**

The writ of habeas corpus is available to a state prisoner who "is in custody in violation of the Constitution or laws or treaties of the United States," and relief may be granted where the state court's decision on the constitutional claim presented "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United

States," 28 U.S.C. § 2254(d)(1). Writing for the Court in Williams v. Taylor, 529 U.S. 362 (2000),

Justice Sandra Day O'Connor explained the meaning of §2254(d)(1) as follows::

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

529 U.S. at 412-413.  The "unreasonable application" clause encompasses either unreasonably

applying the facts of the case to the correct governing legal rule, or unreasonably extending or failing

to extend a legal principle from Supreme Court precedent.  Moore v. Morton, 255 F.3d 95, 104 (3d

Cir. 2001). See also Matteo v. Superintendent, SCI-Albion, 171 F.3d 877 (3d Cir.), cert. denied 528

U.S. 824 (1999).

    In addition to the "contrary to" and "unreasonable application" clauses of 28 U.S.C.

§2254(d)(1), moreover – 28 U.S.C. § 2254(d)(2) also permits relief to be granted where the decision

is "based on an unreasonable determination of the facts in light of the evidence presented in the State

court proceeding." See also 28 U.S.C. § 2254(e)(1), establishing a presumption of correctness for

state factual determinations, unless rebutted by "clear and convincing evidence."

    Under these standards, Petitioner herein is clearly entitled to relief.

**B.      Argument With Respect to Specific Grounds for Relief Alleged**

**Ground One:**          **Petitioner was deprived of due process of law under the Fifth and Fourteenth Amendments by the trial court's charge (and similar statements by the prosecution), pursuant to which it was reasonably likely that the jury believed that proof of a specific intent to kill on Petitioner's part was not necessary to convict Petitioner of first degree murder as accomplice or co-conspirator.**

To convict someone of first degree murder under Pennsylvania law, the Commonwealth must prove beyond a reasonable doubt that *the specific defendant who is convicted must have himself had the specific intent to kill the victim;* it is *not* sufficient that one of the defendant's accomplices or co-conspirators had that specific intent.  Accordingly, it is incumbent upon the trial court to make it plain to the jury that first degree murder is a special case of accomplice or co-conspiratorial liability, and that specific intent may not be "transferred."  Commonwealth v. Huffman, 638 A.2d 961, 962 (Pa. 1994).  This is because an instruction which "omits or materially mis-describes an essential element of an offense as defined by state law relieves the state of its obligation to prove facts constituting every element of the offense beyond a reasonable doubt, thereby violating the defendant's federal due process rights....." Smith v. Horn, 120 F.3d 400, 415 (3d Cir. 1997), citing Carella v. California, 491 U.S. 263, 265 (1989) (per curiam).

When examining the instructions complained of, a reviewing court must consider both whether the instruction given was ambiguous, and if so, whether "there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." Waddington v. Sarausad, 555 U.S. 179, 190-191 (2009), citing  Estelle v. McGuire, 502 U.S. 62, 72 (1991).  See also, to similar effect,  Smith v.

23

Horn, supra, 120 F.3d at 411, 416; Laird v. Horn, 414 F.3d 419, 425-426 (3d Cir. 2005). In so doing, the court must analyze the effects of the specific language complained of in the context of the charge as a whole. Francis v. Franklin, 471 U.S. 307, 315 (1985).

In Petitioner's case, the trial court did inform the jury several times that the Commonwealth had the burden of proving a particular defendant individually guilty of every element of the crime charged, regardless of the fact that there were two persons being tried together. See, e.g., N.T. 12/16/97, pp. 6-7, 14, 22, 55, 79, 87, 89 (R. 2104a-2105a, 2112a, 2120a, 2153a, 2162a, 2170a, 2172a). In the definition of first degree murder itself, the court also indicated generally that each defendant charged must be proven to have had the specific intent to kill. These instructions, however, were vitiated by confusing and inappropriate use of the plural at important junctures [19], as well as by serious ambiguity contained in the definitions of accomplice and conspirator liability.

Thus, in the definition of first degree murder, the Court instructed:

Murder of the first degree is a criminal homicide committed with a specific intent to kill.

Now, remember, each defendant is on trial individually and the evidence against each with respect to all charges, including first degree murder, must be considered separately.

Again, murder of the first degree is a criminal homicide committed with a specific intent to kill. An intentional killing may be a killing by means of poison or by lying in wait, or any other kind of willful, deliberate and premeditated act.

Therefore, in order to filed [sic] **the defendant** guilty of murder of the first degree, you must find that **the defendant** had the specific intent to kill and that the killing

_____

[19]    The court made general disclaimers about its habit of using the singular and plural interchangeably, warning that each defendant should considered separately. See N.T. 12/16/97, pp. 7, 32 (R. 2105a, 2130a). This was not enough, however, to overcome the serious confusion created by the repeated use of the plural, particularly when taken together with the clearly ambiguous accomplice and conspirator instructions described below.

was a willful, deliberate and premeditated act.

Now, I will try to more specifically define these words.

If an intention to kill exists, then in the eyes of the law the killing is willful.  If this intent is accompanied by such circumstances as evidence a mind fully conscious of its own purpose, it's deliberate.  And if sufficient time has been afforded to enable the mind of the killer fully to frame the design to kill, and to select the instrument or to frame the plan to carry the design into execution, it is premeditated.

Now, although **a defendant** must premeditate in order to have a specific intent to kill, premeditation can be very brief.  All that is necessary is that there be time enough so that **the defendant** has a fully formed intent to kill the victim and is conscious of that intention.

Now, if you believe that **the defendants** intentionally used a deadly weapon on a vital part of the victim's body, you may regard that as an item of circumstantial evidence from which you may infer that **the defendants** had the specific intent to kill.

N.T. 12/16/97, pp. 14-15 (R. 2112a-2113a) (emphasis supplied).  <u>See also</u>, similarly, <u>id.</u>, p. 81 (R.

2164a) ("if you believe that the **defendants** intentionally used a deadly weapon on a vital part of the

victim's body, you may regard that as an item of circumstantial evidence from which you may infer

that the **defendant** had the specific intent to kill").

After defining all the specific crimes charged, moreover, the court then went on to instruct:

Now, members of the jury, you may find the defendants guilty of certain crimes **without finding that they personally engaged in the conduct required for commission of those crimes** or even that they were personally present when the crimes were committed.

A defendant is guilty of a crime if he is an accomplice of another person or persons **who commits these crimes.**  A defendant does not become an accomplice merely by being present at the scene or knowing about the crimes.  The Commonwealth has the burden to not simply show the defendants present at the scene but to show that the defendant was an active partner of the actual perpetrator or perpetrators.

He is an accomplice if with the intent of promotion or facilitating commission of the crime, he solicits, commands, encourages or requests the other person to commit it,

25

or aids, agrees to aid or attempts to aid the other person or persons **in planning or committing the crimes.**

. . . .

Now, members of the jury, further, a defendant may by reason of being a member of a conspiracy become liable for a crime he did not personally commit.  To become liable as a coconspirator, although it is not necessary that the defendant be present at the scene, again, mere presence and knowledge of the proposed crime are not alone sufficient to show a defendant's participation as a coconspirator.  You may find the defendant guilty of the crimes charged as a conspirator if you're satisfied beyond a reasonable doubt first, that the defendant agreed with another person or persons that they or one of them would commit **these crimes,** or that the defendant would aid another person or persons in committing **these crimes**; and second, that the defendant so agreed with the intent of promoting or facilitating the commission of **these crimes;** and third, that while the agreement remained in effect, **the crimes** were committed by the defendant or that other person or persons; and fourth, that **the crimes** were committed by the defendant or that other person or persons, or in this case it would be by that other person or persons, if you are finding guilt as a coconspirator, and that they were committed by that other person or persons **in furtherance of the defendant's and his – that's the other person's common design.**

N.T.  12/16/97, pp. 33-36 (R. 2131a-2134a) (emphasis supplied).  As can be seen from the

emphasized language above, and particularly with respect to the explanation of co-conspirator

liability, the court failed to clearly indicate that first degree murder was to be considered separately

from the other crimes charged.  Indeed, the main part of the co-conspirator instruction was couched

in terms of "these crimes" – lumping all the crimes charged together.  The court began the

explanation, moreover, with a statement that under accomplice or co-conspirator theories, a person

could be convicted of crimes "without finding that they personally engaged in the conduct required

for commission of those crimes."  Without further elucidation, therefore, the quoted instruction was

likely interpreted to create an exception to the usual "specific intent" requirement – that is, that  if

a defendant were found to be a co-conspirator as to any of "these crimes," it was no longer necessary

for the Commonwealth to prove, as to that particular defendant, all the elements of the <u>crimes</u>

(plural) charged – one of those elements being the element of specific intent in first degree murder.

The confusion was magnified, moreover, by the fact that the separate instruction on criminal

conspiracy charged <u>two possible predicate acts</u>, that is, robbing and/<u>or</u> shooting Andrew Haynes:

> Now, members of the jury, in this case, too, the defendants are charged with conspiracy.  They're charged with conspiracy **to shoot and rob the victim, and I already defined the crimes of murder and robbery which are the crimes which the defendant allegedly – which the defendants allegedly conspired to commit.**
>
> In order to find the defendants guilty of conspiracy, you must be satisfied initially that the following two elements of the conspiracy have been proved beyond a reasonable doubt: first that the defendants agreed with each other or another person or persons that they engage in conduct which constitutes the crimes **of robbery and/or murder,** or agreed to aid each other or another person or persons in the planning of the crimes **of robbery or murder** . . .

N.T. 12/16/97, pp. 28-29 (R. 2126a-2127a) (emphasis supplied).  In effect, therefore, the trial court's

instructions relied on the jurors to take the separate first-degree murder instructions, with the

admonition that the guilt of each of the defendants must be considered separately – and use them to

*amend* the conspiracy instruction and co-conspirator liability instructions given, *which permitted as*

*a general rule the transfer of intention from one defendant to the other so long as the defendants*

*were found to have conspired to commit **either** murder **or** robbery.*   Respectfully, there is no reason

in logic or in law to conclude that the jurors were capable of making that amendment, felt free to

make that amendment, or did in fact make that amendment.  Accordingly, the instructions as given

were constitutionally infirm.   <u>Compare</u> <u>Smith v. Horn</u>, <u>supra</u>, holding that the trial court's jury

instruction was constitutionally infirm <u>because the definition of "accomplice" and "co-conspirator"</u>

<u>included combined references to both the murder charges and the robbery charges</u> –  just as in this

Petitioner's case – making it reasonably likely that the jury would treat an accomplice for one

purpose as an accomplice for all purposes.  120 F.3d at 411-414. See also Laird v. Horn, supra, 414 F.3d at 428, quoting Francis v. Franklin, supra, 471 U.S. at 322 ("Language that merely contradicts and does not explain a constitutionally inform instruction will not suffice to absolve the infirmity").

Nor was the error in the trial court's instructions harmless.  Although a number of witnesses testified to the involvement of Petitioner's co-defendant Simpson in making ransom demands, and to Allister Durrante's appearance on Haynes' doorstep as a precipitating event to the eventual abduction, only Rasheema Washington directly connected Petitioner to the kidnapping of Haynes. Furthermore, unlike the testimony of Hall and Duncan regarding Simpson's personally delivered threat to kill Haynes if money was not forthcoming, not one word of similar import was attributed to Petitioner, even by Washington.  Indeed, Washington's account, even if believed, would be equally consistent with an intent to participate in kidnapping and robbery short of murder, as with the specific intent to kill.[20] See generally, N.T. 12/12/97, pp. 10-18, 41-50, 69-71, 97-101 (R. 1856a-1864a, 1887a-1896a, 1915a-1917a, 1943a-1947a).

Given this paucity of evidence, therefore, the court's instructions on accomplice and co-conspirator liability were of absolutely critical importance.  It was absolutely essential that the jury understand that accomplice or co-conspirator status with respect to the crime of robbery did not relieve the Commonwealth of its burden of proving a specific intent to kill on the part of Petitioner beyond a reasonable doubt.  Any confusion on that point, any belief Petitioner could be found guilty of first degree murder without finding that he personally engaged in the conduct required for

---

[20]     Petitioner's possession of any old gun, before or after the incident – see Part III(B) above – , clearly does not add anything to the specific intent analysis.  Weapons are ordinarily employed for protections, or if Rasheema Washington were to be believed, as coercive instrumentalities in kidnappings and robberies.  Mere possession, however, falls far short of the specific intent to use the gun to kill.

commission of that crime, merely because he was alleged to have conspired to commit robbery, would clearly deprive Petitioner of his constitutional right to remain cloaked in innocence unless *all* elements of first degree murder were proven beyond a reasonable doubt. As has been demonstrated above, however, this is precisely what the court's charge allowed, and given the paucity of the evidence against Petitioner, it is reasonably likely that the first degree murder verdict was in fact the result of just such a belief.

The prejudicial effect of the trial court's confusing instructions was augmented, moreover, by the arguments made by the prosecutor during his closing speech which, like the charge of the court, confused and mixed together the evidence concerning Rasheed Simpson's specific intent to kill, with principles of accomplice and co-conspirator liability. See, e.g., the following arguments:

> Conspiracy: Conspiracy is when two people or more get together and they agree to do something. They agree to commit a crime, in this case agree to commit a crime. Agree to commit a crime. **What crime? Obviously more than one person commits the kidnapping. The robbery. They're the crimes that they agree to commit. What other crime? Because** *they* **say while he's alive no money, no Dread. No money, he's dead. No money in 15 minutes, he's dead.**

> Conspiracy. To agree to commit a crime. Murder, kidnapping, robbery.

> Accomplice liability: You'll hear something from the judge about accomplice liability and I may even talk a little bit more about that. Accomplice liability. That means when you help somebody do something and you knowingly and voluntarily aid them in committing a crime that you have certain liability. Criminal liability. When you aid them in doing something, and they do it, even though you may not have done it personally, you're liable for what they've done.

> We used to say when we were kids and I used to hear my uncle say, some of the older folks which you don't hear it much anymore, **in for a penny, in for a pound. That means if you help them, you aid them, you're in for the whole thing. Because we don't know really who pulled the trigger, do we?**

N.T. 12/15/97, pp. 123-125 (R. 2056a-2058a) (emphasis supplied). Nothing could be a clearer

invitation for the jury to conclude that if Petitioner was in the conspiracy for robbery, he was in for

the "whole thing," including the eventual murder. See also, the prosecutor's additional remarks,

designed to invite conviction of Petitioner based on evidence of *Simpson's* intent:

> . . . In this case we have circumstantial evidence. We have, if you believe – and
> we'll talk about that a little bit, I'll give you an example. Rasheed calling these
> young fellows saying 20,000, 15 minutes, or the Dread's dead. Even if no Rasheema,
> take her out of it, let's forget her, let's cut her off for the sake of this argument right
> now. 20 minutes or he's dead. 20 minutes come, half hour comes, an hour comes,
> several other phone calls **from the same person,** and as a matter of fact there's even
> one phone call after the boy's killed. **He** said that **he** was going to kill him. **He** said
> that **he** had him. **Their** words. They are words from his lips.
>
> **He** didn't come and say **he** was going to kill him, but what happened? A short time
> after those phone calls and a short time before the last one, when **they** thought **they**
> could still get the doggone money, this young man's dead. Did anybody see **him** do
> it? No. No one saw **him** do it. There is no evidence that anyone saw **him** do it
> outside or know about **him** doing it **outside of that conspiracy.**
>
> But then are you going to let **him** come in here and say oh, I was just playing, nobody
> proved I killed him because **there's no evidence of anybody else saying they want
> him dead?**

Id., pp. 137-138 (R. 2070a-2071a) (emphasis supplied).

> Keep your eye on the ball here. Because it ain't over there. And I suggest to you that
> whoever pulled the trigger, from jump street, from the beginning, their intent is to kill
> this boy. **And whoever kills him, they're both liable for first degree murder**
> 'cause the argument will kind of go well, you don't know really who killed him, we
> were there, but oh, geez, you don't have any evidence that he did it or he did it. So
> they both should be found guilty of second degree murder. No. **They** said give us
> the money or we're going to kill him and they carried it out, executed him. And I
> suggest to you there's only one verdict for **these guys.** And that's first degree
> murder, kidnapping, robbery, conspiracy and possession of an instrument of crime....

Id., pp. 164-165 (R. 2097a-2098a) (emphasis supplied).

Given all these remarks by the prosecuting attorney, and given the paucity of the evidence

concerning Petitioner's participation in events and the *total absence* of any evidence concerning his

attitude towards murder, it is absolutely crystal clear that the Court's failure to clarify its charge on accomplice and co-conspirator liability was far from harmless, but rather, serious, prejudicial error of constitutional dimension.  See <u>Smith v. Horn</u>, <u>supra</u>, 120 F.3d at 419 ("[h]aving repeatedly urged the jury to base its verdict on a theory predicated on a fundamental constitutional error, the Commonwealth cannot now seriously contend that the error had no substantial and injurious effect or influence on the verdict").

On direct appeal, Petitioner raised the claim that the trial court erred in failing to instruct the jury clearly that a defendant cannot be held culpable for first degree murder as an accomplice or coconspirator unless he possessed the specific intent to kill.  The Superior Court, however, summarily rejected this claim on grounds that the Pennsylvania Supreme Court had held, *in Rasheed Simpson, Petitioner's codefendant's, case,* that the jury was "adequately apprised" by the charge in its entirety that Mr. Simpson "could only be convicted of first degree murder if he harbored the specific intent to take the victim's life."  Superior Court Memorandum, <u>Commonwealth v. Bowers</u>, 2468 EDA 2003, 9/9/03, pp. 5-6, <u>citing</u> <u>Commonwealth v. Simpson</u>, 754 A.2d 1264, 1276 (Pa. 2000).  Both the conclusion of the Pennsylvania Supreme court, and the Superior Court's adoption of that conclusion in the differing context of Petitioner's, rather than Mr. Simpson's, appeal, constitute unreasonable applications of the United States Supreme Court decisions cited above.

As previously set forth, and contrary to the Pennsylvania Supreme Court's conclusion, the trial court's instructions on accomplice and co-conspirator liability stood apart on their own, and clearly invited interpretation as exceptions to the requirement of individualized specific intent for first degree murder.  Those instructions, as previously stated, conflated as potential objects of the alleged conspiracy to commit "robbery and/or murder"– N.T. 12/16/97, p. 29 (R. 2127a) – a fact

which the Pennsylvania Supreme Court's opinion in <u>Simpson</u> fails to acknowledge. Also unacknowledged in the Supreme Court's opinion, is the content of the prosecutor's closing speech to the jury, which blatantly attributed Rasheed Simpson's expressed intent to kill Mr. Haynes to Petitioner by means of mixing the evidence about Simpson's ransom calls with principles of accomplice and co-conspirator liability, using catch phrases such as "in for a penny, in for a pound" and otherwise indicating that it was irrelevant whether Petitioner agreed to commit a robbery or agreed to commit a murder, and inviting the jury to impute Simpson's intentions to petitioner. <u>See</u>, N.T. 12/15/97, pp. 123-125, 137-138, 164-165 (R. 2056a-2058a, 2070a-2071a, 2097a-2098a), cited extensively above. All this required an emphatic correction by the court – a correction that simply was never forthcoming.

It must be remembered, moreover, that the case against Mr. Simpson was far different from the prosecution's case against Petitioner. Contrary to the Superior Court's statement at p. 4 of its September 9, 2004 opinion (Habeas Petition, Attachment A), Petitioner was not "convicted of exactly the same offenses for the same conduct" as Mr. Simpson. Mr. Simpson was convicted of capital murder and sentenced to death upon evidence that he *personally* delivered telephone threats to kill Mr. Haynes if a ransom was not delivered. This evidence came from several sources, including Selvan Haynes and Aloysius Hall. <u>See</u> testimony described in Part III(A)(4)-(5) above.

Mr. Bowers, however, was convicted on the sole basis of Rasheema Washington's testimony that he was present with others when Mr. Haynes was brought to her apartment and abused. Importantly, Ms. Washington did *not* implicate Petitioner in the making of any phone calls or the utterance of any threats. Nor was Mr. Bowers implicated by anyone in the abduction itself. Accordingly, the clarity of the co-conspirator instruction was of absolutely crucial importance to

32

Petitioner's defense, and the trial court's failure to ensure such clarity, particularly in the face of the prosecutor's argument, was highly prejudicial and effectively denied Petitioner the fair trial to which he was entitled.  The Superior Court's conclusion to the contrary constituted an unreasonable application of governing federal law, and is not entitled to deference.  Accordingly, Petitioner should be afforded habeas relief.

> **Ground Two:**      **Trial and direct appeal counsel rendered ineffective assistance under the Fifth, Sixth and Fourteenth Amendments by failing to (a) correctly and adequately raise and argue Petitioner's claim that the court's jury charge effectively relieved the prosecution of its burden of proving specific intent in the case of accomplice and co-conspirator liability for first degree murder, and (b) object to the prosecutor's arguments which were based upon the same fundamental constitutional error.**

The right to effective assistance of counsel is guaranteed under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution as well as similar sections of the Pennsylvania Constitution.   To support a claim of ineffective assistance under Pennsylvania standards,  it is necessary to show that the underlying claim is of arguable merit, that counsel had no reasonable strategic basis for his act or omission, and that counsel's ineffectiveness prejudiced the petitioner.  Commonwealth v. Pierce, 786 A.2d 203, 213 (Pa. 2001).  As articulated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the standard is two pronged.  First:

> A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.  The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance ....

466 U.S. at 690, 104 S.Ct. at 2066.  Second:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

466 U.S. at 694, 104 S.Ct. at 2068.

### (a)    Trial counsel

Both defense counsel unequivocally objected to the trial court's failure to specifically tell the jury that a defendant may not be convicted of first degree murder on an accomplice liability theory unless he personally shares the specific intent to kill.  It is not clear from the colloquy, however, whether an objection to the co-conspirator part of the charge was also understood.  See N.T. 12/15/97, pp. 58-62. To the extent that counsel's objection may have been insufficient under Pa.R.A.P. 302(b), counsel was clearly ineffective, since the Pennsylvania Supreme Court's opinion in Commonwealth v. Huffman, 536 Pa. 196, 199,  638 A.2d 961, 962 (1994) had by the time of Petitioner's trial  very clearly cautioned charging courts to add additional explanations to the general co-conspirator liability instruction in cases involving first degree murder.  Having interposed an objection on this basis, there was no conceivable strategic reason why counsel would have chosen to fail to complete the argument by including the obviously deficient co-conspirator portion of the charge.

Similarly ineffective was the failure to object to the portions of the prosecutor's closing argument described above, inviting decision on the same improper basis. As a matter of   w e l l - established  federal  constitutional  law,  the  prosecution  may  not  rely  upon  unfair  or  misleading argument, which "may so infect the trial with unfairness as to make the resulting conviction a denial

34

of due process, " and which therefore amounts to a "failure to observe that fundamental fairness essential to the very concept of justice." Moore v. Morton, 255 F.3d 95, 105-106 (3d Cir. 2001), quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).  Due process requires that a conviction be set aside where prosecutorial misconduct has so infected the case with fundamental unfairness as to rise to the level of a denial of due process.  Id.

In the instant case, the prosecutor's statements which have been specifically quoted in the discussion of Ground One above, directly invited the jurors to predicate first degree murder liability for Petitioner upon statements allegedly made by Rasheed Simpson out of Petitioner's hearing, constantly referred to Simpson's threats as "*their* words" and "their threats," and insisted that because Petitioner was "in for a penny"  – meaning, obviously, the kidnapping –  he was "in for a pound"– meaning, obviously, the murder.  R. 2056a-2058a, 2070a-2071a, 2097a-2098a.  Clearly, the effect of such statements was to render the whole proceeding fundamentally unfair – particularly when their impact is measured along with the impact of the court's failure to give a proper charge.  Trial counsel's failure to object to these arguments by the prosecutor is completely inexplicable, as they affected the very same important constitutional right to have the evidence against Petitioner evaluated separately from the evidence against Mr. Simpson with respect to the specific intent requirement for first degree murder.  There would be no rational strategic reason to make objection in one instance and not the other.  See Acala v. Woodford, 334 F.3d 862, 870-871 (9th Cir. 2003) (counsel having chosen to present an alibi defense, no rational purpose was served by failing to pursue the matter completely and competently).

Petitioner, moreover, was gravely prejudiced by these omissions to object to the offending portions of the prosecutions closing argument and the charge to the jury.  Had the relevant arguments

been made cohesively, consistently and coherently, and thereafter correctly ruled upon by the Court, there is a substantial likelihood that Petitioner would in fact not have been convicted.  As previously stated, the only evidence connecting Petitioner to the occurrence at all was the suspect testimony of Rasheema Washington.  That testimony, moreover, was completely devoid of any hint at all about his views on whether Haynes should in killed or merely robbed.  Had the jury been properly instructed, and had the prosecution refrained from argument suggesting improper transfers of intent, it is substantially likely that the jurors would not have found Petitioner guilty of the specific intent to kill beyond a reasonable doubt, as was required for first degree murder.  Even if the court had failed to rule correctly, moreover, such complete and timely objections would have preserved these meritorious issues for appeal.

### (b)   Direct appeal counsel

As the United States Supreme Court has stated, counsel's "role as advocate requires that he support his client's appeal to the best of his ability." Anders v. State of California, 386 U.S. 738, 744 (1967).  Therefore, the Strickland test for ineffective assistance applies with equal force to counsel on appeal. Evitts v. Lucey, 469 U.S. 387 (1985); Commonwealth v. McGill, 832 A.2d 1014 (Pa. 2003).

As can be readily seen from an examination of the Brief for Appellant filed  in Petitioner's direct appeal, the jury charge issue was argued in a neglectful and cursory manner.  The relevant jury instructions were never so much as quoted, for example, and the offending, misleading portions were never specifically identified.  Furthermore, in a truly stunning display of inattention and one-size-fits-all form-briefing, direct appeal counsel string-cited to the Pennsylvania Supreme Court's decision *in co-defendant Simpson's appeal* –  which dealt in an adverse manner with portions of the

very same jury instructions at issue here  –  without any acknowledgment of the connection to Petitioner's case at all. <u>See</u> Brief for Appellant, 3/15/04 (PCRA Petition, Exhibit A), p. 16.  Even after the Superior Court rejected Petitioner's appeal based solely on the <u>Simpson</u> decision – <u>see</u> Superior Court Memorandum, <u>Commonwealth v. Bowers</u>, No. 2468 EDA 2003, 9/9/04 (Habeas Petition, Attachment A), pp. 5-6 –  counsel *still* made no effort to distinguish that decision in her Petition for Allowance of Appeal to the Pennsylvania Supreme Court.  <u>See Commonwealth v. Bowers</u>, No. 498 EAL 2004, Petition for Allowance of Appeal, 8/8/04 (PCRA Petition, Exhibit C), pp. 12-16.

Since the arguments this Petitioner was attempting on appeal went *beyond* the argument addressed in <u>Simpson</u>, competent counsel would have pointed out that while the Supreme Court in <u>Simpson</u> examined the first degree murder charge and the accomplice/co-conspirator charges, it does not appear that the Court's attention was drawn to the fact that when charging the jury concerning the *crime* of criminal conspiracy, the trial court's instructions were couched in terms allowing conviction for *either* a conspiracy to rob *or* a conspiracy to murder. <u>See Commonwealth v. Simpson</u>, 562 Pa.255, 273-279, 754 A.2d 1264, 1273-1276 (2000).  The Supreme Court, therefore, had no occasion to consider the effects of this confusing definition upon the instructions given for co-conspirator liability generally, and how the combination would be viewed by a jury considering a first degree murder charge on a co-conspirator theory.  Nor did it, obviously, consider the potential effects of the instruction upon Petitioner specifically, who was not directly implicated in any death threats towards the decedent, as was Mr. Simpson.  Therefore, had the <u>Simpson</u> decision been faced directly, and had Petitioner's argument been made correctly, there would have been a very real chance of meriting separate consideration by both the Superior and Supreme Courts.  As it was, the

failure of counsel to even acknowledge the Simpson decision connection to Petitioner's case was nothing less than appellate suicide on the issue.

Even more importantly, appellate counsel failed to argue Petitioner's jury charge issues in their proper federal context, as due process violations, as set forth in Ground One above.  By the time of Petitioner's trial in 1997, as previously stated, the Third Circuit Court of appeals had already decided Smith v. Horn, supra, in which jury instructions strikingly similar to those in Petitioner's case were held to violate due process, in a reasoned opinion squarely based upon United States Supreme Court cases.   Thus, there was absolutely no excuse for counsel's failure to include the applicable federal authorities and to properly argue Petitioner's issue as a federal due process claim in an effort to persuade the Pennsylvania courts to reach a different conclusion  from that stated in Simpson, and to preserve the issue for habeas review.   Compare, e.g., Mayo v. Henderson, 13 F.3d 528 (2d Cir. 1994) (counsel ineffective for failing to raise a claim that would ultimately be addressed by the state supreme court, even though it was virtually certain to be rejected by intermediate state court).

For all of the foregoing reasons, therefore, Petitioner's direct appeal counsel rendered seriously ineffective service, greatly to Petitioner's prejudice, resulting in loss of highly meritorious appeal issues.

### c.    Alleged previous litigation; failure to reach the merits.

The ineffectiveness of trial and direct appeal counsel as set forth above, was carefully raised in Petitioner's August 11, 2006 Petition for Post Conviction Collateral Relief, pp. 132-155.  Both the Court of Common Pleas and the Superior Court, however, dismissed Petitioner's contentions on the on the clearly erroneous ground that these claims had been litigated before.  See Superior Court

Memorandum, <u>Commonwealth v. Bowers</u>, No. 2703 EDA 2008,  12/31/09 (Habeas Petition, Attachment C), pp. 13-14; Opinion of the Honorable William J. Mazzola, 3/20/09 (Habeas Petition, Attachment B), pp. 11-15.    This conclusion was clearly in error.  First of all, these issues were raised in Petitioner's first PCRA petition following completion of his direct appeal, which represented his first opportunity to present *any* ineffectiveness issues under <u>Commonwealth v. Grant</u>, 813 A.2d 726 (Pa. 2002).   It had, moreover, been established in <u>Commonwealth v. Collins</u>, 888 A.2d 564 (Pa. 2005) that even if an issue presented on direct appeal bears some resemblance to an ineffectiveness issue being presented on collateral review, the latter must still be treated as an independent constitutional claim and separately analyzed.

Furthermore, Petitioner's current ineffectiveness claim is not merely a rehash of the arguments made on direct appeal,[21] but rather, is founded upon identifiable and prejudicial mistakes

---

[21]      In Petitioner's direct appeal, counsel stated the following issue:

THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY THAT A DEFENDANT CANNOT BE HELD CULPABLE FOR FIRST DEGREE MURDER AS AN ACCOMPLICE OR CONSPIRATOR UNLESS HE POSSESSES THE SPECIFIC INTENT TO KILL.

As previously described, the ensuing five page argument failed to even quote the jury instructions actually given by the court, failed to cite crucial federal precedents on the subject, and failed to distinguish the arguments being made from those rejected by the Pennsylvania Supreme Court in Petitioner's co-defendant's case.  Given such an argument, the Superior Court predictably issued a single paragraph ruling on the issue, simply relying upon the Supreme Court's holding in the <u>Simpson</u> case as previously described.

In his first PCRA petition, by contrast, Petitioner alleged (a) that the charge as actually given, taken as a whole, was violative of federal due process jurisprudence (b) that trial counsel arguably failed to specify the correct rationale for his objection to the charge as given at the time of trial, and moreover failed to object to similarly objectionable argument by the prosecutor, and (c) that appellate counsel failed to competently present Petitioner's claim, which was different from the claim made in co-defendant Simpson's case, directly resulting in the adverse decision on direct appeal. <u>See</u> Petition for Post Conviction Collateral Relief, 8/11/06, pp. 163-167.

made by prior counsel in the litigation of the issue, which under Pennsylvania law clearly entitled Petitioner to an evidentiary hearing concerning the reasons for those mistakes.  Compare, e.g., Commonwealth v. Franklin, 823 A.2d 906, 908 (Pa.Super. 2003) (appeal counsel ineffective for filing a brief so deficient that it failed to cite to evidence in the record); Commonwealth v. Halley, 870 A.2d 795 (Pa. 2005) (counsel  ineffective and prejudice presumed for failure to file a Rule 1925(b) statement when ordered).  Accordingly, the Superior Court's dismissal of this claim without reaching the merits was based upon a clear, factual mis-reading of the record and is not entitled to deference in the federal courts.  Since the merits were not reached, moreover, this Court must consider the issue of counsel's ineffectiveness de novo.  Simmons v. Beard, 590 F.3d 223, 231 (3d Cir. 2009).

> **Ground Three:**     **Trial counsel rendered ineffective assistance by failing to have the former testimony of unavailable witness Felicia Brokenbrough read to the jury to impeach the Commonwealth's time-line and Rasheema Washington's story, and by failing to impeach witnesses Hall, Duncan, Washington and Selvan Haynes  by reference to their former testimony and statements.**

A fundamental requirement for competent representation is that counsel conduct a full and complete investigation concerning possible witnesses and defenses.  See, e.g. Strickland, 466 U.S. at 691 ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary");  United States v. Gray, 878 F.2d 702, 711 (3d Cir. 1989) (counsel ineffective for failing to go to the scene to attempt to find available eyewitness and for failing to investigate witnesses suggested by defendant); Berryman v. Morton, 100 F.3d 1089 (3d Cir. 1996) (failure to investigate potential defense witnesses was not reasonable trial strategy when

witnesses could have directly contradicted victim's height description of second assailant, and victim's claim that she had not been drinking); Sullivan v. Fairman, 819 F.2d 1382 (7th Cir. 1987) (failure to locate and call disinterested eyewitnesses who had given statements exculpatory to the defendant); Rolan v. Vaughn, 445 F.3d 671 (3d Cir. 2006) (counsel ineffective for failing to investigate two potential eyewitnesses who could have supported defendant's self-defense claim). The duty to conduct such an investigation is, moreover, not dependent upon whether or not the defendant prefers a certain defense over another, and indeed, has been held to extend even beyond the  client's explicit directives to abandon a particular line of inquiry.

Similarly ineffective is the failure to utilize available impeachment material against important Commonwealth witnesses. Berryman v. Morton, supra, 100 F.3d at 1097-1099 (where rape conviction depended solely on victim's identification, failure of counsel to cross examine victim with respect to greatly differing physical descriptions of her assailants, previously given at alleged accomplices' trials, constituted ineffective assistance, and state court's conclusion to the contrary was unreasonable); United States ex rel. Washington v. Maroney, 428 F.2d 10 (3d Cir. 1970) (hastily prepared counsel held ineffective for failing to impeach key government witness by use of his prior criminal record and failing to call character or other witnesses); Commonwealth v. Baxter, 537 Pa. 41, 640 A.2d 1271 (1994) (defendant prejudiced and counsel ineffective for failing to impeach witness who testified that defendant confessed to him at his home, by reference to fact that witness was in fact incarcerated at the time);  Commonwealth v. Bolden, 517 Pa. 10, 534 A.2d 456 (Pa. 1987) (defendant was prejudiced and counsel ineffective for failing  to impeach testifying police officer with his own contradictory report, where officer was main Commonwealth witness called to impeach defendant's alibi).

a.        **Time line shift between the two trials**

In the instant case, trial counsel failed to utilize the critically important prior recorded testimony of an important witness, Felicia Brokenbrough, as well as other impeachment material, all of which collectively would have unequivocally demonstrated the damaging fact that that *all* of the Commonwealth's witnesses from  the earlier trial of Petitioner's alleged co-conspirator Allister Durante had made a *coordinated and mutually consistent alteration* in their testimonies for purposes of  *Petitioner's* trial – dramatically changing the alleged time-line of events so as to accommodate the tale told by the Commonwealth's newly discovered witness, Rasheema Washington, *who just happened to be the only witness to implicate Petitioner in the kidnapping.*   Had counsel demonstrated this suspiciously coordinated shift in testimony to the jury, it is extremely likely that the credibility of the entire prosecution would have been destroyed – and particularly its case against Petitioner, for which Rasheema Washington was the only direct witness.

By way of background, the Commonwealth's witnesses testified at Durante's trial to a series of events beginning with Durrante's arrival at the door of Haynes' apartment around 10:00 or 10:30 p.m., *followed by* Haynes' trip to the nearby Chinese store in the company of one Felicia Brokenbrough, and his *subsequent* abduction by unidentified parties.  See Part III(A)(2)-(6) above. Specifically, Duncan testified that it was not until 10:00 p.m. that Durrante first came to Haynes's door. Commonwealth v. Durrante, N.T. 10/3/95 (PCRA Petition, Exhibit O), pp. 6-10, 26-28 (R. 636a-640a, 656a-658a).  Brokenbrough testified that it was not until 10:00 or 10:30 p.m. that she first met up with Haynes, who was only then just setting out for the store. Commonwealth v. Durrante, N.T. 10/5/95 (PCRA Petition, Exhibit U), p. 17 (R. 783a).  Thus, the abduction, which did not occur until their return trip from the store, would have been even later.  Selvan Haynes, similarly

testified that he did not receive a call from Hall about his brother's abduction until sometime after

10:00 p.m.  N.T. 10/3/95 (PCRA Petition, Exhibit T), p. 92 ( R. 751a)..  Crediting all this testimony,

as given at Duncan's trial, the abduction itself could not have taken place more than a half hour or

less before the first 911 phone call announcing Haynes's death, *at 11:10 p.m.*  See Telephone and

Radio Transmittal Log, 12/8/93 (PCRA Petition, Exhibit N), pp. 1-3 (R. 624a-626a).

Between the time of Durrante's trial and the time of Petitioner's trial, however, Felicia

Brokenbrough disappeared, and the Commonwealth came up with a completely new witness,

Rasheema Washington, Petitioner's purported girlfriend, who claimed that on the night of Haynes'

death, Petitioner, his co-defendant Simpson, Durrante and another person together brought a bound

a gagged man over to her apartment where he was beaten, abused and questioned for a period of time

while Durrante and Simpson used the phone in her bedroom.  According to Washington, in fact,

Petitioner called her to announce that he was coming over about an hour before this captive man was

brought to her apartment, and the subsequent activities took another half hour more.  N.T. 12/12/97,

pp. 43-45, 97  (R. 1889a-1891a, 1943a).

Obviously, in order to use this testimony by Washington in Petitioner's trial,   the

Commonwealth's time line had to be pushed back by a considerable amount, since there simply was

not enough time between an abduction at 10:30 p.m. or later and the victim's execution at about

11:10 p.m., for the events related by Washington to have occurred.  Duncan therefore changed his

testimony, placing everything that happened a whole hour earlier, which testimony was corroborated

by Aloysius Hall and by Selvan Haynes, who likewise changed his testimony from one trial to the

next.[22]

Bringing the jury's attention to this clearly opportunistic, and essentially uniform, change in the testimony of the Commonwealth's witnesses and its proposed time line, would have been particularly powerful impeachment of Washington (whose story would have required about an hour and a half between the initial abduction and the actual killing – see N.T. 12/12/97, pp. 43-45, 97 (R. 1188a-1891a, 1943a) – and the other witnesses involved in Petitioner's trial. This is particularly true since there were already some very good reasons to doubt Washington[23], and other discrepancies in Duncan's and Hill's various statements as given at various times (see subpart (c) below).

### b.   Failure to use Felicia Brokenbrough's prior recorded testimony.

Besides the previous testimony of Duncan and Selvan Haynes, the wholesale nature of the

---

[22]    According to Duncan's testimony at Petitioner's trial, his conversation with Brokenbrough, who was still excited from having just witnessed Haynes' abduction , would have taken place easily before 9:45 p.m.  See N.T. 12/10/97 pp. 46-53 (R. 1644a-1650a)  (Allister Durrante came to the door at 9:00 p.m.; after a brief conversation with Duncan and Hall, Haynes went downstairs and talked to Durrante briefly; Duncan then spent 5 minutes listening to music in his own apartment, took a shower and had been watching television for about 15 minutes before Brokenbrough rang the doorbell).  See also Hall's testimony at N.T. 12/11/97, pp. 16-18, 40, 44 (R. 1692a-1694a, 1716a, 1720a) (Durrante came to the door at 8:45; shortly thereafter, Haynes went out and a gunshot was heard, followed by Brokenbrough's appearance at the door; the first ransom call occurred at approximately 9:45 p.m.).  See also N.T. 12/11/97, p. 70 (R. 1746a) (Selvan Haynes putting Hall's phone call to him after the abduction at 8:00 p.m.).

[23]    Among other things, Washington described a full half hour of vicious beading and kicking of Haynes, all of which was belied by the condition of the body, which revealed nothing more than a scrape on the leg.  See N.T. 12/11/97, pp. 159, 162, 166 (R.1835a, 1838a, 1842a) .  Her preliminary hearing testimony and statements to police were at odds with her trial testimony over such matters as timing, whether weapons were in evidence, what she was actually in a position to see, and how Petitioner was able to gain access to her apartment.  Compare Statement of Rasheema Washington, 6/17/96 (PCRA, Exhibit W) (R. 801a-815a) and N.T. 11/7/96 (Preliminary Hearing, PCRA Exhibit X), pp. 5-6, 8, 16, 19 (R. 820a-821a, 823a, 831a, 834a) with N.T. 12/12/97, pp. 10-16, 27, 41-45, 49-50, 70-71 (R. 1856a-1862a, 1873a, 1887a-1891a, 1895a-1896a, 1916a-1917a).

Commonwealth's time-line shift was dramatically demonstrated by the testimony given by Felicia Brokenbrough at Durante's trial.   Counsel, however, failed to make any attempt to read in the previously recorded testimony of Felicia Brokenbrough – despite the fact that Duncan was permitted to testify to certain "excited utterances" allegedly made by her just after the abduction.   N.T. 12/10/97, pp. 52-53, 60, 73 (R. 1650a-1651a, 1658a, 1671a).   Brokenbrough herself could not be found by either party, and a stipulation to that effect was read to the jury, along with the information that Brokenbrough had tentatively identified Haynes' abductor from a photo array shown to her by police, which person was not Petitioner, *or* Mr. Simpson. N.T. 12/15/97, pp. 21-40 (R. 2032a-2047a).

What Petitioner's trial counsel completely overlooked , however, was the fact that Felicia Brokenbrough had previously testified for the prosecution in Allister Durrante's trial back in 1995. Her testimony was recorded and was subject to cross examination by the Commonwealth, in a similar proceeding in which the Commonwealth's interests were similar.   Accordingly, that testimony would have been fully admissible under controlling Pennsylvania Supreme Court precedents.  See, e.g., Commonwealth v. Bazemore, 614 A.2d 684 (Pa. 1991) (unavailable witness' testimony from preliminary hearing was admissible on behalf of the Commonwealth at trial, where the defendant against whom the testimony was offered had a full and fair opportunity to examine the witness); Commonwealth v. Graves, 398 A.2d 644 (Pa. 1979) (to similar effect, testimony from earlier trial).  See also subsequent codification of this common law rule as Pa.R.E. 804(b)(1) (providing a hearsay exception for testimony given by a presently unavailable witness "at another hearing of the same or a different proceeding . . .  if the party against whom the testimony is now offered . . . had an adequate opportunity and similar motive to develop the testimony by direct, cross,

45

or redirect examination"). Instead, counsel permitted Duncan's hearsay description of Brokenbrough's supposedly excited utterances to be admitted, *using Duncan's opportunistically revised time line.*

Here again, therefore, counsel completely defaulted on his obligation to bring to the attention of the jury the incredibly damning fact that at Durrante's trial, Duncan and Haynes, corroborated by Brokenbrough, used a completely different time-line that simply would not have accommodated the story later advanced by Rasheema Washington in aid of the prosecution's attempt to draw this Petitioner into the web of this murder.

### c.    Failure to use other impeachment material.

In addition to the above, moreover, there were numerous other instances of impeachment material from prior statements and testimony that could haves been used, but were *not* used, in the cross examination of Duncan, Hall and Selvan Haynes.

Duncan, for example, testified on direct that the doorbell rang at about 9:00 p.m., that it was Allister Durrante at the door, that he went and told Haynes and Hall, followed Haynes downstairs, ignored the conversation at the door, listened to music (5 minutes), took a shower, and watched TV (15 minutes) until Felicia Brokenbrough rang the doorbell to say that she had just witnessed a gunshot fired and Haynes abducted. N.T. 12/10/97, pp. 46-51 (R. 1644a-1649a). On cross, by contrast, he said that after telling Haynes and Hall that Durrante was at the door, he remained upstairs with Hall while Haynes went down to talk to Durrante, heard the gunshot, looked out the window and only then, having failed to see anything, went downstairs after Haynes to see him talking at the door with Durrante *and* another man. N.T. 12/10/97, pp. 44-60, 69, 72-73 (R. 1642a-1658a, 1667a, 1670a-1671a ). At Durrante's trial, he testified that he spent the evening primarily

with Haynes on the third floor, had come downstairs for his shower *prior* to Durrante appearing at the front door, had not answered the door to Durrante until *after 10:00 p.m.,* had followed Haynes downstairs immediately, had immediately entered his own apartment and shut the door and heard nothing further until Brokenbrough rang, *only 10 minutes later! And* at Durrante's trial on *cross,* he claimed, contrary to all of the above, to have initially closed his door, but after hearing Haynes open the door to Durrante,  opened it up again, listened to the conversation, and watched Haynes climb back up the stairs – all, once again, before taking *another* shower. Commonwealth v. Durrante, N.T. 10/3/95 (PCRA Petition, Exhibit O), pp. 6-10, 26-28, 21-33, 40-42 (R. 636a-640a, 656a-658a, 660a-663a).

Hall  testified,  on  direct  examination,  that  he  had  been  with  Haynes  in  the  third  floor apartment when Durrante came by, that Haynes went down to talk to Durrante and then returned, that a whole 10-15 minutes went by before Haynes went back out to purchase his oil, after which Hall heard the shot, after which Felicia Brokenbrough rang.   *On cross examination, by contrast*, Hall changed his story to harmonize with Duncan's, claiming *for the first time* that Duncan had been in Haynes' apartment with Hall when the shot was heard.  See N.T. 12/11/97, pp. 16-20, 44-46 (R. 1692a-1696a, 1720a-1722a).   In his original version at Durrante's trial, by contrast, Hall never actually saw Haynes leave the apartment on his errand, but rather, suddenly missed him after hearing a gunshot. . Commonwealth v. Durrante, N.T. 10/3/95 (PCRA Petition, Exhibit R), pp. 59, 76 (R. 713a, 730a).   This is not to mention also the   substantial  differences  between  Hall's  various statements at both trials, and the preliminary hearing, and in his statement to police, concerning when he arrived at Haynes' apartment, the number of times Brokenbrough rang before being admitted, and his recollection that Duncan spoke of a getaway "car" rather than a "station wagon." See Statement

of Aloysius Hall (PCRA Petition, Exhibit P) (R. 688a-691a); N.T. 11/7/96 (Preliminary Hearing, PCRA Petition, Exhibit Q), pp. 41-46 (R. 697a-702a); <u>Commonwealth v. Durrante</u>, N.T. 10/3/95, pp. 58-61, 74-76 (R.712a-715a, 728a-730a); N.T. 12/11/97, pp. 15-23, 33-36, 40-58, 62-66 (R.1691a-1699a, 1709a-1712a, 1716a-1734a, 1738a-1742a).   Had Hall been examined with reference to his preliminary hearing testimony, moreover, the jury would have known that his story about *a whole series of ransom calls after the initial two* was of recent origin, and that  he had previously sworn to only three calls in all.  <u>Compare</u> N.T. 12/11/97, pp. 21-22, 33-36, 40-42 (R. 1697a-1698a, 1709a-1712a, 1716a-1718a) with N.T.11/7/96 (Preliminary Hearing, PCRA Petition, Exhibit Q, p. 46 (R. 702a).

The decedent's brother, Selvan Haynes, was similarly unable to adopt a consistent story from one minute to the next.  At Petitioner's trial, the call came from Hall at 8:00 p.m. N.T. 12/11/97, p. 70 (R. 1746a).  At Durrante's trial, it came two hours later.  <u>Commonwealth v. Durrante</u>, N.T. 10/3/95 (PCRA Petition Exhibit T), p. 92 (R. 752a).   At Petitioner's trial, Hall told him on arrival about hearing a gunshot and getting the first ransom call, but made no mention of Brokenbrough's tale. N.T. 12/11/97, pp. 70-71 (R. 1746a-1747a).  In his statement to the police, Hall told him on arrival about Brokenbrough's description of the abduction, but made no mention of any ransom calls. Statement of Selvan Haynes, December 9, 1993 (PCRA Petition, Exhibit S) (R. 745a-746a).  At Petitioner's trial, the ransom call he received at his brother's apartment was a follow-up to an earlier call made to Hall alone.  N.T. 12/11/97, pp. 71-72 (R. 1747a-1748a).  In his statement, by contrast, the first ransom call he mentioned at all was the one made to him. Statement of Selvan Haynes, December 9, 1993 (PCRA Petition, Exhibit S) (R. 745a-746a).  At Petitioner's trial, he used call forwarding to deliberately re-route the kidnappers' calls to his mother's home. N.T. 12/11/97, p. 72

(R. 1748a). In his statement, he had no idea how the kidnappers had gotten his mother's phone number, and speculated that his brother may have given it to them. Statement of Selvan Haynes, December 9, 1993 (PCRA Petition, Exhibit S) (R. 745a-746a). In Petitioner's trial, the next call came immediately as they arrived at his mother's house. N.T. 12/11/97, p. 73 (R. 1749a). In Durrante's trial, it was 15-20 minutes later. Commonwealth v. Durrante, 10/3/95 (PCRA Petition, Exhibit T), p. 96 (R. 756a). In Petitioner's trial, there were 4-5 calls from the kidnapper, lasting until after midnight, during one of which he was able to actually speak to his brother. N.T. 12/11/97, pp. 71-77 (R. 1747a-1753a). In his statement, there were only two calls. Statement of Selvan Haynes, December 9, 1993 (PCRA Petition, Exhibit S) (R. 745a-746a). At Petitioner's trial, he was unable to tell if it was the same man making all the calls. N.T. 12/11/97, p. 79 (R. 1755a). In his statement to police, and at Durrante's trial, he had no trouble saying that it was. Statement of Selvan Haynes, December 9, 1993 (PCRA Petition, Exhibit S) (R. 745a-746a); Commonwealth v. Durrante, 10/3/95 (PCRA Petition, Exhibit T), p. 99 (R. 759a).

None of the opportunities listed above, for effective cross examination of these important prosecution witnesses, were used. The mere recitation of their pervasive inconsistencies – from day to day as well as from witness to witness – would clearly have had significant potential for convincing the jury that the Commonwealth's case was a made-up patchwork of opportunistic lies – and, therefore, for a judgment of acquittal. Compare Cargle v. Mullin, 317 F.3d 1196, 1213-1214 (10th Cir. 2003) (counsel ineffective for failing to call a number of witnesses concerning inconsistent prior statements, who together would have shown "that the case involved such a tangle of inter- and intra-witness inconsistency that the jury could not be confident enough in any person's word to justify holding petitioner responsible for first degree murder beyond a reasonable doubt").

### d.      State court conclusions

As can be seen from the above, trial counsel overlooked what may have been the single most important circumstance of Petitioner's trial, that is, the wholesale fabrication of an entirely new time-line, coordinated among all the witnesses, as compared with their earlier testimony against Durrante. Additionally overlooked were a myriad of other inconsistencies in these witnesses' previous testimony and statements. The failure to use Brokenbrough's prior recorded testimony and the previous testimonies of these time-line-shifting witnesses was ineffective representation of the most classic sort.

The Superior Court's conclusion to the contrary was, moreover, completely unreasonable and demonstrates a lack of understanding of the record.

At pp. 5-8 of its December 31, 2009 memorandum (Habeas Petition, Attachment C), for example, the Court opines that because Brokenbrough was unable to give a more precise time that 10:00 or 10:30 p.m., and because Washington did not assign *any* particular time for the events she allegedly witnessed, there was no impeachment potential to the line of questioning forgone by counsel. This completely overlooks the fact that Petitioner's argument had nothing to do with what Washington said about the time the events in her apartment began. What Washington did testify to, was an hour lapse between Petitioner's alleged phone call about bringing over the victim, and the alleged arrival of the group at her apartment. What Washington also testified to was a half hour at least during which the group abused the victim on the floor of her living room, and Simpson made phone calls, presumably demanding ransom. The significance of the approximate time given by Brokenbrough for the abduction ***as well as the times given by Duncan and Haynes at the Durrante trial consistent therewith,*** is that an abduction after 10:30 would simply not have left time for the

50

alleged events at Washington's apartment to have taken place at all, because the victim was dead and his body dumped and 911 being called at 11:10 p.m.

Furthermore, and even more importantly, the Superior Court completely blindsides the fact that the shift in time testimony took place across the board with all Commonwealth's witnesses from one trial to another. It is difficult to conceive of any more powerful impeachment than a uniform shift in testimony from one trial to another, so as to accommodate the only witness who happened to be willing to implicate Petitioner. Nor is it any answer, with respect to the other impeachment evidence suggested herein, that trial counsel conducted *some* cross examination of the Commonwealth's witnesses. The impeachment evidence *not* used was clear, compelling, overwhelming, and would have struck at the very heart of the Commonwealth witnesses' credibility. The failure to use it was irrational. The Superior Court's justification for counsel's failure to use it is similarly unreasonable.[24] It is therefore entitled to no deference by this Court and habeas relief is clearly warranted.

> **Ground Four:** **Petitioner was deprived of due process of law by virtue of his conviction of first degree murder upon evidence which was legally insufficient to provide proof beyond a reasonable doubt that he specifically intended to kill the decedent.**

Essential to the notion of due process as guaranteed by the Fourteenth Amendment is the

---

[24]     In rather breathtaking non-sequitur, the Superior Court in footnote 1, page nine of its memorandum opines that Brokenbrough's testimony would have been "more prejudicial than exculpatory" because (a) Brokenbrough described one of the *abductors* as having had his hat pulled down over his face to this nose, obscuring his face – see Commonwealth v. Durrante, N.T. 10/4/95 (PCRA Petition, Exhibit U), p. 20 – and (b) Washington described the *victim* as having had a hat pulled down over his face in a similar way – see N.T. 12/12/97, pp. 15-16. It is unclear to undersigned counsel how these coincidental uses of hats on different persons would have affected the jury in any way.

principle that "no person shall be made to suffer the onus of a criminal conviction upon sufficient proof – defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." Jackson v. Virginia, 443 U.S. 307, 316 (1979).  Thus, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id., 443 U.S. at 319.

As previously discussed in connection with Ground One above, evidence is sufficient to sustain a conviction for first-degree murder only where the Commonwealth establishes that the defendant acted with a specific intent to kill after premeditation, and that the defendant is responsible for the killing.  18 Pa.C.S.A. § 2502(d);  Commonwealth v. Mitchell, 528 Pa. 546, 599 A.2d 624, 626 (1991).   Thus, the mere presence of a defendant at the scene of a crime is not sufficient under Pennsylvania law to support a conviction beyond a reasonable doubt.  Commonwealth v. Hargrave, 745 A.2d 20, 23-24 (Pa.Super. 2000); Commonwealth v. Goodman, 465 Pa. 367, 370, 350 A.2d 810, 811 (1976).   While the existence of  a conspiracy may be proven by reference to circumstantial evidence, this does not lessen the Commonwealth's burden of proof, or permit a conviction based upon conjecture or surmise.  See  Commonwealth v. Emmi, 434 A.2d 142, 145-146 (Pa.Super. 1981); Commonwealth v. Hennigan, 753 A.2d 245, 253 (Pa.Super. 2000).   Furthermore, as previously discussed, when first degree murder is concerned, the Commonwealth does not satisfy its burden by merely proving that a defendant was part of a conspiracy to rob or kidnap or commit some other crime – it is necessary to establish that the defendant *specifically* intended to kill, in other words, that  that the particular act he conspired to commit was a deliberate and knowing murder.

The evidence against Petitioner Bowers fell into two categories.  First of all, there was some

evidence suggesting that he possessed a certain 9 millimeter gun weeks prior to Haynes killing, and possibly again eight days after the killing.  See Grounds Seven and Eight below.  Secondly, Rasheema Washington  testified that Petitioner and four others including Rasheed Simpson and Allister Durrante, brought Haynes to her apartment, bound hand and foot, where he was kicked and beaten and subjected to repeated demands for money, until finally, a half hour later, at her request, they all left again.  N.T. 12/12/97, pp. 9-10, 13-17, 38-39, 42-46, 49-50, 69, 97-101 (R. 1855a-1856a, 1859a-1863a, 1884a-1885a, 1888a-1892a, 1895a-1896a, 1915a, 1943a-1947a).    Notably, Washington did *not* implicate Petitioner in any of the ransom calls or threats to kill Haynes. N.T. 12/12/97, pp. 17, 69, 99-101 (R. 1863a, 1915a, 1945a-1947a).  According to Hall, moreover, the caller was always Simpson. N.T. 12/11/97, p. 33 (R. 1709a).  Accordingly, every act attributable to Petitioner from any of the testimony anywhere in the trial is just as consistent with a limited intent to perpetrate a kidnapping, as with the claimed conspiracy to murder.  The unavoidable conclusion, therefore, is that the Commonwealth failed to establish beyond a reasonable that Petitioner was an accomplice or co-conspirator to murder in the first degree, and  the conviction is deficient as a matter of due process.

The sufficiency of the evidence was raised by Petitioner on direct appeal.  The Superior Court, however, summarily dismissed the claim on the basis that the Pennsylvania Supreme Court, in co-defendant Simpson's case, had found the evidence sufficient to convict Simpson.  See Superior Court Memorandum, Commonwealth v. Bowers, No. 2468 EDA 2003 (Habeas Petition, Attachment A), pp. 4, 6-9.  Nowhere in the opinion, however, does the Superior Court address the enormous differences in the evidence against Simpson as compared with this Petitioner, Mr. Bowers.  As previously explained, there was direct evidence from both Hall and Selvan Haynes indicating that

Simpson directly threatened to kill Mr. Haynes if his ransom demands were not met.  There is no evidence, however, that Petitioner shared that intent, or was even within earshot of the demands being made.  Accordingly, the Superior Court's reliance on the Supreme Court's assessment of the evidence as to Mr. Simpson was patently erroneous on the record and entitled to no deference by this Honorable Court.

Even when viewed in the light most favorable to the Commonwealth, it simply cannot be said that any rational trier of fact – correctly instructed on the elements of first degree murder in the Commonwealth – could have found beyond a reasonable doubt that Petitioner shared Mr. Simpson's intention to kill Mr. Haynes.  Accordingly, under <u>Jackson</u>, Petitioner should be afforded habeas relief.

> **Ground Five:**    **Direct appeal counsel was ineffective for inadequately arguing the due process/insufficiency issue as a matter of Pennsylvania law and constitutional due process, and for failing to properly seek review of the Superior Court's failure to decide the matter as to _Petitioner_, as opposed to his co-defendant Rasheed Simpson.**

Although direct appeal counsel did raise the issue of the sufficiency of the evidence, she failed to directly cite any federal constitutional precedents, such as <u>Jackson v. Virginia</u>, <u>supra</u>. <u>See</u> Brief for Appellant (PCRA Petition, Exhibit A), pp. 20-22; Petition for Allowance of Appeal (PCRA Petition, Exhibit C), pp. 16-18.  Indeed, counsel's argument was insufficient even as a matter of state law, containing not a single citation to the actual record, and without any close analysis of the evidence, or lack of evidence, relating to Petitioner in particular.  <u>Id.</u>  Quite possibly as a result of this, the  Superior Court panel, as described above in Ground Four, erroneously decided Petitioner's sufficiency of the evidence issue _based on what the Supreme Court had held about the sufficiency_

*of the evidence **as to Petitioner's co-defendant Rasheed Simpson.***

This exclusive reliance upon the sufficiency determination undertaken in the <u>Simpson</u> case was, unfortunately, itself a violation of the principles analyzed in Ground One above, which require that each defendant's guilt or innocence of first degree murder be considered *independently* of the guilt or innocence of the co-defendant.   Furthermore, this violation was *especially* wrong and prejudicial in this case, because there *was* evidence from more than one witness that Rasheed Simpson – unlike Malik Bowers – specifically threatened to kill Mr. Haynes. Accordingly, the Supreme Court's determination that there was sufficient evidence to convict *Simpson* of "willingly and consciously participating in the killing of the victim" had absolutely *no* relevance to the question presented in *this* Petitioner's appeal, which is whether or not there was sufficient evidence of intent to kill on the part of *this* Petitioner, Malik Bowers.

One would expect, of course, that such an obvious error in the sufficiency analysis – one that once again deprived Petitioner of his right to be considered separately from his co-defendant when it came to first degree murder – would have been prominently pointed out by counsel in the subsequently filed petition for allowance of appeal to this Court.  Counsel, however, failed to do so. <u>See</u> <u>Commonwealth v. Bowers</u>, No. 498 EAL 2004, Petition for Allowance of Appeal, 10/8/04, pp.16-18 (R. 279a-281a).

It should go without saying that once having chosen to argue a valid and meritorious due process claim, stemming from the lack of sufficient evidence, there could have been no strategic purpose to arguing it in an ineffective manner.  The prejudice, moreover, is clear, going to the very heart of the conviction.  <u>See</u> <u>United States v. Bass</u>, 310 F.3d 321 (5th Cir. 2002) (counsel ineffective for failing to raise meritorious challenge to the sufficiency of the evidence).

The Superior Court's opinion on PCRA appeal failed to reach the merits of Petitioner's ineffectiveness argument on grounds that it was merely an attempt to "relitigate" the sufficiency of the evidence claim that was made on direct appeal.   See Superior Court Memorandum, Commonwealth v. Bowers, No. 2703 EDA 2008, 12/31/09, pp. 16-17.  As can be seen from the above, this was clearly erroneous as a matter of fact upon the record.  Petitioner's ineffectiveness claim is not a mere rehash of counsel's direct appeal argument, but rather points out specific and glaring omissions by counsel, resulting in a decision based on the sufficiency of the evidence as to Mr. Simpson rather than as to Petitioner.  Moreover, as previously stated in Ground Two above, the Pennsylvania Supreme Court has clearly held that ineffectiveness claims must be considered separately from the underlying issues, and it is improper to dismiss same as previously litigated as though derivative only.  Commonwealth v. Collins, supra.

For all these reasons, therefore, the Superior Court decision rejecting this issue is contrary to plain facts of record, and an unreasonable application of governing federal law requiring sufficient evidence to convict beyond a reasonable doubt.  Petitioner, therefore, should be granted habeas relief.

> **Ground Six:  Trial and direct appeal counsel rendered ineffective assistance by failing to object  to the prosecution's use of its peremptory strikes, make a full record in support of that objection, or otherwise pursue Petitioner's claim of racially motivated jury selection under Batson v. Kentucky, and the Fifth, Sixth and Fourteenth Amendments**.
>
> a.  **Standards for evaluation of a claim of racially motivated jury selection.**

In Batson v. Kentucky, 476 U.S. 79 (1986), the United States Supreme Court set forth the

presently applicable test for evaluating an equal protection challenge to the Commonwealth's use of its peremptory strikes.  First of all, a court must consider whether the defendant has made a *prima facie* showing using "any . . . relevant circumstances" which give rise to an inference of purposeful racial discrimination in the jury selection process.  If this prong is not satisfied, then the claim must fail, *but if it **is** satisfied, then the burden shifts to the prosecution* which must next come forward with race-neutral reasons to justify its use of its peremptory strikes on the minority venire members. Finally, if a race-neutral explanation is in fact tendered, then the court must make a credibility determination as to the persuasiveness of the assigned race-neutral reasons, and then decide whether or not the defendant has carried his burden of demonstrating, nonetheless, purposeful discrimination. Batson, supra, 476 U.S. at 96-98; Commonwealth v. Harris, 572 Pa. 489, 505-508, 817 A.2d 1033, 1042-1044 (2003).

The Superior Court has held, however, based on Pennsylvania Supreme Court precedent directly contrary to federal law, that the Batson analysis is inapplicable where the challenge to the jury selection is brought in the context of an ineffectiveness claim, thus depriving the petitioner of the burden-shifting effect of showing a *prima facie* case under Batson.  See Superior Court Memorandum, Commonwealth v. Bowers, No. 2703 EDA 2008, 12/31/09, pp. 10-13.  Petitioner respectfully submits that the Pennsylvania Supreme Court cases relied upon for this proposition are directly contrary to governing federal law.

Beginning in 1993, the Pennsylvania Supreme Court imposed a number of requirements constraining the use of the three-part Batson requirement in the context of ineffectiveness claims. In Commonwealth v. Spence, 627 A.2d 1176, 1182-1183 (Pa. 1993), first of all, the Court established a rule that before it would even consider an ineffectiveness claim based on Batson, the

defendant would have to supply a record specifically identifying the race of venire persons (1) stricken by the Commonwealth, (2) acceptable to the Commonwealth but stricken by the defense, and (3) finally empaneled in the jury selected. In a later case, <u>Commonwealth v. Uderra</u>, 862 A.2d 74 (Pa. 2004), the Court further dispensed with the burden-shifting mandated by <u>Batson</u>, holding that where a post-conviction petitioner has failed to make an adequate <u>Batson</u> challenge at the time of his trial, he may not subsequently rely upon <u>Batson</u>'s burden-shifting at all, but must instead bear the burden, from the beginning, of demonstrating the presence of actual, purposeful discrimination by a preponderance of the evidence.

In the instant case, the Pennsylvania Supreme Court has held in Petitioner's co-defendant Simpson's case that the record required by <u>Spence</u> is in fact available. See <u>Commonwealth v. Simpson</u>, 66 A.3d 253, 262 (Pa. 2013). Accordingly, this holding presents no barrier to Petitioner. Petitioner does maintain, however, that both the <u>Spence</u> requirements and <u>Uderra</u>'s emasculation of the three part <u>Batson</u> analysis in cases such as his, constitute ruling plainly contrary to the decision in <u>Batson</u> itself, which places no qualification upon the procedural circumstances under which it is to apply.

It is instructive, in this regard, that while the Third Circuit has yet to decide the question of whether or not <u>Uderra</u> was decided contrary to applicable Supreme Court law,[25] it has held that the <u>Spence</u> requirements constitute an unreasonable application under § 2254 which will not be enforced in federal habeas proceedings. Specifically, the Third Circuit has noted (1) that <u>Batson</u> created a more "fluid" standard for its first-stage analysis requiring proof only that jurors of a particular race

---

[25]    See <u>Williams v. Beard</u>, 637 F.3d 195, 212-213 (3d Cir. 2011), reserving judgment on the question.

have been stricken under circumstances indicative of an improper motive and (2) that the final racial composition of the jury, and the race of persons stricken by the defense, were both irrelevant to the Supreme Court's analysis in Batson, and contrary to its teaching that the remediable discrimination consists in the discriminatory removal of one or more jurors of a particular race, and *not* the failure to achieve a particular racial distribution on the jury.  Holloway v. Horn, 355 F.3d 707, 728-729 (3d Cir. 2004); see also Batson, 476 U.S. at 96-98; Bronshtein v. Horn, 404 F.3d 700, 722 (2005) (Spence requirements constitute an incorrect interpretation of Batson's substantive holding, and not merely an independent state procedural rule).[26]  Petitioner respectfully submits that a similar analysis should apply to the even more complete abrogation of Batson contained in the Uderra decision – which essentially returns post-conviction petitioners with ineffectiveness claims related to Batson to pre-Batson standards of proving purposeful discrimination, standards which the United States Supreme Court has decided present too great a barrier for the eradication of racially discriminatory practices.

The Third Circuit's position in Spence, and Petitioner's position herein on Uderra, are supported by the United States Supreme Court's decision in Johnson v. California, 545 U.S. 162, (2005), which  overruled a series of California cases that required defendants bringing a Batson challenge to demonstrate a "strong likelihood that the exercise of the peremptory challenges were based upon a group rather than an individual basis," in order to satisfy the prima facie requirement of step one.  See 545 U.S. at 164-172.  In so doing, the Supreme Court reiterated that under Batson,

---

[26]The Pennsylvania Supreme Court has declined to follow Holloway, disagreeing with the Third Circuit's analysis of Spence as creating a substantive deviation from Batson, and holding instead that the Spence requirements are merely procedural and within the authority of the Pennsylvania Courts.  See Commonwealth v. Fletcher, 580 Pa. 403, 423, n.15, 861 A.2d 898, 910, n.15 (2004); Commonwealth v. Spotz, 587 Pa. 1, 36, n.27,  896 A.2d 1191, 1212, n. 27 (2006).

"a prima facie case of discrimination can be made out by offering *a wide variety of evidence*, so long as the sum of the proffered facts gives rise to an inference of discriminatory purpose. 545 U.S. at 169-170 (citations, footnote and internal quotations omitted; emphasis supplied).   The Court's defense of its holding in <u>Batson</u> against California's attempt to moderate the liberality of the prong one, prima facie standard, would seem to support the position taken here, that Pennsylvania is *not* free to simply dispense with <u>Batson</u>'s requirements based on its own assessment of the difficulties to be encountered in enforcing it.

> **b.    Petitioner has made a more than sufficient offer of proof for a *prima facie* case under <u>Batson</u>, and it was an unreasonable application of <u>Batson</u> for the Pennsylvania Courts to refuse an evidentiary hearing as to the second and third prongs of the <u>Batson</u> analysis.**

Proceeding under the correct, first prong analysis under <u>Batson</u>, therefore, it is clear that Petitioner has made a sufficient proffer of statistic analysis, various side by side comparisons of white jurors retained and black jurors stricken, and other information tending to confirm a pattern of racially disparate voir dire questioning and racially motivated selection, sufficient to have warranted proceeding to the second prong.

As the PCRA court's opinion acknowledges, the final composition of Petitioner's  jury is known: six black members, six white members and two white alternates.[27]  Moreover, the racial analysis which was submitted along with the PCRA Petition (Petitioner's Exhibits D-H – R. 287a-432a) also establishes that the prosecution used 18 of a possible 22 strikes, 13 of them against black

---

[27]   <u>See</u> R. 426a-432a, R. 1083a-1084a (J. Bell - B), 1098a-1099a (Anick - W), 1142a-1143a (Hehn - W), 1207a-1208a (Staples - B), 1226a-1227a (McGill - B), 1298a-1299a (Papa - W), 1313a-1314a (Thomas - B), 1328a-1329a (Farrell - W), 1369a-1370a (Jamanow - W), 1400a-1401a (Robertson - W), 1489a-1490a (Green - B), 1534a-1535a (Canty - B), 1554a-1555a (Cancillier - W), 1582a-1583a (Mason - W).

venire members and 5 of them against white venire members.[28]   The combined defense, by contrast,

used 20 strikes, 10 against white venire members and 10 against black venire members.[29]   For 8 of

these strikes (5 black and 3 white), defense counsel voted first and the Commonwealth therefore did

not indicate its position on the prospective juror.[30]   Among the remaining 12 defense strikes,

however, voir dire notes indicate that 7 white and 5 black potential jurors were acceptable to the

Commonwealth.[31]   Thus, the record was adequately developed as required in Spence.

Furthermore, the statistics show a definite disproportionate removal of black venire members

by the prosecution's peremptory strikes.   The venire consisted of 137 people, of whom 61 were

white, 59 were black, 5 were Hispanic, one Asian, and a female who described herself as "other."

---

[28]   The PCRA court erroneously states at page 18 of its opinion that the Commonwealth used only 13 out of 18 available peremptory strikes during the whole voir dire.   See Opinion (Appendix B hereto), p. 18.  This is not correct.  In picking the first twelve jurors, the prosecution used 17 out of 20 available strikes to dismiss 12 black and 5 white venire members.  It used one of its available two strikes to dismiss a black venire member while choosing the two alternates.   See R. 426a-432a, 1106a-1107a (Martin - B), 1147a-1148a (Spivek - W), 1169a-1170a (Lipford - B), 1196a-1197a (Smith - B), 1218a-1219a (Dileo - W), 1244a-1245a (Edny - B), 1258a-1259a (Frierson - B), 1266a-1267a (Jones - B), 1318a-1319a (Feighan - W), 1336a-1337a (Tennesen - W), 1350a-1351a (Haynes - B), 1410a-1411a (Melchor - B), 1419a-1420a (Hicks - B), 1446a-1447a (Wilkinson - B), 1462a-1463a (Harris - B), 1476a-1477a (Perri - W), 1521a-1522a (A. Bell - B), 1571a-1572a (Cade - B).

[29]   See R. 426a-432a, 1091a (Alicea - W), 1119a-1120a (J. Wilson - W), 1129a-1130a (Jeter - B), 1160a (Stec - W), 1178a (McCreery - W), 1189a-1190a (Mizia - W), 1227a (Willis - B), 1252a-1253a (New - W), 1279a-1280a (Ringgold - B), 1289a-1290a (Livingston - B), 1361a (Wright - B), 1381a-1382a (Coats - B), 1390a-1391a (Darcy - W), 1433a (A. Wilson - B), 1455a (Temple - B), 1499a-1500a (Thompson - W), 1510a (Ucilletti - W), 1515a-1517a (Taylor - B), 1545a (Dalton - W), 1565a-1566a (Paziora - B).

[30]   See R. 426a-432a,  1129a-1130a (Jeter - B), 1189a-1190a (Mizia - W), 1279a-1280a (Ringgold - B), 1289a-1290a (Livingston - B), 1381a-1382a (Coats - B), 1390a-1391a (Darcy - W), 1499a-1500a (Thompson- W), 1515a-1517a (Taylor - B).

[31]   R. 426a-432a, 1091a (Alicea - W), 1119a-1120a (J. Wilson - W), 1160a (Stec - W), 1178a (McCreery - W), 1227a (Willis - B), 1252a-1253a (New - W), 1361a (Wright - B), 1433a (A. Wilson - B), 1455a (Temple - B), 1510a (Ucilletti - W), 1545a (Dalton - W), 1565a-1566a (Paziora - B).

After accounting for dismissals for cause, hardship, disqualification, or defense peremptory challenges, the Commonwealth had 12 opportunities to peremptorily strike black women and used 8 of them (67%).  It had 7 opportunities to peremptorily strike black men and used 5 of them (71%).  By contrast, it struck only two of the available 5 white men (40%), and only 3 of the available 8 white women (37%).  In other words, the Commonwealth exercised 13 of its 18 peremptory challenges (72%) against people of color, and only 5 (28%) against whites, despite the fact that people of color comprised only 48% of the venire, and whites, 52%.  Whereas the original venire was 59% black, that percentage dropped to 43% in the eventual petit jury (including alternates).  Clearly, therefore, the pattern of the prosecution's strikes was suggestive of a systematic exclusion of blacks from the petit jury.

In addition to the foregoing statistical analysis, Petitioner has demonstrated patterns in the specific voir dire which are highly suggestive of discriminatory intent and sufficient to establish a *prima facie* case under Batson.  As the Supreme Court indicated in Batson, a *prima facie* case may be established through statistical pattern and other relevant evidence including but not limited to questions asked and statements made during the voir dire process.  Batson, 476 U.S. at 97, 106 S.Ct. at 1723; see also Commonwealth v. Basemore, 744 A.2d 717, 729 (Pa. 2000).  Along these lines, the Third Circuit has held that striking black jurors after a perfunctory voir dire revealing no reason for the strike, is similarly supportive of an inference of discrimination.  Morse v. Hanks, 172 F.3d 983, 985 (3d Cir. 1999).  The Supreme Court, also, observed in Miller-El v. Dretke, 545 U.S. 231 (2005) that:

> More powerful than . . . bare statistics . . . are side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve.  If a prosecutor's proffered reason for striking a black panelist applies just as well to an

> otherwise-similar nonblack who is permitted to serve, that is evidence tending to
> prove purposeful discrimination at *Batson's* third step.

545 U.S. at 241.  See also id. at 242-252 & n. 8-11 (comparing black venire members stricken supposedly because of their responses during death penalty qualification, or because they had relatives with criminal histories, with white venire members accepted after having given similar responses).

Consideration of the particular voir dire conducted in this case leads to quite a number of unexplained disparities between the treatment of similarly situated black and white venire members, which were detailed in the PCRA petition and supporting memorandum (R. 48a-55a, 148a-155a). See, e.g., the following:

> ### 1. Acceptance of Bruce Jamanow, Danny Farrell, Trina Mason; Rejection of Jimmy Haynes, Paul Melchor, Mabel Harris.

The Commonwealth asked Bruce Jamanow – a young white man from a traditionally white neighborhood – only a few questions related to his youth and prior jury experience.  The defense then developed his military academy background, his 13 year work history with the Post Office, and his college enrollment while living with his parents.  Jamanow was accepted.  R. 430a, 1362a-1370a.

Jimmy Haynes, although older than Mr. Jamanow, had children in his 20's, had a similarly stable employment history as a security guard, having worked on the same assignment for eight years, and gave appropriate responses with respect to the death penalty.  After carefully establishing that Mr. Haynes, who is black, had resided in traditionally black-populated neighborhoods, the prosecutor peremptorily struck Mr. Haynes. R. 430a, 1338a-1351a.

The Commonwealth accepted Danny Farrell, a white male truck driver, with friends among

Philadelphia police, whose partner and girlfriend's mother had both been recently held up at gunpoint, and who gave unremarkable answers about the death penalty and presumption of innocence.  R. 430a, 1320a-1329a.

Paul Melchor, a black man residing in traditionally black areas of the city, with children in their 20's and 30's, and a stable 13 year work history as a local truck driver, also gave unremarkable answers on the death penalty questions.  His brother worked as a prison guard and his sister had been recently raped.  The prosecution struck Mr. Melchor.  R. 430a, 1402a-1411a.

The Commonwealth accepted Trina Mason, a young white female bank secretary who had prior experience on a jury in a case Mr. Savino had tried, who had a close family member who had been raped and another killed in a fight where only assault was charged, and a cousin who was a Philadelphia policeman.  R. 432a, 1573a-1583a.

The Commonwealth struck Mabel Harris, a black woman, mother of four children in the same age bracket as Jamanow, environmental services worker, with unremarkable prior civil jury experience and able to impose the death penalty where proper.  R.431a, 1456a-1463a.

Clearly, there was a racial disparity in the treatment of these six venire members, despite marked similarities in work stability, connection to law enforcement, and acquaintance with victims of crime.

### 2.    Acceptance of Patricia Anick; Rejection of Juanita Martin

Patricia Anick, a white woman with two brothers-in-law in law enforcement, who had previously served on a criminal, hung jury, was asked about her willingness to impose the death penalty.  She replied that she was "not really sure . . . I say yes but I'm not really sure unless I was

faced with that." R.  1096a.  Upon further questioning by the court, she agreed that she was "very reluctant or concerned" about imposing the death penalty, but was ultimately not dismissed for cause because she did affirm that she would follow the court's instructions. The prosecution accepted Ms. Anick without any further inquiries concerning occupation, residence, etc.  R. 426a, 1092a-1099a.

Juanita Martin, a black woman, married and mother of two, also had prior jury experience on a recent criminal case, as well as two civil matters.  When asked about the death penalty, she replied, "I would have to be absolutely sure that, you know, I felt the person was guilty.  I couldn't have any doubts; otherwise, I think I could.  I would have to be sure, you know, really, really sure." R. 1103a. Upon further questioning, in a statement almost identical to Ms. Anick's, Martin replied, "I've never been in that position before so I really can't say."  R.  1105a.   As in the case of Ms. Anick, the Court finally inquired, "But you could do it if the law and facts required it?" – to which Ms. Martin replied with a clear affirmative.  Id.  Despite the fact that these responses were functionally indistinguishable from those given by Ms. Anick, the Commonwealth peremptorily struck Ms. Martin.  R. 426a, 1100a-1107a.

### 3.    Acceptance of Joanne Hehn, Michele Papa, Edwin Robinson; Rejection of Paula Smith, Valerie Lipford, Magnolia Hicks

Joanne Hehn, a white woman, retired legal secretary, with prior criminal jury service, whose daughter-in-law's sister was a court liaison officer and whose  son's home had been burglarized three years earlier – also reported that her grandson had spent time as a juvenile in St. Gabriel's Hall, on a burglary charge. After just one single question addressed to this point of possible bias, and two other questions of a general nature, the Commonwealth accepted Ms. Hehn.  R. 426a, 1131a-1143a.

Paula Smith, a black woman, mother of four, data support clerk with the City Water

Department for the previous 9 years,  reported that her brother had been caught shoplifting five years before, but had since completed his ARD and had his record expunged.  Even though Ms. Smith testified – like Ms. Hehn –  that her brother's arrest and conviction would have no effect upon her ability to be fair, the Commonwealth struck Ms. Smith. R. 427a, 1191a-1197a

Valerie Lipford was a black woman, mother of five,  employed as an administrative assistant at the University of Pennsylvania[32] and for four years prior to that at the Veteran's Administration. Her father had once been robbed in his home.  Ms. Lipford stated that she could follow the law with respect to penalty.  Her son had served time for selling drugs, four years before, but had since been released.  Like Ms. Hehn and Ms. Smith, Ms. Lipford assured the court that her son had been treated fairly and that she held no animosity towards law enforcement as a result.  The Commonwealth, however, had no questions for Ms. Lipford, prior to exercising its strike.  R. 427a, 1161a-1170a.

Magnolia Hicks, a black woman, had lived in the same home for 25 years and was  partially retired after 20 years employment as a nurse's aid at the former Byberry state hospital.  She had served on four previous criminal juries, and expressed no difficulty with either the death penalty issue or the presumption of innocence. She had a cousin who had been convicted of murder.  Ms. Hicks, like Ms. Heyn, Ms. Smith and Ms. Lipford, believed that her cousin had been fairly treated and stated that she could be fair in this trial.  Again, however, after failing to ask a single question, the Commonwealth peremptorily struck Ms. Hicks.  R. 431a, 1412a-1420a.

---

[32] Nor could Ms. Lipford's university connection and several years of college education (R. 1168a-1169a), be considered a race-neutral reason, in light of the Commonwealth's acceptance of Michele Papa, a white female with two years post-High School training at Community College and the hospital where she worked as a microbiology lab technician (R. 429a, 1298a-1299a), and Edwin Robertson, a white male, with no fewer than *three* masters' degrees, teaching 7th and 8th  grade in Southwest Philadelphia and living in the University City area. (R. 430a, 1392a-1401a).

4.      **Michele Papa accepted; Janice Jones peremptorily
stricken**

Michele Papa  was a white woman, living in South Philadelphia for the past 10 years with her two teenage children.  She had one year of college and another year of in-house training at the hospital where she had worked for 23 years in a microbiology lab.  This information was developed by the defense; the prosecution questioned Ms. Papa solely about her service on two previous criminal juries involving murder and drug trafficking, and her willingness to impose the death penalty where appropriate, before accepting Ms. Papa.  R. 429a, 1292a-1299a.

Janice Jones was a black woman, mother of three, who had lived for 10 years in *her* neighborhood, the Fairhill section of North Philadelphia, with her mother and father and 8 and 10 year old daughters.  Originally, she worked as a hairdresser, but later acquired an additional year of training as a licensed practical nurse and then obtained employment in a nursing home. She was summarily excused by the prosecution after a perfunctory examination covering only her length of residence in her traditionally black neighborhood and her willingness to follow the law as to burden of proof and penalty.  R. 428a, 1260a-1267a.

5.      **Patterns of comparison**

As can be seen from the foregoing, there was markedly different treatment of similarly situated white and black venire members by the prosecution.  Moreover, the perfunctory nature of many of the Commonwealth's inquiries were indicative of a mind made up without serious consideration of the matters ostensibly under consideration.  See, e.g., (1) acceptance of Ms. Anick without inquiry as to anything other than her somewhat equivocal responses as to the death penalty, (R. 1092a-1099a); (2) acceptance of Ms. Hehn with very little inquiry into the effects of her

67

grandson's criminal background upon her (R. 1131a-1143a); (3) rejection of Ms. Lipford whose son similarly had a prior conviction, without asking a single question (R. 1161a-1170a); (4) rejection of Magnolia Hicks, whose first cousin had a criminal conviction, again without a single question (R. 1412a-1420a); (5) acceptance of Ms. Papa after questioning her solely about prior jury service and death penalty issues (R. 1292a-1299a); (6) rejection of Ms. Jones after a perfunctory examination covering only her length of residence in her traditionally black neighborhood and her willingness to follow the law as to burden of proof and penalty (R. 1260a-1267a). Compare Morse v. Hanks, supra, 172 F.3d at 983 (3d Cir. 1999) (holding that inference of discrimination arose from a pattern of striking black venire members after perfunctory voir dire revealing no reason to strike).

> **6.  The inference of discrimination is strengthened by other circumstances relevant to showing discriminatory pattern.**

The Supreme Court has held that a *prima facie* case under Batson can *also* be confirmed by reference to the general policies of the particular prosecutor's office involved. See Miller-El v. Cockrell, 537 U.S. 322, 328-334 (2003). In the instant case, there is likewise some supporting evidence of a more generalized pattern of discrimination by the Philadelphia District Attorney's office, including:

(i) the now notorious training tape by Jack McMahon dating from 1986 but not publicly revealed until April of 1997, which the Pennsylvania Supreme Court itself has described as advocating the practice of racial and gender discrimination during jury selection and the fabrication of pretextual reasons to disguise that purpose. See Commonwealth v. Basemore, supra, 560 Pa. at 280, 744 A.2d at 729 (remanding for evidentiary hearing, where McMahon was the prosecutor); see also Wilson v. Beard, 426 F.3d 653, 667-668 (3d Cir. 2005)

(McMahon guilty of <u>Batson</u> violation in 1984 trial) and <u>Brinson v. Vaughn</u>, 398 F.3d 225 (3d Cir. 2005) (prima facie case of <u>Batson</u> violation, made out against McMahon in 1986 trial). R. 433a-506a.[33]

        (ii) federal cases documenting discriminatory practices by members of the District Attorney's office. <u>See</u> <u>Diggs v. Vaughn</u>, 1991 WL 46319, *1 (E.D.Pa. Mar. 27, 1991) (3 different trials ending 1977); <u>Sistrunk v. Vaughn</u>, 90-CV-1415, Magistrate's Report & Recommendation (E.D.Pa. August 10, 1995), p. 6 (Powers, Chief Magistrate Judge) (R. 507a-520a) (1981 trial), <u>rev'd</u> 96 F.3d 666 (3d Cir. 1996) (grounds not relevant to the finding of discrimination); <u>Harrison v. Ryan</u>, 909 F.2d 84 (3d Cir. 1990)(1982 trial); <u>Holloway v. Horn</u>, 355 F.3d 707 (3d Cir. 2004) (1986 trial).

        (iii) statistical data relating to 401 capital juries picked by the Philadelphia District Attorney's office during the years 1981-1999, as analyzed by respected statisticians David Baldus and George Woodworth, *Evidence of Race Discrimination in the Commonwealth's Use of Peremptory Strikes in Capital Cases – Commonwealth v. Lee Baker (1984),* showing not only severely disproportionate imposition of the death penalty on black defendants, but also a pattern of eliminating black venire-persons from juries at a rate almost double that of other prospective jurors. <u>See</u> R. 542a-550a, 568a-585a, 591a.  Since the instant case was a death penalty case tried within the time period covered by Baldus and Woodworth's study (in which Petitioner's co-defendant was in fact sentenced to death), it is especially interesting that Mr. Fisher's results in

---

[33]    An August, 1990 lecture given by Assistant District Attorney Bruce Sagel has been suggested as further evidence of continuing racially discriminatory jury selection practices.  <u>See</u> R. 521a-524a (notes taken of lecture).  <u>But see</u> <u>Bond v. Beard</u>, 539 F.3d 256, 274 (3d Cir. 2008) and <u>Commonwealth v. Castro</u>, CP-51-CR-0310323-1997, April 26, 2007 Opinion of Honorable Carolyn Engel Temin (both concluding after testimony that Mr. Sagel did not suggest violating <u>Batson</u>).

this particular voir dire actually exceeded the statistical pattern found by Baldus and Woodworth for the office as a whole.

Petitioner is well aware, of course, of those decisions which have held that the McMahon tape and the Baldus statistics are insufficient, standing alone, to establish that racially discriminatory jury selection has occurred in any given particular case not actually tried by Mr. McMahon.  See, e.g., Commonwealth v. Rollins,  738 A.2d 435, 443, n.10 (Pa. 1999) (McMahon tape insufficient by itself to prove discrimination in defendant's particular case, especially since appellant was able to identify the race of only one venire person struck by the Commonwealth); Commonwealth v. Lark, 746 A.2d 585, 589 (Pa. 2000) (McMahon tape, "in and of itself" was insufficient to demonstrate racially biased jury selection in trial which occurred before the tape's creation); Commonwealth v. Williams, 863 A.2d 505, 510, 523 (Pa. 2004) (no Batson violation established where petitioner failed to establish *during his PCRA hearings* a link between the Baldus study, the McMahon tape and his own prosecution); Commonwealth v. Marshall, 810 A.2d 1211, 1216, 1228-1229 (2002) (denying remand for consideration of newly discovered McMahon tape and Baldus study where the Court had already reviewed the particulars of the defendant's own jury selection process and found that there was no racial bias shown).  While Petitioner can readily concede that such generalized evidence of a discriminatory culture is insufficient *by itself* to supply a *prima facie* case under Batson, the Supreme Court of the United States has clearly and unequivocally held that such evidence is indeed relevant and may constitute strong confirmation of discriminatory intent if otherwise suggested in a particular case.  In Miller-El, supra, for example, the Court considered the existence of a written manual advocating the exclusion of minorities from juries which was in circulation some *ten years prior* to Miller-El's own trial, together with other evidence suggesting that

discriminatory practices may not have been discontinued by the time of Miller-El's trial.   Miller-El

v. Cockrell, supra, 537 U.S.  at 334-335; Miller-El v. Dretke, supra, 545 U.S. at 263-266.

> **7.      From all of the above, it is clear that petitioner has set forth a *prima facie* case under Batson, and it was an unreasonable application of Batson for the Pennsylvania courts to deny him an evidentiary hearing as to the second and third prongs of the Batson analysis.**

In sum, therefore, the statistical analysis, the comparison of the treatment of similar white

and black venire members, and the other existing evidence tending to show a pattern of

discriminatory conduct, all clearly satisfy the first prong of the Batson analysis. Compare, e.g., Bond

v. Beard, supra, 539 F.3d at 264 (all parties agreed that a pattern of disproportionate strikes and

questionable individual strikes, together with the McMahon video and the Baldus study, gave rise

to a *prima facie* showing under Batson).[34]

> **c.      Petitioner should have been afforded an evidentiary hearing on his claim that trial counsel was ineffective for failure to object to the prosecution's discriminatory use of its peremptory strikes.**

Despite all of the above, Petitioner's trial counsel failed to make any objection whatsoever

to the prosecution's discriminatory use of its peremptory strikes – and by failing to do so, rendered

ineffective assistance under the standards established in Strickland and Pierce.  Petitioner has

demonstrated above a clear *prima facie* case under Batson, which satisfies the first prong of the

ineffectiveness analysis – an arguably meritorious issue.   Since the pattern was clearly evident in

the questioning and peremptory strikes during voir dire, moreover, there could have been no

---

[34]      The Batson claim was ultimately rejected after a third stage analysis. 539 F.3d at 274-275.

reasonable strategic justification for failing to make the requisite contemporaneous objection and the necessary record to support Petitioner's challenge to the petit jury that was empaneled. Nothing would have been lost by raising the issue and nothing about the issue would have conflicted in any way with any other defensive trial strategy. The failure to make a record, moreover, seriously prejudiced Petitioner by exposing him to the Pennsylvania Supreme Court's restrictive handling under Spence and Uderra. For these reasons, therefore, trial counsel's failure to properly raise, preserve and litigate this issue constituted ineffective assistance. It follows, then that Petitioner should have been afforded an evidentiary hearing, both as to counsel's thinking and purposes in failing to make the Batson objection and record, and as to the prosecutor's non-racial reasons, if any, for the peremptory strikes exercised. The failure to afford such a hearing constituted an unreasonable application of Batson, and Petitioner is, therefore, entitled to habeas relief.

> **Ground Seven:** **Petitioner was deprived of due process of law by virtue of the admission of prejudicial and irrelevant evidence concerning his unrelated purchase and alleged later possession of a certain firearm.**

As a matter of federal constitutional law, a defendant is entitled to have his guilt or innocence determined "by probative evidence and beyond a reasonable doubt." Estelle v. Williams, 425 U.S. 501, 503 (1976). The corollary to this principle is that due process is violated if the decision of the jury is invited based upon matters which are not, in fact, probative of guilt – such as, in Estelle, for example, the prejudice likely to be aroused by the appearance of the defendant standing trial while in prisoner's garb. See also Albrecht v. Horn, 485 F.3d 103, 122, n.6 (3d Cir. 2006) (due process claim under fundamental fairness standard arises if the probative value of evidence offered, although relevant, is greatly outweighed by prejudice to the accused).

Despite the fact that nothing but unidentifiable bullet fragments were recovered, and no testimony was offered as to the type or caliber firearm which was responsible for killing Haynes – N.T. 2/5/97, p. 107 (R. 1596a) – the Commonwealth was permitted to put on testimony (1) from Tracena Copper that she purchased a 9 millimeter gun for Petitioner on September 28, 1993, and (2) from Officer Slavin regarding an incident in Cheltenham Township in which this same gun was found on the driver's side floor of a car into which Petitioner had just sat down *on the passenger side*. N.T. 12/11/97, pp. 99-107, 112-113, 119-142 (R. 1775a-1783a, 1788a-1789a, 1795a-1818a); 12/12/97, pp. 126-132 (R. 1972a-1978a); 12/15/97, pp. 3-5.

The governing legal standard for this evidence was as follows:

> A weapon shown to have been in a defendant's possession may properly be admitted into evidence, even though it cannot positively be identified as the weapon used in the commission of a particular crime, <u>if it tends to prove that the defendant had a weapon similar to the one used in the perpetration of the crime</u>.

<u>Commonwealth v. Marshall</u>, 743 A.2d 489, 492 (Pa.Super. 1999) (emphasis supplied), <u>quoting</u> <u>Commonwealth v. Williams</u>, 537 Pa. 1, 20, 640 A.2d 1251, 1260 (1994). Furthermore, the probative value of a given piece of evidence, even if technically relevant to some issue, must be weighed against the potential for unfairness, distraction of the jury, or other potential for unfair prejudice. <u>Commonwealth v. Robinson</u>, 554 Pa. 293, 304, 721 A.2d 344, 350 (1999) (pictures of defendant holding various guns were unduly prejudicial, even if marginally relevant to his knowledge and experience with nine millimeter weapons); Pa.R.E. 403 ('[a]lthough relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . .").

The testimony given by Tracena Copper and Officer Slavin failed to meet the basic test set

forth in Williams, supra.   First of all, as previously stated, there was no identifiable ballistics connection between the particular firearm in question and the killing of Mr. Haynes – and indeed, it was not even possible to deduce the type, or the caliber, of the gun which fired the fatal bullets, only fragments of which were recovered. R. 2019a-2027a.  Accordingly, there was no basis whatever for holding that the gun was "a weapon similar to the gun used in perpetration of the crime."

Secondly, Tracena Copper's alleged purchase of the gun in question for Petitioner took place more than two months prior to the killing of Haynes.  This is unacceptably remote.  To hold that the Williams exception applies in such a case would be the substantial equivalent of holding that anybody, anywhere, who has ever before possessed a gun, could have that gun hauled into court and introduced in evidence against him merely because somebody somewhere used a gun to commit an offense. Surely the probative value of this evidence was slight compared to the prejudicial effect.

Finally, there is no evidence whatever to show that Petitioner actually "possessed" the gun as required by Williams, following the murder.  On the contrary, Officer Slavin testified consistently that on December 16, 1993, eight days after the murder of Haynes, the gun was found under the driver's seat of a vehicle Petitioner had just recently entered from the passenger side.  R. 1778a-1784a, 1799a-1804a.   Rasheema Washington, also, testified that it was Simpson, not Petitioner, who placed the gun under the driver's seat. R. 1927a.  It is telling, moreover, that the charges against Petitioner for possession of that gun were dropped, and he was allowed to plead merely to disorderly conduct (stemming from his behavior during his arrest by Officer Slavin).  R. 1812a-1814a.

These references to a gun which was never shown to be similar to the one used to kill the decedent, and which Petitioner was never even convicted of "possessing" following the Cheltenham Township incident (N.T. 12/11/97, pp. 137-138), injected highly prejudicial and irrelevant material

into Petitioner's trial, in violation of fundamental due process guarantees.  The Superior Court's

finding to the contrary was objectively unreasonable, and habeas relief should be granted.

> **Ground Eight:**      **Both trial and direct appeal counsel were
> ineffective for failing to make and/or properly
> support arguments against admission of testimony
> purporting to connect Petitioner to a certain nine
> millimeter weapon.**

As previously stated, the testimonial references to a gun which was never shown to be similar

to the one used to kill the decedent, and which Petitioner was never even convicted of "possessing"

following the Cheltenham Township incident (N.T. 12/11/97, pp. 137-138 – R. 1813a-1814a),

injected highly prejudicial and irrelevant material into Petitioner's trial, in violation of fundamental

due process guarantees.  Additional prejudice inured to Petitioner because of the unboundaried way

in which the testimony was elicited from both Ms. Copper and Officer Slavin,  See, e.g., N.T.

12/12/97, pp. 127-128 (R. 1973a-1974a)(Tracena Copper's persistent, apparently calculated "blurt-

outs" implying a pattern of dealing in multiple guns for Petitioner); N.T. 12/11/97, pp. 105-107, 125-

127 (R. 1781a-1782a, 1801a-1803a) (Officer Slavin's testimony that Petitioner was reaching under

his passenger side seat "in an attempt to reach for the gun" – when the gun was in fact under the

driver's seat); id., p. 140 (R. 1816a) (prosecutor "misspoke" by indicating, contrary to fact, that

defendant had stipulated to ownership of the gun).

There were wide-ranging discussions among counsel and the court, related to the admission

of testimony concerning the aforementioned 9 millimeter firearm, and it was the Superior Court's

judgment on direct appeal that counsel had waived and withdrawn Petitioner's objection.  See

Superior Court Memorandum, Commonwealth v. Bowers, 2468 EDA 2003, 9/9/04 (Habeas Petition,

Attachment A), pp. 3-4; see also N.T. 12/5/97, pp. 95-96, 107-130, 134-137; 12/9/97, pp. 5-8;

12/11/97, pp. 91-93; 12/12/97, pp. 141-166 (R. 1584a-1585a, 1596a-1613a, 1623a-1624a, 1630a-1631a, 1767a-1769a, 1989a-1994a).  If true, this constituted clear ineffective assistance. Counsel had a clearly meritorious argument pursuant to both Pennsylvania rules of evidence and due process considerations, for exclusion of all evidence related to this firearm.  There was no strategic reason for counsel to have *ever* acquiesced in this inflammatory and largely irrelevant testimony.   The prejudice was great, moreover, not only because of the "legitimate" content of the testimony proposed, but also because of the highly inflammatory and unboundaried way in which the prosecutor permitted its witnesses to testify and attempted, in fact, to testify himself.  Trial counsel's performance was, accordingly, constitutionally ineffective.

The same is true of direct appeal counsel.  Instead of carefully and cogently presenting the meritorious arguments outlined above on direct appeal, counsel effectively abandoned them.  First of all, the Brief for Appellant unaccountably *conceded* the admissibility of Ms. Copper's testimony, which concession was accepted without further inquiry by the Superior Court in its Opinion.  See Brief for Appellant (PCRA Petition,  Exhibit A), p. 12 (R. 244a);  Superior Court Memorandum, Commonwealth v. Bowers, No. 2468 EDA 2003, 9/9/04 (Habeas Petition, Attachment A), p. 3. Secondly, counsel neglected to file a reply brief correcting the incorrect statement made by the Commonwealth in its "Letter Brief," accusing Mr. Savino of waiving the entire issue of Officer Slavin's testimony's admissibility.  See PCRA Petition, Exhibit AA, p. 8 (R. 921a) (citing N.T. 12/11/97, pp. 91-96 – R. 1767a-1772a). In fact, the passage cited by the Commonwealth establishes only that, in light of the trial court's ruling that it would allow Officer Slavin's testimony concerning the incident in Cheltenham, Mr. Savino decided to withdraw his objection to mentioning the charges against Petitioner which resulted from that incident, so as to point out instead that the gun possession

charges were dropped. N.T. 12/11/97, pp. 91-96 (R. 1767a-1772a.)  As a result of counsel's failure

to correct the Commonwealth's mischaracterization,  the Superior Court's memorandum opinion

picked up the error and held that all objection to Officer Slavin's testimony had been waived.  See

Superior Court Memorandum, Commonwealth v. Bowers, No. 2468 EDA 2004 (Habeas Petition

Attachment A), pp. 3-4.

On both counts, therefore, Ms. McDermott  failed to present Petitioner's meritorious issues

in a competent way, which directly resulted in the Superior Court's failure to even consider the

issues presented. Clearly, this was ineffective assistance.   Once having stated a particular issue on

appeal, there is never a good strategic issue for briefing an issue in such a way as to virtually insure

a negative outcome. In this case, moreover, the negative outcome could have been prevented,

because, as previously described, the issue had merit.

For all of the foregoing reasons therefore, Petitioner has a valid claim of ineffective

assistance and was clearly been prejudiced.  The Superior Court's failure to so hold constitutes an

unreasonable application of Strickland, and habeas relief should be granted.

>**Ground Nine:**          **The cumulative prejudice from the foregoing**
>                          **constitutional violations was sufficient to require**
>                          **that Petitioner be granted a new trial.**

When evaluating whether Petitioner has suffered deprivation of his constitutional right to due

process,  and when evaluating the prejudice to Petitioner from his various ineffectiveness claims, set

forth above, it is important to consider, taken together, the effects of all founded violations on the

fairness and reliability of Petitioner's trial.   See, e.g., Reid v. Vaughn, 109 Fed.Appx. 500 (3d Cir.

2004) (errors that might not amount to due process deprivation  when considered alone, may

cumulatively produce a trial that is fundamentally unfair); Acala v. Woodford, supra, 334 F.3d at

883 (errors that might not amount to due process deprivation when considered alone, may cumulatively produce a trial that is fundamentally unfair); Cargle v. Mullin, supra, 317 F.3d at 1206-1207 (even errors resulting from diverse constitutional violations should be considered cumulatively when assessing whether error is harmless).

In the instant case, as was discussed throughout Petitioner's briefing above, the various ways in which trial and direct appeal counsel were ineffective were substantively intertwined and contributed to a specific misconception that the evidence tending to show Petitioner's assent to kidnapping and robbery, was *ipso facto* sufficient to show that he possessed the specific intent to kill. As previously argued, this misconception was fostered by portions of the charge of the court and by portions of the Commonwealth's closing argument to the jury – and appellate counsel's wholly ineffective argument with respect to the sufficiency of the evidence served only to perpetuate the error on appeal.

Counsel's ineffectiveness in failing to impeach the Commonwealth witnesses, moreover, inevitably led to an uncritical acceptance of Rasheema Washington's tale, which was the only evidence to actually connect Petitioner to even kidnapping or robbery. That testimony is, however, rendered unlikely or even impossible, given the time line established by the Commonwealth's witnesses in the original trial of Allister Durrante – prior to the Commonwealth's wholesale alteration of its time line for the apparent purpose of accommodating the new prosecution theory developed between Durrante's trial and this one. On top of this – and despite the fact that even the *caliber* of the murder weapon was never determined – the jury was invited to draw conclusions from Petitioner's "possession" of a gun which was found beneath a seat in a car *other* than the one in which Petitioner was sitting, *other* than the one beneath which he allegedly reached, and which was

put there, according to the star witness Washington herself, by someone *other* than Petitioner.

Clearly, therefore, all of Petitioner's ineffectiveness and due process allegations concerned the fundamental prejudice at the heart of this case: conviction of the Petitioner based on association and nuance tailored by the prosecution to substitute for actual evidence of the specific intent to kill which was charged.  Accordingly, Petitioner should be afforded habeas relief.

## V.    CONCLUSION

For all of the foregoing reasons, therefore, Petitioner respectfully requests that the Honorable Court grant habeas relief.

Respectfully submitted,

/s/ Carole L. McHugh
CAROLE L. McHUGH, ESQUIRE
BARNABY C. WITTELS, ESQUIRE
Attorneys for Petitioner, Malik Bowers