**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MALIK BOWERS** | : | **CIVIL ACTION** |
| **Petitioner** | : | |
| **v.** | : | **NO. 2:13-cv-05550-BMS** |
| | : | |
| **MICHAEL WENEROWICZ, et al.** | : | **(Habeas § 2254)** |

**MEMORANDUM IN REPLY TO THE RESPONSE**
**TO PETITION FOR WRIT OF HABEAS CORPUS**

## I.      INTRODUCTION

By leave of Court granted June 13, 2014, Petitioner files the following Reply to the Response to the Petition for Writ of Habeas Corpus (hereinafter, "Response"), filed by Respondents Michael Wenerowicz et al.

## II.     REPLY TO RESPONDENTS' STATEMENT OF FACTUAL BACKGROUND

The statement of factual background set forth by Respondents should be read with caution, as it adopts a view of the facts, and in particular a time line, which is open to serious dispute on this record.

For example, the time given for Allister Durrante's first contact with the victim Andrew Haynes on the night of December 8, 1993 – 8:45 p.m. – is the time given by witness Aloysius Hall at Petitioner's trial. N.T. 12/11/97, p. 17 (R. 1693a).[1] Clayton Duncan put this time at 9:00 p.m. at Petitioner's trial, N.T. 12/10/97, p. 46 (R 1644a), and after 10:00 p.m. at the former trial of Allister

---

[1]      Petitioner will continue his practice of providing alternative citations to the Reproduced Record filed with the Superior Court in the PCRA appeal, in the hope that this will provide a convenience to the Court.

Durrante. <u>Commonwealth v. Allister Durrante</u>, N.T. 10/3/95 (PCRA Petition, Exhibit O),  pp. 7-8 (R. 637a-638a).  There were similar differences in the witnesses description of the time interval between this first contact with Durrante and the victim's abduction, the location of Hall and Duncan at the time of the first ransom call, the timing of the ransom calls, and so forth.  Indeed, one of the Commonwealth's statements, to the effect that Petitioner called Rasheema Washington "minutes later" after the victim's abduction, has absolutely no record support.   Similarly, the statement that the abductors arrived at Washington's apartment "a short time later" is a liberal reading of the witness's testimony that the time between the call and the arrival was "less than an hour." N.T. 12/12/97, p. 43 (R. 1889a).  All in all, the testimony recounted by the Respondents as if it were a seamless narrative involves considerable picking and choosing among the often self-contradictory testimonies of Clayton Duncan, Aloysius Hall and the victim's brother Selvan Haynes.  Moreover, it most certainly does not take into account the large number of points of impeachment of those testimonies from the earlier trial of Allister Durrante and the police statements of the witnesses.

One of Petitioner's most important claims concerns the coordinated shift towards an earlier time line which took place between the Durrante trial and the Petitioner's trial, in an apparently deliberate attempt to accommodate the Commonwealth's new witness, Rasheema Washington. Accordingly, Petitioner respectfully requests that the Honorable Court refrain from accepting uncritically the Respondents' preferred version of the timing of events, but instead refer to the careful, painstaking description of the testimony of each of the witnesses contained in Petitioner's opening Memorandum of Law in Support of Petition Under 28 U.S.C. § 2254 (hereinafter, Petitioner's "opening Memorandum").

2

III.    **REPLY TO RESPONDENTS' STATEMENT OF PROCEDURAL BACKGROUND**

The procedural history stated by the Commonwealth is substantially correct with a few exceptions.

The sentences imposed for robbery, kidnapping, conspiracy and possession of an instrument of crime, although consecutive to each other, were imposed to run concurrently with the life sentence for murder.  The issue raised on direct appeal regarding the jury instruction included both accomplice and conspiratorial liability for first degree murder.  The statement of issues appealed to the Superior Court in connection with Petitioner's PCRA petition – as well as the statement of issues pled in the instant habeas Petition – are inaccurately truncated, and Petitioner would respectfully refer the Court to his opening Memorandum, p. 8, n.8 for an accurate listing of the PCRA issues, and to the actual habeas pleadings herein.

IV.    **REPLY TO RESPONDENTS' DISCUSSION OF PETITIONER'S CLAIMS FOR RELIEF**

A.    **Petitioner's Ground One:**

**Petitioner was deprived of due process of law under the Fifth and Fourteenth Amendments  by the trial court's charge (and similar statements by the prosecution), pursuant to which it was reasonably likely that the jury believed that proof of a specific intent to kill on Petitioner's part was not necessary to convict Petitioner of first degree murder as accomplice or co-conspirator.**

Respondents correctly observe that as a freestanding claim for relief, Petitioner's Ground One is procedurally defaulted for failure of direct appeal counsel to properly raise the challenge to the trial court's instructions on accomplice and conspiratorial liability as a due process issue. What Respondents overlook, however, is that this Ground One forms sets forth the underpinning of the ineffectiveness claim set forth as Ground Two –  which ineffectiveness claims was fully litigated in

3

Petitioner's PCRA proceedings.  See Petitioner's Brief for Appellant in No. 2703 EDA 2008 (PCRA appeal) (Exhibit 1 hereto),  pp. 48-61, in which Petitioner argued that trial and direct appeal counsel were both ineffective for failing to raise the issue as a due process violation, failing to cite relevant federal precedent, failing to even quote the jury instructions involved, failing to distinguish the arguments being made by Petitioner from those rejected by the Pennsylvania Supreme Court in Petitioner's co-defendant's case, and failing to object to the prosecutor's related arguments to the jury.

With respect to the merits, Respondents suggest that because the Pennsylvania Supreme Court found the arguments of co-defendant Rasheed Simpson, challenging the jury instructions for murder, accomplice liability and conspiracy as a matter of Pennsylvania law, to be without merit – see Commonwealth v. Simpson, 754 A.2d 1264, 1274-1276 (Pa. 2000) –  then this Court must find that said jury instructions are sufficient as a matter of constitutional due process.  The disconnect is obvious, and has been comprehensively laid out in Petitioner's opening Memorandum of Law in Support of Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus (hereinafter, "Petitioner's opening Memorandum"), pp. 23-33, the content of which will not be repeated here.   A few points must be emphasized, however.

First of all, as a factual matter, the Pennsylvania Supreme Court in Simpson simply did not consider certain portions of the instant charge which Petitioner maintains were crucial and should have been raised on appeal.  In particular, after describing the meaning of premeditation generally, the Court further observed:

> Now, if you believe that **the defendants** intentionally used a deadly weapon on a
> vital part of the victim's body, you may regard that as an item of circumstantial
> evidence from which you may infer that **the defendants** had the specific intent to

kill.

N.T. 12/16/97, p. 15 (R. 2113a) (emphasis supplied).  Furthermore, at the outset of the Court's

discussion of the  crime of conspiracy, the Court mixed together the two possible predicate acts

which had been charged, in a way that permitted the inference that conspiratorial liability could be

found whether  the defendants agreed either to shoot *or* to rob the victim:

> Now, members of the jury, in this case, too, the defendants are charged with conspiracy.  They're charged with conspiracy **to shoot and rob the victim, and I already defined the crimes of murder and robbery which are the crimes which the defendant allegedly – which the defendants allegedly conspired to commit.**
>
> In order to find the defendants guilty of conspiracy, you must be satisfied initially that the following two elements of the conspiracy have been proved beyond a reasonable doubt: first that the defendants agreed with each other or another person or persons that they engage in conduct which constitutes the crimes **of robbery and/or murder,** or agreed to aid each other or another person or persons in the planning of the crimes **of robbery or murder** . . .

N.T. 12/16/97, pp. 28-29 (R. 2126a-2127a) (emphasis supplied).

Secondly, even if it were conceded for purposes of argument only that the Pennsylvania

Supreme Court considered the identical language as is being argued here, the fact remains that a

finding that the jury charge comports with Pennsylvania law as in Simpson is not identical to  the

analysis of that charge under the Due Process Clause.[2]  While it is true, as Respondents point out,

that federal relief may not be granted simply because a jury instruction may have been deficient as

a matter of state law, a federal court must still inquire, when reviewing an ambiguous jury instruction

---

[2]        Respondents suggest that if Petitioner's direct appeal issue is to be read liberally as a federal claim, then so should be the Pennsylvania Supreme Court's decision in Simpson.  See Response, p. 17, n. 2.  As previously stated, Petitioner does not argue that his challenge to the jury instruction was presented as a federal claim on direct appeal, but has simply parsed out as Ground One the constitutional argument underlying his ineffectiveness argument as stated in Ground Two.  Counsel apologizes for any confusion this may have engendered.

under the Due Process Clause, whether "there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." Waddington v. Sarausad, 555 U.S. 179, 190-191 (2009). See also, to similar effect, Estelle v. McGuire, 502 U.S. 62, 71, 72 (1991), quoting Boyde v. California, 494 U.S. 370, 380 (1990); Smith v. Horn, 120 F.3d 400, 415 (3d Cir. 1997).[3]  At pp. 23-33 of his opening Memorandum, Petitioner herein has demonstrated just such ambiguity, and just such reasonable likelihood that the jury applied the instructions as given in a manner at odds with the Due Process Clause.

It is in this respect, thirdly, that Petitioner sets forth at pp. 29-30 of his opening Memorandum the improper argument by the prosecutor which was ineffectively not objected to by trial counsel. Petitioner is not suggesting that the prosecutor's remarks somehow amended the trial court's instructions – nor that they rendered the instructions invalid "despite the absence of any error." See misstatement of Petitioner's argument at p. 18 of the Response.  However, the reasonable likelihood that the jury may have misunderstood the ambiguous instructions in a way that violates the Due Process Clause is definitely increased by its pre-exposure to the improper argument[4] – because the prosecutor's remarks did in fact, contrary to Respondents' argument, suggest to the jury that if

_____

[3]     Notably, in Government of the Virgin Islands v. Smith, 949 F.2d 677 (3d Cir. 1991), cited by Respondents for a petitioner's "heavy burden," the Third Circuit reversed the defendant's murder conviction on grounds of due process, fundamental fairness and plain error, after finding that the trial court's instructions in a murder prosecution could reasonably have led jurors to believe that it was not necessary for the prosecution to prove the absence of self-defense beyond a reasonable doubt. 949 F.2d at 681-682

[4]     Furthermore, of course, the failure to object to prosecutorial misconduct, in the form of misstating the burden of proof, is an independent basis for Petitioner's ineffectiveness claim as argued as Ground Two.  See Part IV(B) below.

Petitioner was "in for a penny" on the robbery kidnapping, he was "in for a pound . . . for the whole thing." N.T. 12/15/97, pp. 124-125 (R. 2057a-2058a).

Finally, Petitioner must take vigorous issue with the suggestion at p. 18 and elsewhere in the Response that the evidence against Petitioner was "virtually identical" to the evidence against Mr. Simpson. As previously pointed out in Petitioner's opening Memorandum, Aloysius Hall specifically identified Petitioner's co-defendant Simpson as the person who made the ransom calls and associated threats to kill the victim. Hall and Duncan testified to Allister Durrante's appearance on Haynes' doorstep as a precipitating event to the eventual abduction. However, *only Rasheema Washington* connected Petitioner in any way to the kidnapping of Haynes. Moreover, not one word indicating an intent threat to kill Haynes was attributed to Petitioner, *even by Washington.* Indeed, Washington's account, even if believed, would be equally consistent with an intent to participate in kidnapping and robbery short of murder, as with the specific intent to kill. See generally, N.T. 12/12/97, pp. 10-18, 41-50, 69-71, 97-101 (R. 1856a-1864a, 1887a-1896a, 1915a-1917a, 1943a-1947a). Given this paucity of evidence, it was absolutely essential that the jury understand that accomplice or co-conspirator status with respect to the crime of robbery did not relieve the Commonwealth of its burden of proving a specific intent to kill on the part of Petitioner beyond a reasonable doubt. The confusing instructions actually given, however, clearly deprived Petitioner of his constitutional right to remain cloaked in innocence unless *all* elements of first degree murder were proven beyond a reasonable doubt. The holding of the Superior Court in Petitioner's direct appeal and the Pennsylvania Supreme Court in co-defendant Simpson's appeal, constituted clearly unreasonable applications of the United States Supreme Court precedents cited above. Habeas relief is, therefore, indicated.

7

**B.     Petitioner's Ground Two:**

**Trial and direct appeal counsel rendered ineffective assistance under the Fifth, Sixth and Fourteenth Amendments by failing to (a) correctly and adequately raise and argue Petitioner's claim that the court's jury charge effectively relieved the prosecution of its burden of proving specific intent in the case of accomplice and co-conspirator liability for first degree murder, and (b) object to the prosecutor's arguments which were based upon the same fundamental constitutional error.**

The Superior Court and Respondents have both answered the foregoing ineffectiveness claim by insisting that the correctness of the challenged jury instructions was previously litigated before the Superior Court in Petitioner's direct appeal, and by the Pennsylvania Supreme Court in codefendant Simpson's appeal. See Superior Court Memorandum, No. 2703 EDA 2008 (Attachment C to the instant habeas Petition), pp. 13-14; Response, pp. 19-20. As has been pointed out in the previous section by Respondents as well as Petitioner, however, no due process violation was argued in either of these direct appeals.  Petitioner's instant claim – as was fully briefed in both the Court of Common Pleas and the Superior Court in connection with Petitioner's PCRA proceeding, see Exhibit 1 hereto, pp. 48-61 – is first of all that trial counsel and direct appeal counsel were ineffective for failing to argue the issue *under the Due Process Clause* as set forth in Part IV(A) above.   Secondly, Petitioner asserts that counsel ineffectively failed to bring to the Pennsylvania Courts' attention the full extent of the misleading portions of the charge at issue.  Thirdly, Petitioner alleges that trial and direct appeal counsel were ineffective for failing to challenge the previously quoted argument by the prosecutor, which invited decision on the improper basis that conspiracy to commit kidnapping and/or robbery was sufficient to demonstrate liability for first degree murder. The Superior Court opinion addressed none of these claims.

Nor is it, as Respondents claim, a sufficient answer that the jury instructions complained of

were upheld as a matter of Pennsylvania law.  Neither of the cases cited by Respondents – <u>Boyd v. Waymart</u>, 579 F.3d 330 (3d Cir. 2009) (per curiam) and <u>Priester v. Vaughn</u>, 382 F.3d 394 (3d Cir. 2004) – address the circumstances presented by this case.  <u>Boyd v. Waymart</u> involved a claim of trial counsel ineffectiveness for rejecting a plea offer without consulting the client.  The per curiam Opinion of the Court merely held that because the Pennsylvania Courts had adjudicated the claim on the merits, deference was due under § 2254(d).  579 F.3d at 332.  Respondents' confusing reference to pages 368-374 of Judge Hardiman's *dissenting* opinion is, moreover, inapt, since that section of the opinion deals with a question of procedural default and the merits of the ineffectiveness claim.  While <u>Priester v. Vaughn</u> did deal with an ineffectiveness claim alleging failure to ensure proper accomplice liability instructions in a first degree murder case, there are important distinctions between Priester's and Petitioner's claims.  First of all, Priester was not challenging the effectiveness of counsel in *presenting* the challenge to the charge as given in the Pennsylvania courts.  Secondly, nothing in the <u>Priester</u> opinion references language such Petitioner has cited from the portions of the charge defining conspiracy.  Thirdly, nothing in the <u>Priester</u> opinion indicates that the defendant had argued his ineffectiveness claim with a constitutional predicate in the Pennsylvania courts.  Fourthly, there is nothing in the <u>Priester</u> opinion challenging, as Petitioner does here, counsel's failure to object to or litigate on appeal any prejudicial statements by the prosecutor in his closing speech to the jury.

The grounds for relief asserted by Petitioner involve distinct failures to argue important facts of record, important federal case law, and baldly misleading statements by the prosecution.  The fact that Pennsylvania courts have reached holdings based upon an incomplete review of the record is clearly cognizable under § 2254(d)(2).  The fact that the Pennsylvania Courts' determination is an

unreasonable application of <u>Waddington v. Sarausad</u>, <u>Estelle v. McGuire</u>, and <u>Strickland v. Washington</u>[5], is likewise cognizable under § 2254(d)(1).

Accordingly, for the reasons previously set forth at greater length in Petitioner's opening Memorandum, pp. 33-40, Petitioner has set forth valid grounds for habeas relief.

### C.    Petitioner's Ground Three:

**Trial counsel rendered ineffective assistance by failing to have the former testimony of unavailable witness Felicia Brokenbrough read to the jury to impeach the Commonwealth's time line and Rasheema Washington's story, and by failing to impeach witnesses Hall, Duncan, Washington and Selvan Haynes by reference to their former testimony and statements.**

### 1.    Time Shift Between Trials and Felicia Brokenbrough's Prior Recorded Testimony

At the trial of Allister Durrante (Petitioner's alleged co-conspirator), Felicia Brokenbrough, Clayton Duncan and Selvan Haynes all testified to a series of events beginning after 10:00 p.m. on the night of December 8, 1993, involving the appearance of Durrante at the victim' door, the victim's abduction from the street by unidentified persons and an immediate series of ransom demands by telephone, all culminating in the victim's body being found by a 911 informant at 11:10 p.m. that same night.  <u>Commonwealth v. Allister Durrante</u>, N.T. 10/3/95 (PCRA Petition, Exhibit O),   pp. 7-8 (R. 637a-638a); N.T. 10/3/95 (PCRA Petition, Exhibit T), p. 91 (R. 751a); N.T. 10/4/95 (PCRA Petition, Exhibit U), pp. 17-19 (R. 783a-785a).  According to this testimony, the lapse of time between first contact by Durrante and the death of the victim was at most approximately an hour and 10 minutes.

At the trial of Petitioner and Rasheed Simpson, Felicia Brokenbrough was not to be found.

---

[5]        <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

A new witness Rasheema Washington testified that at some point, about a half hour or hour after she returned home after leaving work at 7:00 or 8:00 p.m. that night, Petitioner called to tell her he was on his way over. Less than an hour later, according to Washington, Petitioner, Simpson, Durrante and an unknown fourth person brought the victim, bound and gagged, to Washington's apartment, where he was physically abused for half an hour, while Simpson and Durrante used the phone in her bedroom. At the conclusion of these proceedings, the victim was taken away again. N.T. 12/12/97, pp. 9-10, 12-18, 43, 97, 99-101 (R. 1855a-1856a, 1889a,1858a-1864, 1943a, 1945-1947). He was, as previously stated, found dead at 11:10 p.m.

In order to make room for the hour or hour and a half or a little less required by Rasheema Washington's account, Clayton Duncan changed his testimony to put the first contact from Allister Durrante an hour earlier, at 9:00 p.m. N.T. 12/10/97, p. 46 (R 1644a). Aloysius Hall testified that Durrante first came to the door at 8:45 p.m. N.T. 12/11/97, p. 17 (R. 1693a). Selvan Haynes testified that he was first notified of the abduction by Hall at 8:00 p.m. – as opposed to after 10:00 p.m. at Durrante's trial, and after 11:00 p.m. in his statement to police. Compare N.T. 12/11/97, p. 70 (R. 1746a) with Commonwealth v. Durrante, N.T. 10/3/95 (PCRA Petition, Exhibit T), p. 91 (R. 751a) and Statement of Selvan Haynes, 12/9/93 (PCRA Exhibit S), p. 2 (R. 746a). Conveniently, now, there was space in the time line to accommodate Rasheema Washington's tale.

According to the Superior Court and Respondents, there was no duty upon trial counsel to have read the former notes of testimony, to have noticed the suspicious, obviously planned shift of all witnesses' testimony to an earlier time-frame, or to have pointed out this suspicious shift by way of cross-examination to the jury. There was, furthermore, no duty to have utilized Felicia Brokenbrough's prior sworn testimony to aid in demonstrating that such a shift had taken place.

11

Petitioner respectfully submits that such a holding is irrational.  No matter how much discretion may reside in trial counsel, the failure to utilize this damning evidence of opportunistically changed testimony was patently ineffective.  It would have challenged Rasheema Washington's tale by demonstrating that according to the other witnesses' original testimony at Durrante's trial, there was simply no time for her alleged events to have happened.  It would, moreover, have exposed the prosecution as willing to play fast and loose with the facts.  Both of these effects would most likely have changed the outcome of the trial, particularly for Petitioner *who was in no way implicated in Andrew Haynes' abduction and subsequent murder, except by Ms. Washington.*

In an effort to avoid these obvious facts, both the Superior Court and Respondents note that Rasheema Washington was not able to state with certainty the time when the alleged proceedings began, and that Brokenbrough was "vague" about the time of her pre-abduction encounter with the victim.  See Superior Court Memorandum, No. 2703 EDA 2008 (Attachment C to the instant habeas Petition), pp. 8-9; Response, pp. 21-22.  First of all, this misstates the testimony.  Brokenbrough testified that she first met up with the victim on his way to the store at "[s]ay about 10:00, 10:30, somewhere around there."  Commonwealth v. Durrante, N.T. 10/4/95 (PCRA Petition, Exhibit U), p. 17.  This is no more vague than any other estimate given at either of the trials by any of these witnesses.  Clearly, however, it does not encompass 8:45 or 9:00 p.m. as testified to by Duncan and Hall at Petitioner's trial.  More importantly, moreover, it was the uniform shift among the *several* witnesses, from event beginning after 10:00 p.m. to events beginning after 8:00 or 9:00 which is important here.

Secondly, the fact that *Felicia Washington* was vague about the time of night when the victim was brought over, is of very little importance.   What is of importance is the lapse of time required

12

Case 2:13-cv-05550-BMS   Document 26   Filed 08/29/14   Page 13 of 31


for Petitioner to have called, the "less than an hour" it took for him to arrive, and the half hour that was supposedly consumed in beating up the victim and in Simpson and Durrante making their calls. This interval is accommodated in the witnesses' testimony at Petitioner's trial, but not by the testimony given against Allister Durrante.

This uniform shift in the direction of the testimony is not simply a case of witnesses "not having identical recollections as to the time when the doorbell rang, the ransom calls occurred, etc." as argued by Respondents. See Response at p. 22. This is a case of a coordinated shift, which most certainly *does* raise an inference of fabrication. Similarly insupportable is the Respondents' claim that "Ms. Brokenbrough's testimony would have done nothing to undermine Ms. Washington's account of the events that occurred in her apartment." Id. Clearly, if there was no time for the events related by Ms. Washington to have taken place before the victim's demise, which was no later than 11:10 p.m., Ms. Brokenbrough's testimony most certainly would have impeached Washington's account.[6]

### 2.  Failure to Use Other Impeachment Material

Petitioner has, at pp. 46-49 of his opening Memorandum, set forth in very considerable detail the large amount of impeachment material from the Durrante trial, preliminary hearing and statements to police that was not used by trial counsel, with respect to Duncan, Hall and Selvan Haynes. While Petitioner does not dispute that trial counsel is vested with considerable discretion,

---

[6]  Respondents also argue, for some reason, that "Ms. Brokenbrough's testimony as to the series of events leading up to the victim's abduction was consistent with the testimony of Clayton Duncan, who was permitted to testify to Brokenbrough's excited utterances to him." Petitioner had no interest in denying that the victim was abducted off the street or that ransom calls were made. His interest was to establish that he was not among the kidnappers, which necessarily involved discrediting Ms. Washington.

there is a point at which the failure to use potent impeachment material exceeds the bounds of reasonable discretion and amounts to simply ineffective assistance.  In the instant case, the failure to make use of the consistent time line shift, and Brokenbrough's testimony, is a glaring example of such ineffectiveness.  The sheer weight of the prior inconsistent statements of the witnesses overlooked by counsel is another such example.

The Superior Court's review of this aspect of Petitioner's claim was cursory at best, amounting to a statement that "trial counsel indeed cross examined each of the witnesses" and another statement that '[d]uring these periods of cross-examination, trial counsel attempted to uncover alleged inconsistencies in their versions of events."  Beyond this "attempt," the Court held, the extent to which counsel "persisted with cross-examination" was left to his discretion.  See Superior Court Memorandum, 2703 EDA 2008, 12/31/09 (Attachment C to the instant habeas Petition), p. 10.  Respectfully, a review of the material counsel omitted was of such extraordinary weight and quality that the failure to use any of it can hardly be described as a reasonable "attempt" at discrediting these witnesses.   The mere fact that counsel engaged in *some* cross-examination is not enough. See Grant v. Lockett, 709 F.3d 224, 237 (3d Cir. 2013) (even though counsel did not forego all attempts to impeach key Commonwealth witness, counsel was nevertheless ineffective for failure to discover and use witness's parole status as evidence of bias).  To excuse such glaring omissions, there has to have been some rationale for the strategic choice alleged to have been made, and the Superior Court opinion fails to suggest one.   Furthermore, Petitioner was denied the opportunity to explore the reasons, if any, for counsel's neglect, because of the PCRA court's denial of an evidentiary hearing.

The cases cited by Respondents at pp. 23-24 of their response simply do not present the kind

14

of prejudicial neglect that has been demonstrated here.  In <u>Alexander v. Shannon</u>, 163 Fed.Appx. 167 (3d Cir. 2006), as Respondents themselves admit, counsel's failure to cross-examine the witness on a single inconsistency "had little direct bearing" on the defendant's guilt. 163 Fed.Appx. at 173.

In <u>United States v. Ciancagline</u>, 945 F.Supp. 813 (E.D.Pa. 1996), the witness's grand jury testimony and testimony at trial were only "slightly inconsistent."  945 F.Supp. at 821.  In <u>United States v. Travillion</u>, 2014 WL 3029837 (3d Cir. 2014), the Court held that counsel's failure to use the witness's testimony at a former trial, to the effect that he could not remember the particular drug sold on a particular occasion, and alluding to mental health problems, was non-prejudicial in light of counsel's otherwise thorough cross-examination, covering the witness's addictions, his lack of memory of specific events and his exchange of testimony for a reduced sentence – and also in light of the overwhelming evidence of guilt including the testimony of other witnesses and extensive wiretap evidence.  2014 WL 3029837 at *4-*6 & nn.12, 18-20.

Petitioner Bowers' case is not like <u>Alexander</u>, <u>Ciancagline</u>, or <u>Travillion</u>.  The impeachment material omitted by counsel was not trivial.  It went to the heart of the plausibility of Rasheema Washington's story by destroying the time line necessary to accommodate her tale.  Rasheema Washington, moreover, was not one of many witnesses against Petitioner.  Petitioner was implicated by Washington alone.  No physical evidence or other testimony placed him among the victim's abductors.

This case, rather, is like <u>Grant v. Lockett</u>, <u>supra</u>, 709 F.3d at 232-238 in which the Third Circuit found ineffective assistance of counsel for failing  to impeach *the only witness to incriminate the defendant* with his parole status and likely resulting bias – and went on to conclude that the Superior Court's holding to the contrary unreasonable under 28 U.S.C. § 2254(d)(1) and (d)(2).  It

15

is like <u>Moore v. Secretary, Pennsylvania Dept. of Corrections</u>, 457 Fed.Appx. 170, 182 (3d Cir. 2012), in which the Third Circuit held that Pennsylvania Courts had unreasonably applied <u>Strickland</u> in holding that the petitioner suffered no prejudice from counsel's ineffective failure to utilize important impeachment material from a key Commonwealth witness's prior FBI statement, failure to use evidence of another witness's deal with the prosecution, and failure to utilize two available defense witnesses.  It is like <u>Berryman v. Morton</u>, 100 F.3d 1089, 1097-1099 (3d Cir. 1996), in which the Third Circuit found counsel ineffective, even under the newly enacted AEDPA amendments to § 2254, for failing to utilize the complaining witness's testimony at two prior trials, in which the description of her attackers was markedly different from the description given at Berryman's trial).  It is like <u>Cargle v. Mullin</u>, 317 F.3d 1198 (10th Cir. 2003), previously cited in Petitioner's opening Memorandum, in which the Tenth Circuit held counsel ineffective for, *inter alia*, failing to call a number of witnesses concerning prior inconsistent statements by the Commonwealth's main witnesses, or to use available evidence of bias during cross examination – which taken together could have shown "that the case involved such a tangle of inter- and intra-witness inconsistency that the jury could not be confident enough in any persons's word to justify holding petitioner responsible for first degree murder beyond a reasonable doubt." 317 F.3d at 1214 (see generally 1213-1216).

     In sum, therefore, Petitioner's claim is not for the failure to use tangentially relevant impeachment material.  Petitioner's claim is for the failure to use important material which would impugn the credibility of the witnesses used by the Commonwealth to establish a time line that made the testimony of Rasheema Washington plausible.  With that plausibility destroyed, the case against Petitioner would have completely evaporated, since there was no evidence other than Washington's

testimony to connect Petitioner to the crime.   The Superior Court's conclusion that counsel was not ineffective and that Petitioner was not prejudiced was, therefore, simply unreasonable, both as determination of fact upon the record, and as an application of the <u>Strickland</u> standard.  Habeas relief should, therefore, be granted.

     **D.    Petitioner's Ground Four**

     **Petitioner was deprived of due process of law by virtue of his conviction of first degree murder upon evidence which was legally insufficient to provide proof beyond a reasonable doubt that he specifically intended to kill the decedent.**

Respondents concede in their Response at p. 25 that in order to have proven Petitioner guilty of first degree murder, it was necessary to demonstrate that he acted with the specific intent to kill. As has been established previously, this remains true even where the defendant is charged on an accomplice or co-conspirator theory.  In other words, the mere participation in a conspiracy to kidnap or rob does not satisfy the burden of proof.  It is necessary to demonstrate a specific intent, even as a co-conspirator, to commit the particular crime of murder.  <u>Commonwealth v. Wayne</u>, 720 A.2d 456, 463-464 (Pa. 1998), <u>citing Commonwealth v. Huffman</u>, 638 A.2d 961 (Pa. 1994) and <u>Commonwealth v. Bachert</u>, 453 A.2d 931 (Pa. 1982).

Despite these clear standards, Respondents suggest at pp. 25-26 that because Petitioner allegedly called and asked Washington for the use of her apartment, and because he allegedly participated in the abuse of the bound victim while there, *and because Simpson and Durrante made ransom calls from Washington's bedroom,* and because Petitioner allegedly left with the others, and because Petitioner was later found to be in possession of a gun *not connected to the murder –* then necessarily Petitioner had the specific intent to kill,.  Such a conclusion is patently unreasonable.

17

As Petitioner has documented in his opening Memorandum at pp. 51-54, there are important respects in which the evidence against co-defendant Rasheed Simpson demonstrated an intent to kill. According to Rasheema Washington, both Simpson and Durrante but nobody else made phone calls from her bedroom. N.T. 12/12/97, pp. 17, 99-101. According to Hall, it was Simpson who made the calls demanding ransom and threatening to kill the victim if those demands were not swiftly met. N.T. 12/11/97, pp. 21-23, 34-36, 47-49, 50-53, 55-56 Such evidence, obviously, was sufficient as to Simpson's and possibly Durrante's specific intent to kill.

With respect to Petitioner, however, neither Hall nor Haynes implicated him in any of the ransom calls. Neither did Rasheema Washington, who specifically testified that from the living room where she and Petitioner were, she could not hear what Simpson and Durrante were saying on the phone. N.T. 12/12/97, p. 17. Nowhere in her testimony is it stated that Petitioner threatened to kill the victim, nor that anyone in Petitioner's presence threatened to kill him, but merely that demands were made for money. Id. Finally, while Washington testified that Petitioner left her apartment with the others, there is absolutely no testimony of record to show that he even remained with Simpson and Durrante after leaving or consented in any way to the killing.

Thus, while Respondents are correct in stating that there was evidence through Washington to show that Petitioner participated in the kidnapping and possible robbery of the victim, there is absolutely nothing of record connecting Petitioner to a specific intent to kill. The Superior Court's conclusion to the contrary is, therefore, absolutely unreasonable as a matter of law, and a patently unreasonable application of Jackson v. Virginia, 443 U.S. 307 (1979), which demands as a matter of federal constitutional law that there be sufficient evidence to support each element of a criminal offense charged beyond a reasonable doubt. Similarly unreasonable, given the evidence of record,

18

is the statement of the Pennsylvania Supreme Court in Commonwealth v. Simpson, 754 A.2d at 1269 that "*the group* placed telephone calls threatening to kill the victim if they did not receive $20,000.00." (Emphasis supplied).  As previously stated, the only evidence of record was that Simpson and Durrante placed the telephone calls out of the hearing of the others.  Of course, the Pennsylvania Supreme Court, when deciding the Simpson appeal, did not have before it the question of this Petitioner's specific intent to kill, nor had it heard argument on the sufficiency of the evidence for such a conclusion.

The cases cited by Respondents at page 26 of their Response are inapt on their facts.  In Commonwealth v. Daniels, 644 A.2d 1175 (Pa. 1994) for example, the evidence as recited by the Court included a specific agreement among the captors to kill the victim, and the appellant himself was one of two people present when the fatal shot was actually fired.  See 644 A.2d at 1178. Accordingly, the evidence was clearly sufficient.  In Commonwealth v. Wayne, supra, moreover, the defendant took one victim aside at gunpoint while his two co-conspirators accosted the other victim and killed him.  The defendant, moreover, ineffectively tried to shoot the first victim, following which the other two assassins also fired but missed.

No such testimony exists with respect to Petitioner in the instant case.  What occurred after the group left Washington's apartment is unknown – except, of course, that somebody shot and killed the victim.  The only evidence beyond a reasonable doubt as to anyone's specific intent to commit that killing is the evidence regarding Rasheed Simpson and conceivably Allister Durrante.  Accordingly, the Superior Court was simply wrong in concluding that Simpson "was convicted of exactly the same offenses for the same conduct as Appellant," and that therefore the Pennsylvania Supreme Court's ruling on the sufficiency of the evidence with respect to Simpson was conclusive

19

as to Petitioner.  See Superior Court Memorandum, No. 2468 EDA 2003, 9/9/04 (Attachment A to the instant habeas Petition).  On the contrary, such a conclusion constitutes and unreasonable finding of fact upon the record under § 2254(d)(2) and an unreasonable application of Jackson v. Virginia under § 2254(d)(1).  Petitioner should therefore be afforded habeas relief.

    **E.**    **Petitioner's Ground Five:**

    **Direct appeal counsel was ineffective for inadequately arguing the due process/insufficiency issue as a matter of Pennsylvania law and constitutional due process, and for failing to properly seek review of the Superior Court's failure to decide the matter as to *Petitioner*, as opposed to his co-defendant Rasheed Simpson.**

Respondents' argument with respect to this issue has been adequately addressed in Petitioner's opening Memorandum.  In summary, however, since the evidence was in fact constitutionally insufficient to support Petitioner's conviction for first degree murder, direct appeal counsel was clearly ineffective for failing to cite the applicable federal due process precedent, (Jackson v. Virginia, supra), for failing to analyze the evidence (as set for in Part D above and in pages  51-54 of Petitioner's opening Memorandum), and for failing to distinguish the evidence against Petitioner from the evidence against Rasheed Simpson.

The Superior Court's statement that Petitioner's ineffectiveness claim was previously litigated was clearly incorrect as a matter of the plain facts of record and under governing Pennsylvania Supreme Court precedents.  Furthermore, the statement that Petitioner has failed to show prejudice under Strickland –  see Superior Court Memorandum, 2703 EDA 2008, 12/31/09 (Attachment C to the instant habeas Petition), pp. 16-17 –  is nothing more than an opinion that the sufficiency challenge would not have succeeded, which in turn is nothing more than a reiteration of the unreasonable factual and legal holdings addressed in Part IV(D) above.

F.     **Petitioner's Ground Six**

**Trial and direct appeal counsel rendered ineffective assistance by failing to object to the prosecution's use of its peremptory strikes, make a full record in support of that objection, or otherwise pursue Petitioner's claim of racially motivated jury selection under <u>Batson v. Kentucky</u>[7], and the Fifth, Sixth and Fourteenth Amendments.[8]**

1.     **Appellate Ineffectiveness**

Preliminarily, Respondents note that Petitioner has waived his claim of appellate counsel ineffectiveness with respect to the <u>Batson</u> issue, by not arguing same in the Pennsylvania courts. In point of fact, the inclusion of the claim herein with respect to direct appeal counsel was unnecessary and may be regarded as surplusage. On December 31, 2002, the Pennsylvania Supreme Court decided <u>Commonwealth v. Grant</u>, 813 A.2d 726 (Pa. 2002), which held that claims relating to the ineffective assistance of trial counsel need not, and indeed should not, be raised on direct appeal, but should be reserved for the defendant's first PCRA proceeding. Petitioner's final nunc pro tunc direct appeal was filed on August 5, 2003, after the decision in <u>Grant</u> had been announced. Accordingly,

---

[7]     <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).

[8]     While preparing the Reply, counsel realized that a portion of the argument in Petitioner's original Memorandum of Law in Support of Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus had, in error, been submitted with citations only to the Reproduced Record in the Superior Court, and not to the original record. This error affected the Argument with respect to Ground Six, Subpart (b)(1) through (b)(5), and was found at pages 60-68 of the Memorandum.

Counsel has prepared a corrected version of that argument, with the original record citations noted in red, leaving the argument in all other respects as it was originally submitted. Because of the large number of citations, it has not been possible to conform the corrected version to the original pagination. Therefore, the corrected version is renumbered from page one as page 1R, 2R, etc. The original footnote numbering has been retained.

The corrected version is attached to this Reply as Exhibit 2

Counsel apologizes for the inconvenience to the Court.

the challenge based on trial counsel's ineffectiveness was properly first raised on collateral review.

### 2.    Application of the Batson Standard

With respect to the merits, Petitioner adheres to his previously made argument that Petitioner had a meritorious Batson challenge which trial counsel ineffectively defaulted by failing to make contemporaneous objections and by failing to establish a contemporaneous record.  The Superior Court rejected Petitioner's ineffectiveness argument on grounds that it was bound by the Pennsylvania Supreme Court's decision in Commonwealth v. Uderra, 862 A.2d 74, 87 (Pa. 2004), and Commonwealth v. Daniels, 963 A.2d 409, 434 (Pa. 2009), which purport to abrogate the three-stage analysis mandated under Batson, when the Batson issue is raised in the context of ineffectiveness of counsel, in favor of a requirement that the petitioner "prove actual purposeful discrimination by a preponderance of the evidence." Superior Court Memorandum, 2703 EDA 2008, 12/31/09, pp. 10-13.

Petitioner continues to maintain that the Pennsylvania Supreme Court's holding in Uderra runs contrary to the Supreme Court's decision in Johnson v. California, 545 U.S. 162 (2005).  While Johnson was not an ineffectiveness case, it does stand for the proposition that the states may not impose more onerous burdens of proof than were announced in Batson itself.  As the Court remarked in Johnson, "[w]e did not intend the first step [of the Batson analysis] to be so onerous that a defendant would have to persuade the judge – on the basis of all the facts, some of which are impossible for the defendant to know with certainty – that the challenge was more likely than not the produce of purposeful discrimination."  545 U.S. at 170.

Respondents point to no Supreme Court caselaw holding that claims of ineffectiveness for failure to properly object and preserve a Batson challenge should be treated any differently than other

claims of ineffectiveness, wherein the avenue alleged to have been ineffectively foregone by counsel is evaluated based upon the governing standards of the foregone claim. In the Batson situation, step one is the establishment of a prima facie case, and the establishment of a prima facie case is the event which triggers a shift in the burden of persuasion to the Commonwealth to offer race-neutral explanations for its strikes. Clearly, a set of circumstances sufficient to trigger such shifting of the burden must necessarily be sufficient to put competent counsel on notice to initiate the Batson review process by making proper objection to the prosecutor's strikes.

Nor do the Third Circuit cases cited by Respondents require any different result. In Lewis v. Horn, 581 F.3d 92, 97 (3d Cir. 2009) the petitioner raised the issue of trial counsel's ineffective failure to object to the prosecutor's discriminatory strikes. After observing that the Batson challenge as such was waived for failure to make a timely objection, the Court went on to evaluate the claim before it by addressing whether the first prong of Batson had been satisfied – and *not* under the Uderra standard. 581 F.3d at 102-105.

In Abu-Jamal v. Horn, 520 F.3d 272 (3d Cir. 2008), vacated other grounds 558 U.S. 1143 (2010), the Court similarly noted that Abu-Jamal had raised both a straight Batson claim as well as a claim of ineffectiveness of counsel for failure to make the necessary objections during voir dire. See 530 F.3d at 276-277, 287. After again finding that Abu-Jamal had waived the straight Batson issue by failing to make a contemporaneous objection during jury selection, and after noting that it was unclear whether the Pennsylvania Supreme Court addressed his Batson claim directly or "through the lens of ineffective assistance of counsel" – 520 F.3d at 284, 286-287 – the Third Circuit again went forward with its review of the claim *again applying the first prong Batson*

23

*analysis* and not the Uderra standard.[9]

Nowhere in any of these opinions is authority for the proposition that the Pennsylvania Supreme Court was free to alter the Batson analysis underlying the subject ineffectiveness claims, so as to require "proof of actual purposeful discrimination by a preponderance of the evidence" as stated in Uderra.[10]

### 3. Statistical Evidence

As set forth in Petitioner's opening Memorandum and Exhibit 2 hereto, statistical analysis shows that in a venire comprised of 48% people of color and 52% white people, the Commonwealth exercised 72% of its challenges against people of color and only 28% against whites. The Commonwealth cites a number of cases for the supposed proposition that similarly high strike rates have been held insufficient to support a prima facie case under step one of the Batson analysis. Investigation reveals, however, that the four such cases cited by the Commonwealth are incorrectly stated.

First of all, the Commonwealth cites Williams v. Beard, 637 F.3d 195, 219 (3d Cir. 2011) for the supposed proposition that a strike rate of 87.5% resulting in five African Americans on the jury "was inconclusive at best." See Response, p. 31. In point of fact, the Third Circuit held, when undertaking the step one analysis, "that evidence of the strike rate alone satisfies Williams' prima facie showing . . . In a venire that was less than 40% black, it is hardly a leap to conclude that a strike

---

[9]      The Second Circuit case cited by Respondents, McCrory v. Henderson, 82 F.3d 1243 (2d Cir. 1996) does not appear to have involved an ineffectiveness claim at all.

[10]     In Williams v. Beard, 637 F.3d 195 (3d Cir. 2011), the petitioner raised, but the Third Circuit did not decide, whether Uderra constitutes an unreasonable application of Batson. See 637 F.3d at 212-213.

rate of 87.5% raises an inference of discrimination." 637 F.3d at 215. The language quoted by Respondents came much later in the opinion, as the Court was considering <u>Batson</u>'s *third* step analysis, where it concluded that Williams had presented "fairly strong" strike rate evidence, only "inconclusive" acceptance rate evidence, and insufficient evidence of invidious comparison between the actual jurors accepted and rejected. <u>See</u> 637 F.3d at 219. Petitioner respectfully submits that his own strike rate statistic, particularly when taken together with the individual comparisons set forth in his opening Memorandum at pp. 63-67 (and Exhibit 2 hereto) was more than sufficient to meet the step one prima facie test, and to have put counsel on notice that objection should be made.

Secondly, Respondents also misstate the holding in <u>Lewis v. Horn</u>, which was *not* that a 67% stroke rate resulting in an all-white jury was insufficient to demonstrate a prima facie case. <u>See</u> assertion in the Response at p. 31. The holding in <u>Lewis</u> was that the 67% strike rate and the all-white jury were alleged but never proven, and that the composition of the venire was also never demonstrated, making it impossible to evaluate the significance of the strike rate. <u>See</u> 581 F.3d at 103-104 & note 7. Indeed, the Court stated in <u>Lewis</u> that "the only reliable information we have to assess this claim is evidence of the fact that Lewis is African American and that the victim, Ellis, was African American." 581 F.3d at 104. In Petitioner's case, by contrast, Petitioner has substantiated the strike rate, the exclusion rate, the make-up of both the jury and the venire, and multiple instances on which African Americans were stricken while similarly situated white persons were accepted.

Thirdly, while Abu-Jamal *was* able to establish a strike rate of 67%, resulting in an original petit jury panel including three persons of color, these facts were not held to be necessarily proof of non-discrimination. Rather, the Pennsylvania Supreme Court and the Third Circuit held that the

25

mere disparity in numbers, although relevant, was inadequate to establish a prima facie case where there was no information as to the racial composition of the venire at large or those venire members dismissed by the defendant or for cause, and where there was no discernable pattern in the prosecution's particular strikes.  Abu-Jamal v. Horn, supra, 520 F.3d at 287, 289-292.  Here, by contrast, Petitioner has provided an adequate record, including the applicable notes of testimony and the racial composition of both the persons stricken, the persons accepted and the venire as a whole.

Finally, Respondents cite Bond v. Beard, 539 F.3d 256, 269 (3d Cir. 2008)  for the proposition that  where the prosecutor had a strike rate of 78.5%, and the final jury included four black jurors and two black alternates, that "these raw statistics do not provide a clear picture of intentional racial discrimination."  Response, p. 31.  Here again, as in Williams v. Beard, the Third Circuit was engaged in a step three Batson analysis, and had previously stated that the prosecution *admitted* that there was a *prima facie* case of racially discriminatory strikes.  See 539 F.3d at 264. The language quoted by Respondents was only part of the Court's comprehensive step three analysis of not only the statistical numbers but also the allegedly race neutral reasons given during voir dire by the prosecutor, and was followed by an observation that the jury eventually empaneled had a considerably higher percentage of African American members than the venire from which it was chosen.  See 539 F.3d at 269-273.

### 4.    Comparative Evidence

Petitioner has supplemented his statistical analysis with comparison of eight African American venire members who were rejected with comparable white venire members who were accepted by the prosecution.  See Petitioner's opening Memorandum, pp. 63-68 and Exhibit 2 hereto. Respondents counter by suggesting possible race-neutral explanations for only two of them.  See

Response, pp. 31-32[11].  Batson, however, is satisfied by proof of even one black person having been

excluded from the jury for racially motivated reasons.  Commonwealth v. Lark, 2014 WL 1778025

(3d Cir., May 6, 2014), quoting Holloway v. Horn, 355 F.3d 707, 720 (3d Cir. 2004).  Petitioner

respectfully submits that his previously submitted comparisons do indeed demonstrate a strong prima

---

[11]        Furthermore, the reasons assigned for even the two instances addressed are far from
compelling.  Respondents first observe that Mabel Harris had a son around the same age as
petitioner, "was unable to tell the prosecutor, without some prodding, the location of the nearest
intersection to her current and former homes," and used the expression "I think so" when questioned
as to whether she could impose the death penalty.  According to Respondents, "Bruce Jamanow,
Danny Farrell and Trina Mason, with whom Petitioner compares Ms. Harris, had no such
infirmities."  See Response, pp. 31-32.   Review of Ms. Harris' testimony as a whole, however,
shows a liberal use of "I think so" as a figure of speech, in circumstances not necessarily indicative
of doubt.  It also reveals that when asked for intersections near to her homes, Ms. Harris tended to
first respond with a single street, and had to then be asked to supply the cross street.  This hardly
amounts to "considerable prodding."  N.T. 12/4/97, pp. 164-172 (R. 1456a-1464a).  Furthermore,
some of the infirmities certainly *were* shared by the other venire members under consideration.
Danny Farrell, for example, when asked if he could impose the death penalty: "I don't know.  I was
never really put in that situation."  N.T. 12/3/97, p. 169 (R. 1461a).  Although he had no children,
Bruce Jamanow *himself* was in Petitioner's age bracket.  N.T. 12/4/97, p. 56 (R. 1366a).

        Respondents next suggest that Janice Jones was stricken because she "repeatedly becamse
irritated during the prosecutor's voir dire, beginning her answers with "Like I said," and "As I
understood it the first time." Response, p. 32. Here again, review of the actual testimony shows that
the case for the witness's supposed irritability is overstated.  In Ms. Jones' six pages of testimony,
she used the expression "like I said" only once.  See N.T. 12/3/97, p. 72 (R. 1266a).  On the other
occasion cited, the full exchange was as follows:

        Q. And if the Commonwealth submitted sufficient amount of evidence to convince
        you that it is an appropriate case for the death penalty, could you vote for death?

        A. As I understood it the first time was that - -

        Q. It's in the context of what Mr. Siegel explained that question is.

        A. If it's appropriate, yes.

Id.  As can be seen from the above, it was the prosecutor who impatiently cut off Ms. Jones as she
attempted to explain her understanding of the question.

facie inference that choices were made among the particular venire persons based on race.  This is especially true given the perfunctory nature of the Commonwealth's examination of a number of the black candidates, as described at pp. 67-68 of Petitioner's opening Memorandum (and Exhibit 2 hereto).

In closing as to this section, a word must be said about the Respondents' suggestion at p. 32, n.11 of its response that comparisons between jurors should not be considered by the District Court unless the state courts were presented with the same arguments.  First of all, the cases cited concern third stage <u>Batson</u> analyses.  <u>See Johnson v. Gibson</u>, 169 F.3d 1239, 1248 (10th Cir. 1999); <u>Atwater v. Crosby</u>, 451 F.3d 799, 806-807 (11th Cir. 2006).  Moreover, Petitioner has consistently presented the same comparisons among jurors from his original pleadings and briefing in the PCRA court, through appellate review in the Superior Court and in his petition for allowance of appeal to the Pennsylvania Supreme Court.  <u>See</u>, <u>e.g.</u>, Brief for Appellant in Superior Court No. 2703 EDA 2008 (Exhibit 1 hereto), pp. 35-41.  It is through no fault of Petitioner's that an evidentiary hearing has been denied.

### 5.    "Culture of Discrimination" Evidence

As a small part of his argument in support of a step one *prime facie* <u>Batson</u> finding, Petitioner has referred to the well-known McMahon training tape and to a statistical study showing a historical pattern of eliminating black venire persons from capital juries in Philadelphia during the years 1981-1999.  <u>See</u> Petitioner's opening Memorandum, pp. 68-70.

In reply, Respondents imprecisely cite <u>Lewis v. Horn</u>, 581 F.3d 104 for the proposition that the "existence of the McMahon tape did not show 'culture of discrimination' at trial prosecutor's office, nor that the prosecutor conducted process of jury selection improperly in a specific case."

Response at p. 32.  What the Third Circuit actually said was that:

> Although many of the practices advocated in the McMahon tape flout the principles outlined in *Batson,* the tape was created four years after Lewis's trial and fails to provide any information about the routine practices of the particular prosecutor in Lewis's case or of the practices actually utilized at Lewis's trial.  This type of general information, <u>while not inconsequential</u>, will not do as a substitute for the concrete, case specific information that is necessary to demonstrate a prima facie *Batson* violation.

581 F.3d at 104 (emphasis supplied) Accordingly, the Court did not reject such "culture of discrimination" testimony as irrelevant, as Respondents appear to believe.  Rather, the Court, quite properly and in accord with the Supreme Court's opinion in the <u>Miller-El</u> cases[12], recognized that such evidence alone will be insufficient, but may be considered in conjunction with the kind of case-specific evidence Petitioner has adduced in these proceedings.  <u>See also</u> <u>Bond v. Beard</u>, <u>supra</u>, cited by the Respondents, in which the Third Circuit rejected the McMahon tape as a consideration only after taking considerable testimony to establish that the particular prosecutor involved had not been exposed to the tape and did not subscribe to its contents.  <u>See</u> 539 F.3d at 273.  <u>McClesky v. Kemp</u>, 481 U.S. 279 (1987), also cited by Respondents, did not have to do with a <u>Batson</u> challenge at all, but rather the use of statistical study to support the claim that the Georgia capital sentencing process was administered in a racially discriminatory manner.

---

[12]     As previously noted in Petitioner's opening Memorandum, the Supreme Court in <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 334-335 (2003) and <u>Miller-El v. Dretke</u>, 545 U.S. 231, 263-266 (2005) itself considered, together with other evidence, the existence of a written manual advocating the exclusion of minorities from juries which was in circulation some ten years prior to Miller-El's own trial.

**G.    Petitioner's Ground Seven**

**Petitioner was deprived of due process of law by virtue of the admission of prejudicial and irrelevant evidence concerning his unrelated purchase and alleged later possession of a certain firearm.**

Petitioner's argument on this ground has been adequately set forth in his opening Memorandum at pp. 72-75.  While his due process challenge to the admission of the gun was not raised as a federal question on direct appeal, the argument set forth under this heading forms a part of the basis for the ineffectiveness claim in Ground Eight.

**H.    Petitioner's Ground Eight:**

**Both trial and direct appeal counsel were ineffective for failing to make and/or  properly support arguments against admission of testimony purporting to connect Petitioner to a certain nine millimeter weapon.**

Petitioner's argument on this ground has been adequately set forth in his opening Memorandum at pp. 75-77.  Respondents rely upon the Superior Court's holding that, as a matter of state law, the gun was admissible.   This misapprehends Petitioner's argument, which is that had counsel properly preserved and raised the issue as, *inter alia,* a due process claim, the result of the appeal would have been different.

**I.    Petitioner's Ground Nine:**

**The cumulative prejudice from the foregoing constitutional violations was sufficient to require that Petitioner be granted relief.**

Respondent apparently agree with Petitioner that where multiple constitutional violations take place, the Court, in considering whether the Petitioner has been sufficiently prejudiced to warrant relief, must consider the cumulative effect of the violations.  See Petitioner's opening Memorandum at pp. 77-78; Response at p. 36.  For the reasons previously asserted, Petitioner

respectfully submits that multiple due process violations have occurred in this matter, including multiple occasions of ineffectiveness by counsel – and that the Superior Court's holding that "there were no errors warranting relief" is based upon unreasonable determinations in light of the evidence of record and unreasonable applications of controlling Supreme Court precedents.

## V.      CONCLUSION

For all of the foregoing reasons therefore, in addition to those reasons previously set forth in Petitioner's opening Memorandum of Law in Support of Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus, Petitioner respectfully requests that the Honorable Court issue a writ of habeas corpus.

Respectfully submitted,


/s/ Carole L. McHugh_____
CAROLE L. McHUGH
BARNABY C. WITTELS
Attorneys for Petitioner,
Malik Bowers