**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MALIK BOWERS | : | CIVIL ACTION |
|     Petitioner | : | |
| v. | : | NO. 2:13-cv-05550-BMS |
| | : | |
| MICHAEL WENEROWICZ, et al. | : | (Habeas § 2254) |

**PETITIONER'S POST-HEARING BRIEF**

**I.    PROCEDURAL INTRODUCTION**

On January 4, 2016, the Court issued an order (Doc. 30) scheduling oral argument and a evidentiary hearing, as follows:

> 1.  Both parties should be prepared to argue their respective positions on the merits as to all issues raised in the petition and supporting memorandum of law (Doc. Nos. 1 and 4), response (Doc. No. 25) and reply (Doc. No. 26);
>
> 2.  The Commonwealth shall be prepared to present testimony regarding the second prong of the analysis set forth in *Batson v. Kentucky*, 476 U.S. 79 (1986) as to the prosecutor's non-discriminatory basis for striking prospective black jurors; and,
>
> 3.  Petitioner shall be prepared to present the testimony of attorneys Louis Savino, Jr., Edward C. Meehan, Jr., and Barbara McDermott regarding the ineffective assistance of counsel claims.

After successive requests for clarification by the Commonwealth, and oral argument held on April

8, 201 – at which Petitioner argued for leave to present testimony on all issues in the Petition – the

Court narrowed the scope of the hearing as follows:

> 1.  At the evidentiary hearing scheduled for Thursday, April 14, 2016, testimony will be limited to the issues of (a) ineffective assistance of trial counsel for failure to raise a *Batson* challenge and (b) ineffective assistance of appellate counsel for failing to raise and properly litigate a federal due process challenge to the jury instructions.
>
> 2.  Oral argument on all issues in the habeas petition is postponed until after the

evidentiary hearing and subsequent post-hearing briefing by the parties . . . .

Order of April 8, 2016 (Doc. No. 48).

Subsequently, on April 14, 2016, the Court heard the testimony of William Fisher, Esquire, the prosecutor at Petitioner's trial. On May 4, 2016, the Court heard the testimony of Petitioner's trial counsel, Louis Savino, Esquire. In accordance with the Court's preference, the parties submitted the Declaration of the Honorable Barbara A. McDermott, who was Petitioner's counsel on direct appeal, in lieu of in-person testimony. See N.T. 5/4/16, p. 4.

Without waiving his position that testimony should have been allowed with respect to all the ineffectiveness claims contained in the Petition, Petitioner submits this post-hearing memorandum limited to the testimony taken on the issues designated by the Court, and relies upon his previous briefing in all other respects.

**II.   ARGUMENT**

    **A.   Ineffective Assistance of Trial Counsel for Failure to Raise and Preserve a Challenge to Racially Discriminatory Jury Selection Under <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986) – Stage 2 Analysis**

At pp. 56-71 of his Memorandum of Law, and pp. 21-29 of his Reply Memorandum, Petitioner has set forth the applicable law governing his claim that trial counsel rendered ineffective assistance by failing to raise a contemporaneous <u>Batson</u> challenge to the prosecution's jury strike pattern. Petitioner will not here repeat that entire analysis, but will confine this discussion to the significance of the testimony recently taken from his trial counsel, Louis Savino, Esquire, and his prosecutor, William Fisher, Esquire.

Mr. Savino, first of all, testified that he did not have an independent recollection of the jury selection process in this trial, and although his memory of the trial itself was somewhat refreshed by

the materials provided to him by counsel for his review, he could not recall the demeanor of the venire members examined – given the lapse of time and the many intervening cases tried and juries picked since Petitioner's trial took place.

As a matter of general practice, however, he testified, he would have raised a <u>Batson</u> challenge if he could not discern a race-neutral reason for the prosecutor's strike, or if there was anything about the strike pattern in the case that he believed to be improper. N.T. 5/4/16, pp. 11-12. In other words, although he could not remember the particulars of this specific jury selection, Mr. Savino did not suggest any strategic reason for overlooking a <u>Batson</u> violation if one existed.

The question for this Court thus becomes whether Mr. Savino's failure to identify a <u>Batson</u> violation during voir dire was or was not the result of unreasonable professional judgment – that is, outside the range of professionally competent assistance – and whether the Pennsylvania courts' failure to so hold constituted an unreasonable application of <u>Strickland v. Washington</u>, 466 U.S. 668, 694 (1984) and <u>Johnson v. California</u>, 545 U.S. 162 (2005) under 28 U.S.C. § 2254(d)(1) or was founded upon an unreasonable determination of facts under § 2254(d)(2).

In the recent case of <u>Foster v. Chatman</u>, 136 S.Ct. 1737 (2016), the Supreme Court reviewed the decision of the Georgia courts denying relief on a petition for state habeas relief on <u>Batson</u> grounds, and ultimately reversed that decision. In the course of its opinion, the Court reaffirmed the three-step process for determining whether a strike is discriminatory:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question, and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

<u>Foster</u>, 136 S.Ct. at 1747, <u>quoting</u> <u>Snyder v. Louisiana</u>, 552 U.S. 472, 476-477 (2008).

In the instant case, Petitioner submits that he has previously set forth, in the cited portions of his opening Memorandum of Law and his Reply Memorandum, the requisite *prima facie* case. Accordingly, the testimony offered at the April 14, 2016 hearing was relevant to stage 2 of the Batson analysis, that is, a proffer of allegedly race-neutral reasons for each of the peremptory strikes cited by Petitioner. What remains, therefore, is for this Court to make its credibility determination as to the persuasiveness of the assigned race-neutral reasons, and to then decide whether Petitioner had an arguably meritorious Batson issue that was ineffectively waived by counsel. See Batson, supra, 476 U.S. at 96-98.

In making this determination, moreover, it is important to keep in mind (1) that the "Constitution forbids striking even a single prospective juror for a discriminatory purpose" – Foster, supra, 136 S.Ct. At 1747, quoting Snyder, supra, 552 U.S. at 478 – and (2) that the "prosecution's proffer of [a] pretextual explanation naturally gives rise to an inference of discriminatory intent." Snyder, supra, 522 U.S. at 485, citing Miller-El v. Dretke, 545 U.S. at 252 and Purkett v. Elem, 514 U.S. 765, 768 (1995).

In Snyder, for example, the Supreme Court found purposeful discrimination because of the pretextual reasons given for the prosecution's strike of a single venire person, a student who had been initially concerned that his jury service would interfere with completion of his student-teaching requirement. The reason for the strike offered by the prosecutor was the student's nervous demeanor, and a concern that the student might vote for guilt of a lesser charge than first degree murder in order to shorten the trial and avoid an additional penalty phase proceeding. The Supreme Court held that this reason was pretextual, given that the trial was frankly anticipated to be short, and in fact lasted less than a week, and given that white persons with even more pressing business, work

and personal conflicts were not similarly stricken. 552 U.S. at 480-484. In the instant case, likewise, Petitioner asserts that the reasons given for striking a number of black venire members were in fact pretextual and that similarly situated white persons were not similarly stricken.

Mr. Fisher testified that he does not have an independent recollection of the jury selection process at Petitioner's trial, except for two venire persons he "vaguely" remembered: Valerie Lipford ("the juror that was seated next to the family") and Edwin Robertson (who had three MA degrees). Otherwise, his reasons for having chosen or stricken particular venire members were constructed from his pre-hearing review of the notes of testimony, jury questionnaires and his handwritten notes from the time of trial. N.T. 4/14/16, pp. 16, 25, 92-93.

He testified, nevertheless, that one of his main concerns during this jury selection was to avoid people from the area in which the killing occurred or the defendants resided – which was essentially the middle of North Philadelphia on the West side of Broad Street. N.T. 4/14/16, pp. 19-20, 47-49. He repeatedly claimed to disfavor persons with children in the same general age bracket as the defendants (who were 23). He stated a preference for persons with at least a high school diploma or some additional college, for married persons with a "vested interest" in society, and for persons with a military background. N.T. 4/14/16, pp. 18-19, 93-94.

In alleged accordance with these principles, he rejected:

- Valerie Lipford, a black woman from Northwest Philadelphia (N.T. 4/14/16, pp. 65-70 – see also N.T. 12/2/97, pp. 140-149 and associated jury questionnaire and prosecutor's notes[1]);

---

[1] As the jury questionnaires and prosecutor's notes are not specifically numbered, Petitioner will supply the citation to each venire person's testimony during voir dire, but will not specifically repeat the qualification "with associated jury questionnaire and prosecutor's notes" in each case.

- Paula Smith, a black woman from North Philadelphia (N.T. 4/14/16, pp. 60-63 – see also N.T. 12/2/97, pp. 174-187);

- Janis Jones, a black woman from the Fairhill section of North Philadelphia (N.T. 4/14/16, pp. 78-81 – see also N.T. 12/3/97, pp. 66-73);

- Mabel Harris, a black woman from Nicetown (N.T. 4/14/16, pp. 44-47 – see also N.T. 12/4/97, pp. 164-172); and

- Magnolia Hicks, a black woman from Nicetown (N.T. 4/14/16, pp. 70-74 – see also N.T. 12/4/97, pp. 111-120).

This rationale is clearly pretextual, however, as Mr. Fisher selected several women who resided in or had ties to the the supposedly interdicted area:

- Blondie Greene, a black woman from North Philadelphia (N.T. 4/14/16, pp. 20, 53, 94 – see also N.T. 12/4/97, pp. 188-199);[2]

- Azalee Wilson, a black woman from 33rd and Allegheny (N.T. 4/14/16, pp. 64-65 – see also N.T. 12/4/97, pp. 120-132);

- Malika Wright, a black woman from Center City who was attending Temple University, which is located in North Philadelphia (N.T. 4/14/16, pp. 101-102 – see also 12/4/97, pp. 40-48).

Likewise, although seven white jurors were selected from neighborhoods outside the suspect

---

[2] Ms. Greene was selected as a juror. Ms. Wilson and Ms. Wright were accepted by Mr. Fisher but stricken by defense counsel. It should be noted that Mr. Fisher, in his testimony, indicated incorrectly that Ms. Wright was stricken without the defense having asked any questions. This is not the case. Ms. Wright was questioned by Mr. Siegel prior to being stricken by Mr. Savino. N.T. 12/4/97, pp. 46-48.

neighborhoods,[3] the following black persons were peremptorily stricken notwithstanding that they too lived in other areas of the city:

- Juanita Martin, a black woman from East Germantown (N.T. 4/14/16, pp. 53-58 – see also N.T. 12/2/97, pp. 60-67);

- James Haines, a black man who at the time of his jury service had left North Philadelphia to establish a residence in South Philadelphia some 8-9 years previously (N.T. 4/14/16, pp. 27-36 – see also N.T. 12/4/97, pp. 25-38);

- Paul Melchor, a black man who lived in West Philadelphia. (N.T. 4/14/16, pp. 40-42 – see also N.T. 12/4/97, pp. 94-103).

What is clear from the above is that location of residence was *not* an actual race-neutral factor

---

[3] These were:

- Patricia Anick, a white woman from the northeast (N.T. 4/14/16, pp. 51-52 – see also N.T. 12/2/97, pp. 51-57);

- Joanne Hehn, a white woman from the Northeast/Torresdale (N.T. 4/14/16, pp. 58-60 – see also N.T. 12/2/97, pp. 103-115);

- Michele Papa, a white woman from South Philadelphia (N.T. 4/14/16, pp. 76-77 – see also N.T. 12/3/97, pp. 130-138);

- Danny Farrell, a white man from the Northeast (N.T. 4/14/16, p. 39 – see also N.T. 12/3/97, pp. 164-163);

- Edwin Robertson, a white man from University City (N.T. 4/14/16 – see also N.T. 12/4/97, pp. 83-92);

- Bruce Jamanow, a white man from the Northeast (N.T. 4/14/16, pp. 25-26 – see also N.T. 12/4/97, pp. 164-173);

- Tina Mason, a white woman from Holmesburg (N.T. 4/14/16, pp. 43-44 – see also N.T. 12/5/97, pp. 84-94).

governing Mr. Fisher's selections, but rather a pretext for removing many of the venire's persons of color. Furthermore, when the relevant comparisons are actually made, it is clear that no other racially neutral criteria have actually been demonstrated.

Blondie Greene, for example, was repeatedly referred to by Mr. Fisher as evidence of extraordinary circumstances justifying a departure from his policy against taking juries from the neighborhoods near the crime. The factors cited were: her two years of college and continuing education, her steady job, her supposed employment as a truck driver, her children, and the fact that she "stood up tall" and was a woman "with rules." See N.T. 4/14/16, pp. 20, 63, 94. A perusal of Ms. Greene's voir dire testimony and Mr. Fisher's notes, however, indicates nothing about continuing education or driving a truck. Nothing about her testimony demonstrated her "rules" or physical bearing. In fact, she, like a number of black men and women from in and out of the neighborhood who were *rejected* by Mr. Fisher, had children within a decade or so of the defendants' ages. See Valerie Lipford, N.T. 4/14/16, p. 68; Janis Jones, id., p. 78; Mabel Harris, id., pp. 46-47; Juanita Martin, id., p. 57; James Haines, id., pp. 28-29, 33; Paul Melchor, id., pp. 40, 42. Yet in Ms. Greene's case, for some reason, the presence of such a child was counted as an asset rather than a reason to strike – again revealing the opportunisticl nature of the alleged criterion. Compare, also, the selection of Bruce Jamanow and Danny Farrell – two white men who, although childless, were *themselves* within the age range of the defendants.

Disparate treatment of white and black venire members is also apparent from the weight given to initial hesitation about the death penalty. It did not bother Mr. Fisher that Bruce Jamanow, a white man he accepted, responded to a death penalty question with the qualification "If it was warranted, yeah," – or that Danny Farrell, also white, began his response with "I don't know. I was

never really put in that situation" and further stated that he would give the two penalties "equal weight to both, I guess." N.T. 4/14/16, pp. 26-27, 39; 12/4/97, p. 60; 12/3/97, p. 169. It likewise did not concern Mr. Fisher that Patricia Anick, also white, replied that she was "not really sure unless I was faced with that" – N.T. 4/14/16, pp. 51-52; 12/2/97, p. 55 – or that Joanne Hehn, also white, indicated that she would have to hear the facts first. N.T. 4/14/16, p. 59; 12/2/97, pp. 111-112.

With respect to the black men and women, however, Mr. Fisher was less forgiving, striking (a) James Haines who made an initial statement that he could impose death "if it was appropriate" – N.T. 4/14/97, pp. 29-35; 12/4/97, pp. 29-30, 37-38; (b) Paul Melchor despite his emphatic appropriate responses once the trial court had clarified his initial confusion with Mr. Fisher's questions – N.T. 4/14/97, pp. 40-42, 12/4/97, pp. 100-101; (c) Mabel Harris for her use of the figure of speech "I think so" – N.T. 4/14/16, p. 47; 12/4/97, pp. 169-171; and (d) Juanita Martin for her statement that she would have to be "really, really sure" of a defendant's guilt before imposing the death penalty – N.T. 4/14/97, p. 47; 12/2/97, pp. 63-65.[4] Here again, therefore, the conclusion is inescapable that initial hesitation on the death penalty questions was a criterion that was disparately applied depending upon the race of the venire member.

When the aforedescribed pretextual explanations are removed, it becomes clear that the prosecution's strikes were exercised in a racially disparate manner. James Haines, a security guard with stable employment from South Philadelphia was removed for what Mr. Fisher recorded at the time as a smile, but now purports to remember after all these years later as a "smirk." N.T.

---

[4] Interestingly, Mr. Fisher's notes from the trial indicate, with respect to Ms. Martin, only "B/F 65 strike."

11/14/16, pp. 35-36. Paula Smith was removed for getting "a little testy" after Mr. Fisher repeatedly misstated the number of her children as disclosed on the questionnaire. See N.T. 12/2/97, p. 177. See also the following statement by Mr. Fisher at N.T. 11/14/16, p. 63: "I wrote this down in my notes that – not these notes you have but later." Aside from the obvious problem of this observation being dependent upon alleged notes that were not turned over to Petitioner's counsel in this proceeding, it is also curious given Mr. Fisher's claim, elsewhere in his testimony, to have recollections – and vague ones at that – of the demeanor of only two of the witness, Valerie Lipford and Edwin Robertson. N.T. 4/14/16, p. 93.

     Paul Melchor was removed despite being one year shy of high school graduation, with more than 13 years stable employment as a truck driver, residence in West not North Philadelphia, a brother who was a prison guard, and a sister who had once been raped. N.T. 11/14/16, pp. 40-42; 12/4/97, pp. 95-98. Contrast the acceptance of Danny Farrell, a white male warehouse worker with a 12th grade education, with previous experience on criminal jury, and with friends among the Philadelphia police and a girlfriend whose mother had been held up at gunpoint. N.T. 11/14/16, p. 39; N.T. 12/3/97, pp. 165-168.

     Despite her 13+ years of education and her residence in Germantown rather than North Philadelphia, Juanita Martin was removed for the pretextual reasons previously noted and the lack of any stated law enforcement or military connection. N.T. 4/14/16, p. 57. Contrast Danny Farrell, Michele Papa, Azalee Wilson, Marie Willis and Angela Temple[5] – none of whom had law enforcement connections.

---

[5] Marie Willis and Angela Temple were, like Ms. Wilson, selected by Mr. Fisher but stricken by the defense. See N.T. 12/3/97, pp. 18-29 and 12/4/97, pp. 154-160.

Magnolia Hicks, although educated only through the 7th grade, had stable employment as a nurse's aide and bore no grudge against the prosecution for its treatment of her cousin who was arrested and tried for murder. According to Mr. Fisher, the main reasons for striking Ms. Hicks were that she was a little slow due to her age, had made two mistakes on her juror questionnaire[6], and may have "absorbed" some things from her cousin's murder trial which she attended. N.T. 4/14/16, pp. 72-73. No rationale is offered, however, as to why the exposure to Ms. Hicks' cousin's criminal trial would be any more disabling than the prior jury service of many of the persons chosen by the Commonwealth and where, indeed, such service was considered positive evidence that the person had been picked before. See, e.g., Bruce Jamanow (sat on three prior juries, including a murder – N.T. 4/14/16, p. 26; 12/4/97, pp. 54-55); Danny Farrell (juror on a robbery – N.T. 4/14/16, p. 39; 12/3/97, pp. 165-166); Tina Mason (juror on prior murder trial in which Mr. Savino was defense counsel – N.T. 4/14/16, p. 44; 12/5/97, pp. 85-86, 91-93); Patricia Anick (service on a hung jury in rape case – N.T. 4/14/16, pp. 51, 53; 12/2/97, pp. 52-53); Joanne Hehn (service on a hung jury, burglary and assault – N.T. 12/2/97, pp. 104-105); Azalee Wilson (juror on rape case – N.T. 12/4/97, p. 123); Michele Papa (juror on murder case – N.T. 4/14/16, p. 77; 12/3/97, pp. 131-132).

In summary, from all of the above, it is very clear that the main selection criteria provided by the Commonwealth as racially neutral are anything but. In the second stage Batson analysis, however, it is the Commonwealth's burden to supply such race-neutral reasons once a prima facie showing has been made. Furthermore, as previously stated, the suggestion of allegedly race-neutral grounds which are shown to be pretextual is itself evidence of discriminatory purpose. Snyder,

---

[6]   Inspection of Blondie Greene's questionnaire reveals a corrected mistake as well, but as previously stated, Ms. Greene was accepted.

supra, 522 U.S. at 485.

Thus, had trial counsel made the appropriate timely objection on Batson grounds, it is probable that the Commonwealth then, as now, would have been unable to produce consistently race neutral reasons for its disparate use of strikes with respect to Afro-American venire members. Likewise, there is a reasonable probability that the result of the proceeding would have been different – that is, either that the challenges to the striking of individual black jurors would have been sustained, or alternatively, that the Batson issue would have been litigated and won on appeal to the Superior Court.

      **B.    Ineffective Assistance of Trial Counsel for Failure to Raise and Preserve a Challenge to Racially Discriminatory Jury Selection Under Batson v. Kentucky, 476 U.S. 79 (1986) – Stage 1 Analysis.**

It is Petitioner's contention, as previously stated, that his prior submissions in his opening Memorandum of Law and Reply Memorandum have been sufficient to satisfy a Stage 1 Batson analysis, and that Mr. Fisher's testimony is primarily relevant to whether a Stage 2 analysis would have had arguable merit, had the Batson issue been raised by trial counsel. The Court, however, indicated during one of the hearings that it had not yet decided the issue of whether Stage 1 had been satisfied. Petitioner would respectfully point out that even in considering Stage 1 of Batson, it is relevant to consider side by side analyses of the venire members, as well as the apparent validity or invalidity of the various reasons advanced for the strikes that were exercised against Afro-American venire members. See discussion at pp. 60-68 in Petitioner's opening Memorandum of Law, citing Batson, 476 U.S. at 97 and Miller-El v. Dretke, 545 U.S. 231 241-252 & nn. 8-11 (2005) – both indicating that a Stage 1 statistical analysis may be strengthened by specific patterns observable during voir dire, including questions asked, statements made, and side by side comparisons of

persons stricken and accepted. For this reason, the argument set forth in Part II(A) above is equally applicable to a Stage 1 analysis. The evidence of record contains evidence of racial bias. The Commonwealth has not advanced any valid race-neutral reasons for its disproportionate use of peremptory strikes against potential jurors, and nor can they. Counsel was therefore ineffective for failing to raise a Batson issue at the time of trial, to the prejudice of the Petitioner.

### C. Ineffective Assistance of Direct Appeal Counsel For Failing to Raise and Properly Litigate a Federal Due Process Challenge to the Jury Instructions.

Petitioner has previously argued that the jury instructions given in this case, taken as a whole, and particularly in light of argument made by the prosecutor, created a reasonable likelihood that the jury applied the instructions in such a way that relieved the Commonwealth of its burden of proving the specific intent necessary for Petitioner's conviction of first degree murder – thus violating the Supreme Court's teaching in Waddington v. Sarausad, 555 U.S. 179, 190-191 (2009) and other cases. See Memorandum of Law in Support of Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus (hereinafter "Petitioner's Memorandum of Law"), pp. 23-32; Memorandum in Reply to the Response to Petition for Writ of Habeas Corpus (hereinafter, "Petitioner's Reply Memorandum"), pp. 3-7. However, direct appeal counsel (now the Honorable Barbara A. McDermott of the Court of Common Pleas), argued this issue on appeal as a matter of Pennsylvania law only, completely ignoring its federal constitutional dimension. She likewise failed to address the fact that aspects (but not all of) the very same jury charge had been already upheld by the Pennsylvania Supreme Court on state law grounds in Petitioner's co-defendant's appeal – but opted instead to include that decision in a string citation, without any comment distinguishing it from Petitioner's case. See Petitioner's Memorandum of Law, pp. 36-38; Petitioner's Reply Memorandum, pp. 36-38. See also March 15,

2004 Brief for Appellant (Exhibit A to Defendant's Petition for Post Conviction Collateral Relief in the Court of Common Pleas, hereinafter, "PCRA Petition").

Petitioner has previously argued that this handling of the jury charge issue on appeal was neglectful and highly prejudicial to Petitioner's chances on appeal and subsequent habeas review. In his Memorandum of Law, pp. 23-33, 36-38, and in his Reply Memorandum, pp. 4-10, Petitioner has carefully set forth his legal argument in this regard, and as requested by the Court, will not repeat those arguments here, but will confine the discussion to the significance of Judge McDermott's Declaration as it relates to whether her handling of this issue on appeal was justifiable by some rational strategic purpose for the benefit of Petitioner.

In her Declaration dated May 3, 2016 and received in evidence by this Court at the May 4, 2016 hearing, Judge McDermott indicates that she does not have any independent recollection of representing Petitioner. Declaration of the Honorable Barbara A. McDermott, ¶ 3. After reviewing her briefing in the appeal, however, Judge McDermott nevertheless felt able to state the following:

> 4. I did not expect to succeed on this jury instruction claim because the Pennsylvania Supreme Court had already affirmed these instructions in co-defendant Rasheed Simpson's direct appeal. Because I had an ethical obligation to bring that case to the Superior Court's attention, I included it in a string citation. I chose not to directly address Simpson's case because I did not want to highlight the adverse ruling. Instead, I tried to distinguish the facts of the two cases in my argument.
>
> 5. I only argued the claim under state law. I typically did not raise federal due process claims because they were almost never raised or addressed by the Pennsylvania Superior and Supreme Court opinions. I also knew that Third Circuit precedent was not binding on the Pennsylvania courts in their rulings and opinions. As a matter of strategy, I believed that I had a greater likelihood of success in the Pennsylvania courts by arguing the claim under Pennsylvania case law.

Id., ¶¶ 4-5. As can be readily seen, the foregoing statements by Judge McDermott are internally inconsistent in an important respect. Furthermore, they are belied by the actual contents of the Brief

for Appellant and Petition for Allowance of Appeal actually filed by her.  Petitioner would, therefore, respectfully suggest that the rationale gleaned by Judge McDermott from her recent perusal of the appeal documents is unfortunately (and understandably, due to the passage of time), mistaken.

First of all, as to the Declaration itself, Judge McDermott indicates in ¶4 that she did not, at the time of writing Petitioner's Brief, expect to win the jury instruction issue.  At ¶ 5, by contrast, she ascribes to herself a belief that she had a greater likelihood of success by arguing the claim under Pennsylvania law exclusively.  The juxtaposition of these two statements is illogical.  Furthermore, if the issue were truly believed to have been a lost cause, one must question its inclusion as the number three issue in a five issue brief.

Secondly, as is apparent from the content of the Brief for Appellant itself, Judge McDermott did not, as a matter of fact, address any differences between the case against Petitioner and the case against his co-defendant Simpson, in the context of the jury charge issue.  The argument concentrated instead on distinguishing Petitioner's case from the Pennsylvania Supreme Court's decision in Commonwealth v. Wayne, 720 A.2d 456 (Pa. 1998) and emphasizing its similarities to the contrary decision in Commonwealth v. Huffman, 638 A.2d 961 (Pa. 1994).  References to the facts of Petitioner's case, moreover, were in general terms equally applicable to any of the alleged participants in the murder.  See Brief for Appellant, Exhibit A to the PCRA Petition, pp. 15-18.  Nor was there any attempt to distinguish the arguments that were made in Mr. Simpson's case from the arguments that *could* have been made on a more expansive consideration of the jury charge as a whole, as has been set forth in Petitioner's instant briefing, as well as the differences in the evidence against Petitioner as opposed to Simpson.  See Memorandum of Law, pp. 24-27; Reply

15

Memorandum, pp. 4-6.

Thirdly, Judge McDermott has understandably rationalized her string-citation to Commonwealth v. Simpson, 54 A.2d 1264 (Pa. 2000) as a balance between the adverse nature of the holding in Petitioner's co-defendant's trial and her ethical obligation to call the Superior Court's attention to that holding. This rationale, however, is belied by the documentary evidence itself. First of all, the Simpson case is not identified as belonging to Petitioner's co-defendant, as ethics would require. See Brief for Appellant, Exhibit A to the PCRA Petition, p. 16. Additionally, as previously mentioned, the differences in the evidence as between the two defendants were not pointed out in this section of the argument. Therefore, Judge McDermott's current reasoning fails to explain the fact that in the Petition for Allowance of Appeal to the Pennsylvania Supreme Court, the argument made is exactly the same as the argument previously made in the Superior Court, with only the offending string-citation omitted. Compare Brief for Appellant (Exhibit A to the PCRA Petition), p. 16 with Petition for Allowance of Appeal (Exhibit C to the PCRA Petition), p. 13. If there was an ethical obligation to include citation to Simpson, that ethical obligation was clearly applicable before both courts. With all due respect, therefore, to Judge McDermott's attempt to reconstruct her reasoning from a case argued long ago, the documentary evidence is far more consistent with the scenario that the Simpson decision was originally cited in ignorance of its connection to Petitioner, and was removed from the *allocatur* petition only after the Superior Court called attention to that connection in its opinion.

Finally and most importantly, Judge McDermott's current rationale for why she would not have argued this issue as a matter of federal constitutional due process is totally illogical, and in any event, constitutes clear ineffectiveness. As her Declaration admits, the Simpson decision was

16

founded upon an analysis of the charge to the jury in Petitioner's and Simpson's *joint* trial. The Simpson decision was, moreover, a decision by the highest Pennsylvania authority and would not likely be reversed, therefore, on Pennsylvania state grounds, particularly where no effort was made to distinguish the argument being made in Petitioner's case from Simpson's. On the other hand, there *was* a body of federal law – including United States Supreme Court decisions such as Waddington, supra; Estelle v. McGuire, 502 U.S. 62, 72 (1991); Francis v. Franklin, 471 U.S. 307, 315 (1985) – setting forth standards on the subject as required by the Due Process Clause, which would have supported a fresh look at the matter, and indeed, a different outcome from Simpson. See Petitioner's Memorandum of Law, pp. 24-38. Nor is it any answer, as suggested in Judge McDermott's Declaration, that the Pennsylvania courts seldom considered governing federal law, or that it was fruitless to cite such law because the Third Circuit's decisions are not binding in Pennsylvania. While this may be true of Third Circuit decisions, the United States Supreme Court's constitution pronouncements *are* most certainly binding, however. As previously argued, therefore, by the "strategy" of failing to raise Petitioner's due process claim, counsel essentially threw away the single best route to obtaining relief from the trial court's defective charge to the jury. The belief that Pennsylvania courts would not consider themselves bound to review a federal due process claim was clearly unreasonable, and had counsel not relied upon such an unreasonable belief, there is a reasonable probability that the results of the appeal proceedings would have been different – not to mention the preservation of the issue for habeas purposes.

For all of the foregoing reasons, therefore, Judge McDermott's Declaration merely confirms Petitioner's argument as previously made, that Petitioner was not afforded effective assistance of counsel in his direct appeal on this issue – and that the Pennsylvania courts' failure to so hold

17

constituted an unreasonable application of <u>Strickland v. Washington</u>, 466 U.S. 668, 694 (1984) and <u>Evitts v. Lucey</u>, 469 U.S. 387 (1985) under 28 U.S.C. § 2254(d)(1), and/or was founded upon an unreasonable determination of facts under § 2254(d)(2).

### III. CONCLUSION

For all of the foregoing reasons, therefore, Petitioner respectfully requests that the Honorable Court recommend that a writ of habeas corpus be issued.

Respectfully submitted,

/s/ Carole L. McHugh
CAROLE L. McHUGH
BARNABY C. WITTELS
Attorneys for Petitioner,
Malik Bowers